FILED

#99
Fee Pd
SI

2007 AUG 30  P 1:37

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

1  David M. Arbogast (SBN 167571)
   David@SpiroMoss.com
2  Ira Spiro (SBN 67641)
   Ira@SpiroMoss.com
3  **SPIRO MOSS BARNESS LLP**
   11377 W. Olympic Boulevard, Fifth Floor
4  Los Angeles, CA 90064-1683
   Phone: (310) 235-2468; Fax: (310) 235-2456
5

6  Paul R. Kiesel, Esq. (SBN 119854)            Jeffrey K. Berns, Esq. (SBN 131351)
   kiesel@kbla.com                             jberns@jeffbernslaw.com
7  Patrick DeBlase, Esq. (SBN 167138)          **LAW OFFICES OF JEFFREY K. BERNS**
   deblase@kbla.com                            19510 Ventura Boulevard, Suite 200
8  Michael C. Eyerly, Esq. (SBN 178693)        Tarzana, California 91356
   eyerly@kbla.com                             Phone: (818) 961-2000; Fax:  (818) 867-4820
9  **KIESEL BOUCHER LARSON LLP**
   8648 Wilshire Boulevard
10 Beverly Hills, California 90211
   Phone:  (310) 854-4444; Fax: (310) 854-0812
11
   Attorneys for Plaintiff and all others Similarly Situated
12

E-FILING

ADR

13                **UNITED STATES DISTRICT COURT**

14       **NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

15 DOLORES MANDRIGUES, individually and    )  CASE NO.  C07  04497  RS
   on behalf of all others similarly situated,  )
16                                              )
                                                )
17              Plaintiff,                       )  **CLASS ACTION COMPLAINT FOR:**
                                                )
18      v.                                       )  **(1)  Violations of the Truth in Lending Act, 15
                                                )       U.S.C.A. §1601, _et seq_;**
19                                              )
   WORLD SAVINGS, INC., WORLD SAVINGS )  **(2)  Violation of Bus. & Prof. Code §17200, _et
20 BANK, FSB, WACHOVIA MORTGAGE         )       seq._ - "Unlawful" Business Practices
   CORPORATION, and DOES 1 through 10   )       (TILA);**
21 inclusive,                                   )
                                                )  **(3)  Violation of Bus. & Prof. Code §17200, _et
22              Defendants.                      )       seq._ – "Unfair" and "Fraudulent" Business
                                                )       Practices;**
23                                              )
                                                )  **(4)  Breach of Contract;**
24                                              )
                                                )  **(5)  Breach of the Covenant of Good Faith and
25                                              )       Fair Dealing; and**
                                                )
26 _____ )  **(6)  Violation of Bus. & Prof. Code  §17200, _et
                                                )       seq._ – "Unlawful" Business Practices (Fin.
27                                              )       Code § 22302).**
28                                                  **JURY TRIAL DEMANDED**

_____

CLASS ACTION COMPLAINT

Plaintiff, DOLORES MANDRIGUES, individually and on behalf of all others similarly situated alleges as follows:

## I.

## INTRODUCTION

1.    This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C.A. §1601, *et seq.,* California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.,* and other statutory and common law in effect. Plaintiff DOLORES MANDRIGUES, individually, and on behalf of all others similarly situated, brings this action against WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1-10 (collectively "Defendants"), based, in part, on Defendants' failure to clearly and conspicuously disclose to Plaintiff and the Class Members, in Defendants Option Adjustable Rate Mortgage ("ARM") loan documents, and in the required disclosure statements, accompanying the loans, (i) the actual interest rate on the note(s) (12 C.F.R. § 226.17); (ii) that payments on the notes at the teaser rate will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the initial interest rate provided was discounted and does not reflect the actual interest that Plaintiff and Class members would be paying on the Note(s).

## II.

## THE PARTIES

2.    Plaintiff, DOLORES MANDRIGUES ("Plaintiff") is, and at all times relevant to this Complaint, was an individual residing in Milpitas, California. On or about August 4, 2006, Plaintiff refinanced her existing home loan and entered into an Option ARM loan agreement with Defendants. The Option ARM loan was secured by Plaintiff's primary residence. Attached hereto as Exhibit 1 is a true and correct copy of the Note and Truth and Lending Disclosure Form pertinent to this action.

3.    Defendant WORLD SAVINGS, INC. is a California corporation licensed to do, and is doing business in California. At all relevant times hereto, WORLD SAVINGS, INC., was and is engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are

-2-

1  the subject of this Complaint. WORLD SAVINGS, INC. transacts business in Santa Clara County,
2  California and at all relevant times promoted, marketed, distributed, and sold Option Arm loans
3  throughout the United States, including Santa Clara County, California. WORLD SAVINGS, INC. has
4  significant contacts with Santa Clara County, California, and the activities complained of herein
5  occurred, in whole or in part, in Santa Clara County, California.

6      4.    Defendant, WORLD SAVINGS BANK, FSB, was and is a business organization form
7  unknown. Plaintiff is informed and believes and thereupon alleges that Defendant WORLD SAVINGS
8  BANK, FSB is a corporation; that Defendant WORLD SAVINGS BANK, FSB is a partnership; and that
9  Defendant, WORLD SAVINGS BANK, FSB, is a division of Defendant, WORLD SAVINGS, INC.

10     5.    Defendants, WORLD SAVINGS, INC. and WORLD SAVINGS BANK, FSB, shall
11 hereinafter be referred to collectively as "WORLD SAVINGS."

12     6.    Defendant, WACHOVIA MORTGAGE CORPORATION ("WACHOVIA"), is a North
13 Carolina corporation licensed to do, and is doing business in California.  At all relevant times hereto
14 WACHOVIA was and is engaged in the business of promoting, marketing, distributing and selling the
15 Option Arm loans that are the subject of this Complaint.  WACHOVIA transacts business in Santa
16 Clara County, California and at all relevant times promoted, marketed, distributed, and sold Option Arm
17 loans throughout the United States, including Santa Clara County, California. WACHOVIA has
18 significant contacts with Santa Clara County, California, and the activities complained of herein
19 occurred, in whole or in part, in Santa Clara County, California.

20     7.    Defendants,  WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB,
21 WACHOVIA MORTGAGE CORPORATION, and DOES 1 through 10, shall hereinafter be referred to
22 collectively as "Defendants."

23     8.    At all times mentioned herein, Defendants, and each of them, were engaged in the
24 business of promoting, marketing, distributing, and selling the Option Arm loans that are the subject of
25 this Complaint, throughout the United States, including Santa Clara County, California.

26     9.    Plaintiff is informed and believes, and thereon alleges that each and all of the
27 aforementioned Defendants are responsible in some manner, either by act or omission, strict liability,
28 fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise,

-3-

1  for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately

2  caused by the conduct of Defendants.

3      10.    Plaintiff is informed and believes, and thereon alleges, that at all times material hereto

4  and mentioned herein, each of the Defendants (both named and DOE defendants) sued herein were the

5  agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-

6  ego of each of the remaining Defendants and were at all times acting within the purpose and scope of

7  such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

8  partnership or employment and with the authority, consent, approval and ratification of each remaining

9  Defendant.

10      11.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant,

11  employee, assignee and/or joint venturer of each of the other Defendants and was acting within the

12  course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the

13  permission and consent of each of the other Defendants.

14      12.    Plaintiff is informed and believes, and thereon alleges, that Defendants, WORLD

15  SAVINGS, WACHOVIA and DOES 1-10, and each of them, are, and at all material times relevant to

16  this Complaint, performed the acts alleged herein and/or otherwise conducted business in California.

17  Defendants, and each of them, are corporations or other business entities, form unknown, have, and are

18  doing business in this judicial district.

19      13.    Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 10,

20  inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters,

21  CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are

22  assignees to the loans which are the subject of this action. Plaintiff will seek leave of Court to replace

23  the fictitious names of these entities with their true names when they are discovered by Plaintiff herein.

24      14.    The true names and capacities, whether individual, corporate, associate or otherwise, of

25  Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time, and

26  Plaintiff therefore sue said Defendants by such fictitious names. Plaintiff alleges, on information and

27  belief, that each Doe defendant is responsible for the actions herein alleged. Plaintiff will seek leave of

28  Court to amend this Complaint when the names of said Doe defendants have been ascertained.

-4-

15.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendants, and each of them, including without limitation those Defendants herein sued as DOES, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

## III.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 15 U.S.C § 1601 *et seq.* and 28 U.S.C. § 1331.

17.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in this District within California or are corporations duly licenced to do business in California.

18.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendant because it regularly conducts business in this judicial district.

## IV.

### FACTS COMMON TO ALL CAUSES OF ACTION

19.     WORLD SAVINGS and WACHOVIA are one the largest financial institutions in the United States.

20.     The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiff and the Class members, in writing, as required by law.

21.     This action also concerns Defendants' unlawful, fraudulent and unfair business acts or practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at

1   maximizing the number of consumers who would accept this type of loan in order to maximize
2   Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to
3   lose their homes through foreclosure.

4        22.     Plaintiff, along with thousands of other similarly situated consumers, were sold an Option
5   ARM home loan by Defendants. The Option ARM loan sold to Plaintiff is a deceptively devised
6   financial product. The loan has a variable rate feature with payment caps. The product was sold based
7   on the promise of a low, fixed interest rate, when in fact Plaintiff were charged a different, much greater
8   interest rate than promised. Further, Defendants disguised from Plaintiff the fact that Defendants'
9   Option ARM loan was designed to, and did, cause negative amortization to occur. Further still, once
10  lured into these loans, consumers cannot easily extricate themselves from these loans. Defendants'
11  Option ARM loan includes a stiff and onerous prepayment penalty making it extremely difficult to
12  extricate from the loans.

13       23.     The Option ARM loan Defendants sold to Plaintiff violates the Truth In Lending Act
14  (TILA). TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to
15  borrowers concerning the terms and conditions of their home loans. Defendants failed to make these
16  disclosures in connection with the Option ARM loans sold to Plaintiff and others similarly situated.

17       24.     At all times relevant, Defendants marketed their Option ARM loan product to consumers,
18  including Plaintiff, in a false or deceptive manner. Defendants marketed and advertised to the general
19  public through brochures, flyers and other substantially identical marketing material, a loan which
20  appeared to have a very low, fixed interest rate for a period of three (3) to five (5) years and no negative
21  amortization. Defendants used this "teaser" rate to lure Plaintiff into purchasing Defendants' Option
22  ARM loan product. However, the low fixed rate was illusory, a false promise. Plaintiff and others
23  similarly situated did not receive the benefit of the low rate promised to them. Once signed on to
24  Defendants' loan, the interest rate applied to Plaintiff's loan was immediately and significantly
25  increased.

26       25.     Plaintiff and others similarly situated were consumers who applied for a mortgage loan
27  through Defendants. During the loan application process, in each case, Defendants promoted,
28  advertised, and informed Plaintiff and the Class members that in accepting these loan terms, Plaintiff

-6-

1    would be able to lower their mortgage payment and save money. Defendants initiated this scheme in

2    order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

3        26.    Based on the Defendants' representations, and the conduct alleged herein, Plaintiff and

4    Class members agreed to finance their primary residence through Defendants' Option ARM loan.

5    Plaintiff and Class members were told they were being sold a home loan with a low interest rate of

6    between 1% and 3.0% interest rate (the "teaser" rate), and that the interest rate was fixed for the first

7    three (3) to five (5) years of the loan. Defendants also informed Plaintiff, and Plaintiff was lead to

8    believe, that if she made payments based on the promised low interest rate, which were the payments

9    reflected in the written payment schedule provided to them by Defendants, the loan was a no negative

10    amortization home loan. Plaintiff's payments were to be applied to their principal loan balances as well

11    as to interest.

12        27.    After, the purported three (3) - five (5) year fixed interest period, Plaintiff was told her

13    rate "may" change. Plaintiff believed she would then be able to re-finance to another home loan.

14        28.    Plaintiff believed these facts to be true because that is what the Defendants wanted her

15    and other similarly situated consumers to believe. Defendants aggressively marketed their product as a

16    fixed, low interest home loan. Defendants knew that if marketed in such a manner, their Option ARM

17    loan product would be a hugely popular and profitable product for them. Defendants also knew,

18    however, that they were marketing their product in a false and deceptive manner. While Defendants

19    trumpeted their low, fixed rate loans to the public, Defendants knew their promise of low, fixed interest

20    was a mirage.

21        29.    In fact, Defendants' Option ARM loan possessed a low, fixed interest *payment* but not a

22    low, fixed interest rate. Unbeknownst to Plaintiff and Class members, the actual interest rate they were

23    charged on their loans was not fixed (and was in fact considerably higher than going market rates.) And,

24    after purchasing Defendants' Option ARM loan product, Plaintiff and Class members did not actually

25    receive the benefit of the low, teaser rate at all in some cases, or at best, received that rate for only a

26    single month. Immediately, thereafter, Defendants in every instance and for every loan, increased the

27    interest rate they charged consumers. The charges incurred by Plaintiff and Class members over and

28    above the fixed interest payment rate were added to the principal balance on their home loans in ever

-7-

1   increasing increments, substantially reducing the equity in these borrowers' homes.

2       30.    Defendants, through the loan documents they created and supplied to Plaintiff, stated that

3   negative amortization was only a possibility and would occur only if the payments were not sufficient.

4   Defendants concealed the fact that the loan as presented and designed, in fact, *guaranteed* negative

5   amortization. Defendants failed to disclose and omitted the objectively material fact that negative

6   amortization would occur if the consumer followed the payment schedule set forth by Defendants in the

7   loan documents. This information was objectively material and necessary to make the statements made

8   by Defendants, in light of the circumstances, not only misleading because that information would

9   indicate that equity would be consumed if the payment schedule was followed, thereby making it

10   difficult if not impossible to refinance the loan at or around the time the prepayment penalty expired and

11   the interest and payment rates re-set. In this respect, Defendants utterly failed to place any warning on

12   the Truth and Lending Disclosure Form about negative amortization.

13       31.    At all times relevant, once Plaintiff and Class members accepted Defendants' Option

14   ARM loan, they had no viable option by which to extricate themselves because these Option ARM loan

15   agreements included a draconian three year pre-payment penalty.

16       32.    The Option ARM loans sold by Defendants all have the following uniform

17   characteristics:

18          (a)    There is an initial low interest rate or "teaser" rate that was used to entice the

19                Plaintiff into entering into the loan. The rate offered was typically 1%-3%;

20          (b)    The loan has with it a corresponding low payment schedule. The marketing of the

21                loan with the above teaser was intended to misleadingly portray to consumers that

22                the low payments for the first three (3) to five (5) years were a direct result of the

23                low interest rate being offered;

24          (c)    The initial payments in the required disclosures were equal to the low interest rate

25                being offered. The purpose was to assure that if someone were to calculate what

26                the payment would be at the low offered interest rate, it corresponded to the

27                payment schedule. This portrayal was intended to further mislead consumers into

28                believing that the payments were enough to cover all principal and interest;

-8-

     (d)    The payment has a capped 2-3 % annual increase on the payment amount;

     (e)    This loan includes a prepayment penalty preventing consumers from securing a new loan for a period of up to three (3) years.

33.    Defendants uniformly failed to inform consumers, including Plaintiff and the Class members, in a clear and conspicuous manner that the fixed "teaser" rate offered by Defendants was actually never applied to their loans, or, at best, was only applied for thirty (30) days. Thereafter, the true interest charged on the loans was significantly higher than the promised, advertised rate.

34.    Defendants uniformly failed to inform consumers, including Plaintiff and the Class members, that the payments set forth in Defendants' schedule of payments were insufficient to cover the actual charges and that this was, in fact, a negative amortization loan.

35.    Defendants uniformly failed to inform consumers, including Plaintiff and the Class members, that when the principal balance increased to a certain level, they would no longer have the option of making the fixed interest payment amount.

## V.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action on behalf of herself, and on behalf of all others similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b), and the case law thereunder. The classes Plaintiff seeks to represent are defined as follows:

> **The California Class**: All individuals who, within the four year period preceding the filing of Plaintiff's Complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the State of California. Excluded from the California Class are Defendants' employees, officers, directors, agents, representatives, and their family members; and

> **The National Class**: All individuals in the United States of America who, within the four year period preceding the filing of Plaintiff's complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America. Excluded from the National Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

> An appropriate sub-Class exists for the following Class Members:

CLASS ACTION COMPLAINT

All individuals in the United States of America who, within the three year period preceding the filing of Plaintiff's complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America. Excluded from the National sub-Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

Plaintiff reserves the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time, or propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

37.    Numerosity: The Classes are so numerous that the individual joinder of all members is impracticable under the circumstances of this case. While the exact number of Class members is unknown at this time, Plaintiff are informed and believe that the entire Class or Classes consist of approximately tens of thousands of members.

38.    Commonality: Common questions of law or fact are shared by the Class members. This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues. Such common questions include, but are not limited to, the following:

(1)    Whether Defendants' acts and practices violate the Truth in Lending Act;

(2)    Whether Defendants' conduct violated 12 C.F.R. § 226.17;

(3)    Whether Defendants' conduct violated 12 C.F.R. § 226.19;

(4)    Whether Defendants engaged in unfair business practices aimed at deceiving Plaintiff and the Class members before and during the loan application process;

(5)    Whether Defendants, by and through their officers, employees, and agents failed to disclose that the interest rate actually charged on these loans was higher than the rate represented and promised to Plaintiff and the Class members;

(6)    Whether Defendants, by and through their officers, employees and agents concealed information they were mandated to disclose under TILA;

(7)    Whether Defendants failed to disclose the true variable nature of interest rates on adjustable rate mortgage loans and adjustable rate home equity loans;

(8)    Whether Defendants failed to properly disclose the process by which negative amortization occurs, ultimately resulting in the recasting of the payment structure

CLASS ACTION COMPLAINT

over the remaining lifetime of the loans;

(9)     Whether Defendants' failure to apply Plaintiff's and the Class members' payments to principal as promised in the form Notes constitutes a breach of contract, including a breach of the covenant of good faith and fair dealing;

(10)    Whether Defendants' conduct in immediately raising the interest rate on consumers' loans so that no payments were made to the principal balance constitutes breach of the covenant of good faith and fair dealing;

(11)    Whether Defendants' marketing plan and scheme misleadingly portrayed or implied that these loans were fixed rate loans, when Defendants knew that only the periodic payments were fixed (for a time) but that interest rates were not, in fact, "fixed;"

(12)    Whether the terms and conditions of Defendants' Option ARM home loan are unconscionable;

(13)    Whether all Class members are entitled to punitive damages;

(14)    Whether all Class members are entitled to actual damages; and

(15)    Whether all Class members are entitled to rescission.

39.    Typicality: Plaintiff's claims are typical of the claims of the Class members. Plaintiff and the other Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiff and the other Class members are based on the same legal theories.

40.    Adequacy: Plaintiff is an adequate representatives of the Class because her interests do not conflict with the interests of the other members of the Class Plaintiff seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends on prosecuting this action vigorously.   The interests of members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

41.    Ascertainable Class: The proposed Classes are ascertainable in that the members can be identified and located using information contained in Defendants' mortgage lending records.

42.    This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2), and 23(b)(3):

-11-

(a)  <u>Risk of Inconsistent Judgments</u>: The unlawful acts and practices of Defendants, as alleged herein, constitute a course of conduct common to Plaintiff and each Class member. Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of individual Class members to protect their interests;

(b)  <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>:  Defendants, and each of them, have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the Class as a whole appropriate; and

(c)  <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to the Class members, including those identified above, predominate over questions affecting only individual Class members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Further, an important public interest will be served by addressing the matter as a class action.  The cost to the court system of adjudicating each such individual lawsuit would be substantial.

## VI.

## FIRST CAUSE OF ACTION

### (Violations of Truth in Lending Laws, 15 U.S.C.A. §1601, *et seq.*,

### (Against All Defendants)

43.  Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

44.  15 U.S.C.A. §1601, *et seq.*, is the Federal Truth in Lending Act ('TILA"). The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12

-12-

CLASS ACTION COMPLAINT

1  C.F.R. §226 ) and its Official Staff Commentary. Compliance by lenders with Regulation Z became

2  mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board

3  is also binding on all lenders.

4      45.    The purpose of TILA is to protect consumers. This is stated in 12 C.F.R. § 226.1, which

5  reads:

6          **§226.1 Authority, purpose, coverage, organization, enforcement and**

7          **liability. . .**

8          (b)    Purpose. The purpose of this regulation is to promote the informed

9          use of consumer credit by requiring disclosures about its terms and costs.

10         The regulation also gives consumers the right to cancel certain credit

11         transactions that involve a lien on a consumer's principal dwelling . . .

12     46.    Reg. Z also mandates very specific disclosure requirements regarding home loans with

13  which lenders, including Defendants, must comply:

14         **§ 226.17. General disclosure requirements.**

15         (a) Form of disclosures. (1) The creditor shall make the disclosures

16         required by this subpart clearly and conspicuously in writing, in a form

17         that the consumer may keep. The disclosures shall be grouped together,

18         shall be segregated from everything else, and shall not contain any

19         information not directly related to the disclosures required under §

20         226.18.

21     47.    The purpose of the TILA is to assure a meaningful disclosure of credit terms so that the

22  borrowers will be able to compare more readily the various credit terms available to them and avoid the

23  uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing

24  practices.

25     48.    Defendants' Option ARM loan violates TILA because Defendants failed to comply with

26  the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the

27  Federal Reserve Board. Defendants failed in a number of ways to clearly or accurately disclose the

28  terms of the Option ARM loan to Plaintiff as Defendants were required to do under TILA. These

-13-

CLASS ACTION COMPLAINT

1  violations are apparent on the face of the TILA Disclosure Forms.

2      49.    As such, Plaintiff seeks redress under the Truth in Lending Act. This action seeks to

3  obtain rescission for each Class member, injunctive relief, redress, restitution, disgorgement, money

4  damages, attorneys' fees and other equitable relief against Defendants for engaging in unfair or deceptive

5  acts or practices in violation of TILA.

6      50.    The TILA violations committed by Defendants are more specifically detailed as follows:

7  **A.**    **Defendants' Failure to Clearly and Conspicuously Disclose The Actual Interest Rate**

8      **Violates Truth in Lending Laws**

9      51.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures

10  concerning the interest rate in a clear and conspicuous manner. Further, a misleading disclosure is as

11  much a violation of TILA as a failure to disclose at all. Defendants failed to meet the disclosure

12  mandates required of them concerning the interest rate Defendants actually applied to Plaintiff's and

13  Class members' loans, as well as the interest actually charged to Plaintiff and the Class members.

14      52.    Defendants' disclosure in the Promissory Note concerning the interest rate is, at best,

15  unclear and inconspicuous. At worst, it is intentionally deceptive. In either instance, it is certainly

16  different than the interest rate set forth by Defendants in the TILA Disclosure Form. The interest rate

17  information set forth by Defendants in the Note conflicts with the interest rate information set forth by

18  Defendants in the TILA Disclosure Form.

19      53.    The interest rate set forth in the Note is the teaser rate that Defendants, in fact, apply to

20  the loan for a single month. However, Defendants do not make clear in the Note or anywhere else that

21  this low promised rate (the same rate upon which Defendants base the written payment schedule

22  provided to Plaintiff) is only offered for the first thirty (30) days of the loan. Defendants employ a most

23  convoluted, confusing and circuitous methodology in describing the interest rate. Somewhere in the

24  Note, Defendants state that the promised low interest rate is the rate until the "change date." A

25  description of the change date is found somewhere else in the Note. The descriptive method employed

26  by Defendants in this regard makes it extremely difficult for anyone to arrive at the conclusion that the

27  change date corresponds to the very first monthly payment Plaintiff and the Class members made on

28  their loans.

CLASS ACTION COMPLAINT

54. The language used by Defendants to disclose the interest rate on Plaintiff's and the Class members loans was anything but clear and conspicuous. Rather, the disclosures used by Defendants were purposefully unclear and meant to mislead and confuse Plaintiff and the Class members. In particular, it is virtually impossible to discern when Plaintiff and the Class members would receive the low interest rate they were promised, if, in fact, it can be determined at all. And, the truth is that Plaintiff and the Class members *never* received the low interest rate, or in some cases received it for only thirty days. Defendants promise of a low interest rate is and was wholly illusory and deception practiced on Plaintiff and Class members by Defendants to facilitate sales of their loans to consumers.

55. The Note also sets forth the amount of Plaintiff's and Class members' initial monthly payments. That amount is equal to what the payment would be if the low interest rate promised to Plaintiff by Defendants was true and was being applied to the principal balance on the loans. This a further deception committed by Defendants, because the real interest rate charged on the loan by Defendants turns out to be much higher than the low interest rate promised to Plaintiff and Class members. The payment amount is included to deceive consumers into falsely believing they are, in fact, receiving the teaser rate promised to them.

56. The TILA Disclosure Form is also confusing and deceptive for much the same reason. It shows the scheduled payments for the first three to five years of the loan as being based on the low "teaser" rate Plaintiff and Class members were promised. In truth, however, this payment schedule has no real relation to the interest rate Defendants actually charged Plaintiff on their loans.

57. Lastly, as concerning Defendants' failure to accurately, clearly or conspicuously disclose the actual interest rate applied to Plaintiff's and Class members' loan, the Note expressly states and/or implies that Plaintiff's and the Class members payments will pay off principal and interest on the loan. That is, based on the payment schedule and initial monthly payment amount presented to Plaintiff by Defendants, and set forth in the Note and TILA Disclosure Form, Plaintiff and the Class members will be paying off principal and interest on their loans by submitting payments in accordance with the payment schedule. The contractual language in the Note only makes sense, and can only be true, if the interest rate actually applied to Plaintiff's loan by Defendants was, in fact, the "teaser" rate promised by Defendants. Thus, Plaintiff and the Class members believed that the low rate promised to them would

-15-

1  be applied to their loans. However, the true fact is that the payment established by Defendants did not

2  pay any principal on the loan at all. The payment established by Defendants only covered a portion of

3  the interest actually charged Plaintiff and the Class members by Defendants each month on these loans.

4      58.    Taken separately and in totality, all of the unclear and contradictory information given to,

5  and representations made by Defendants, to Plaintiff and the Class members, violated TILA in that it

6  failed to provide the clear and conspicuous disclosures as required under the Act.

7

8      **B.**    **Defendants' Failure to Clearly and Conspicuously Disclose Negative Amortization**

9               **Violates the Truth in Lending Laws**

10      59.    12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential

11  home loans:

12      **§ 226.19. Certain residential mortgage and variable-rate transactions.**

13      . . .

14      (b) Certain variable-rate transactions. If the annual percentage rate may

15      increase after consummation in a transaction secured by the consumer's

16      principal dwelling with a term greater than one year, the following

17      disclosures must be provided at the time an application form is provided or

18      before the consumer pays a non-refundable fee, whichever is earlier. . .

19      (vii) *Any rules relating to changes in the index, interest rate, payment*

20      *amount, and outstanding loan balance including, for example, an*

21      *explanation of interest rate or payment limitations, negative amortization,*

22      *and interest rate carryover.* (Emphasis added.)

23      60.    These required disclosures must be made in the TILA Disclosure Form with the other

24  disclosures. The TILA Disclosure Form must state whether the loan *is* a negative amortizing loan and

25  whether unpaid interest *is* being added to principal.

26      61.    In 1995, and continuing each time new Official Staff Commentary was issued, the

27  Federal Reserve Board made clear that when the loan was a variable rate loan and it had payment caps,

28  that the disclosure required a definitive statement about negative amortization:

CLASS ACTION COMPLAINT

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Monday, April 3, 1995

AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

"For the program that gives the borrower an option to cap

monthly payments, the creditor must fully disclose the rules

relating to the payment cap option, including the effects of

exercising it (such as **negative amortization occurs** and

that the **principal balance will increase**)..." (Found at

C.F.R. § 226.19)

62.    At all times relevant, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply the Federal Reserve Board's Official Staff Commentary as well as Regulation Z and TILA.

63.    Defendants sold Plaintiff and the Class members an Option ARM loan which has a variable rate feature with payment caps. Defendants failed to include any reference on the TILA Disclosure Form that there was negative amortization. There is nothing that would indicate to anyone that the loan schedule had negative amortization. The payment schedule makes no reference to negative amortization and makes it appear that the payments cover both principal and interest.

64.    In fact, the only place where Defendants even inferentially reference negative amortization is in the Note. However, they mention it in such a way as to make a reasonable person believe that negative amortization is only a possibility, rather than a certainty. And, these loans are, in fact, designed in such a manner so as to make negative amortization a certainty.

65.    This attempt at a disclosure did not actually serve to alert or inform the borrowers of anything, much less clearly and conspicuously disclose that the the payment schedule provided by Defendants absolutely would not pay both principal and interest, and therefore would guarantee that negative amortization was to occur on these loans. Rather, Defendants made it appear that as long as the payment schedule provided by Defendants was followed, there would be no negative amortization.

-17-

CLASS ACTION COMPLAINT

66.    So, even where any language is found describing negative amortization, the language is misleading and deceptive. In fact, Defendants' Option ARM loan was designed in such a way as to guarantee negative amortization. TILA demands more than a statement that the payment could be less when Defendants were well aware that the payment is less, and would always be less, than the full interest and principal.

**C.    Defendants' Failure to Clearly and Conspicuously Disclose that the Initial Interest Rate is Discounted Violates Truth in Lending Laws**

67.    As previously stated, the informed use of credit means being able to make decisions, as well as being able to plan an individual's finances. Every month consumers look at their income and budget where their funds must be paid. The biggest investment in one's life is generally that person's home. In fact, it is often referred to as "the American Dream" to own a home.

68.    Variable rate loans are based on a "margin" and an "index." The index is often the Prime Rate or the LIBOR exchange rate. The margin is the amount the lender charges over that rate, basically it is the lender's profit on the loan.

69.    TILA and Regulation Z require disclosures to be clear and conspicuous so people understand what their obligations are. In particular, when the payment is not based on that index and margin a separate disclosure is required. Further, the disclosure must inform the borrower that the payment they are making is not based on what the index and margin really should be in order to avoid negative amortization. The disclosure must also inform that interest rate and payment may go up and clearly and conspicuously provide the circumstances under which the rate and payment will increase.

70.    The Federal Reserve Board established disclosure requirements for variable rate loans. 26 C.F.R. § 226.19 requires a lender to disclose the frequency of interest rate and payment adjustments to borrowers. If interest rate changes will be imposed more frequently or at different intervals than payment changes, a creditor must disclose the frequency and timing of both types of changes.

71.    The disclosures required pursuant to 12 C.F.R. § 226.19 are extremely important because Plaintiff and other consumers similarly situated need this information in order to budget their money. They need to know if their house payments are going to go up so that they can plan for it. If the change

-18-

CLASS ACTION COMPLAINT

1  comes as a surprise, they face a much greater possibility of defaulting on their loans and losing their

2  homes.

3      72.    Defendants, and each of them, state only that the interest rate *may* increase in the future.

4  However, an interest rate increase was in fact far more certain than this disclosure lead Plaintiff and

5  Class members to believe. If Defendants had given the Plaintiff and the Class members the promised

6  low interest rate for any initial period of time, the interest rate was guaranteed to go up even without any

7  change in the index. Thus, the increase in the interest rate on these loans was not just a possibility; it

8  was an absolute certainty and Defendants failed and omitted this material information in their

9  disclosures to Plaintiff and the Class members.

10      73.    Defendants disclosure statement provided that, "the interest rate may increase during the

11  term of this transaction if the index increases." This, however, was not the only circumstance that could

12  cause an increase in the interest rate. The Defendants, and each of them, failed to disclose that the initial

13  interest rate is discounted, creating the possibility of an increase even when the index did not rise. Due

14  to the initial discounted interest rate, the annual interest rate would increase if the index remained

15  constant, or even if the index declined. Because Defendants' disclosure failed to provide this extremely

16  important, material information, Defendants disclosure failed to meet the clear and conspicuous standard

17  mandated under TILA.

18      74.    Defendants failed to disclose to Plaintiff and the Class members that their rate was, with

19  100% certainty, going to increase, whether or not the index upon which their loans are based changed or

20  not. As such, Defendants violated TILA and Regulation Z with unclear, deceptive and poorly drafted or

21  intentionally misleading disclosure.

22

23  **D.**    **Defendants' Failure to Disclose the Composite Interest Rate Violates Truth in**

24      **Lending Laws**

25      75.    Defendants provided Plaintiff and Class members with multiple, conflicting interest rates

26  when describing the costs of this loan. On the TILA Disclosure Form Defendants set forth one interest

27  rate, while on the Note, Defendants set forth two other, different interest rates.

28  / / /

-19-

76.    The official staff commentary to 226 C.F.R. § 17(C)(8) states:

*Basis of disclosures in variable-rate transactions.* The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the disclosures only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the disclosures on the initial rate and should not assume that this rate will increase 5 percentage points. **However, in a variable-rate transaction with a** seller buydown that is reflected in the credit contract, a consumer buydown, or **a discounted or premium rate, disclosures should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term.** (See the commentary to section 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature.)

77.    The reason for this requirement is clear. Consumers cannot make informed decisions when they cannot compare the cost of credit to other proposals. It is therefore incumbent upon Defendants to show the composite interest rate in effect so that the borrowers can understand exactly what they are paying for the loan.

78.    A lender violates TILA, Reg. Z and the OTS guidelines by failing to list the composite rate in variable rate loans that had a discounted initial rate. The loan sold to Plaintiff and Class members by Defendants is a discounted variable-rate loan. Because Defendants failed to properly, clearly and conspicuously, disclose a composite annual percentage rate on these loans Defendants violated TILA and Regulation Z.

CLASS ACTION COMPLAINT

79. As a direct and proximate result of Defendants' conduct in violation of TILA, Plaintiff and Class members have suffered injury an amount to be determined at time of trial. If Defendants had not violated TILA and had instead properly disclosed the material terms of Defendants' Option ARM loan product, as alleged herein, Plaintiff and Class members would not have entered into the home loan agreements which are the subject of this action. Because Defendants failed to make proper disclosures in violation of TILA, Plaintiff and Class members now seek redress in an amount and/or type as proven at time of trial.

## VII.

### SECOND CAUSE OF ACTION

**Violation of California's Unfair Competition Law, Bus. & Prof. Code § 17200 *et. seq.* -**

**"Unlawful" Business Acts or Practices Predicated on Violations of TILA**

**(Against All Defendants)**

80. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

81. California's Unfair Competition Law ("UCL"), Business and Professions Code, §17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

82. A business act or practice is "unlawful" if it violates any other law, code or statute.

83. Defendants, and each of them, engaged in unfair competition within the meaning of §17200 by violating the TILA as detailed in Plaintiff's First Cause of Action. Defendants failed to comply with the disclosure requirements mandated by TILA, Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. Defendants failed in a number of ways to clearly or accurately disclose the terms of the Option ARM loan to Plaintiff as Defendants were required to do under TILA.

84. Plaintiff and the Class members are direct victims of the Defendants' unlawful conduct, as herein alleged, and each has suffered injury in fact, and have lost money or property as a result of Defendants' unfair competition.

-21-

CLASS ACTION COMPLAINT

## VIII.

## THIRD CAUSE OF ACTION

### (Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200 *et seq.*,

### "Unfair" and "Fraudulent" Business Acts or Practices,

### (Against All Defendants)

85.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

86.    The instant claim is predicated on the generally applicable duty of any contracting party to not misrepresent material facts, and on the duty to refrain from unfair and deceptive business practices. The Plaintiff and the Class members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct. The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

87.    California Business and Professions Code, §17200, *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

88.    A business practice is "unfair" if is violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.

89.    A business practice is "fraudulent" if it is one which is likely to deceive the public.

90.    Defendants engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept their Option ARM loan. Defendants, and each of them, marketed and sold Plaintiff and Class members a deceptively devised financial product. Defendants marketed and sold their Option ARM loan product to consumers, including Plaintiff, in a false or deceptive manner. Defendants marketed and advertised to the general public through brochures, flyers and other substantially identical marketing material, a loan which appeared to have a very low, fixed interest rate for a period of three (3) to five (5) years and no negative amortization. Further, Defendants disguised from Plaintiff and the Class members the fact that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.

-22-

91.     Defendants lured Plaintiff and the Class members into the Option ARM loan with promises of low fixed interest. Once Plaintiff and the Class members entered into these loans, Defendants switched the interest rate charged on the loans to a much higher rate than the one they advertised and promised to Plaintiff and the Class members. After entering these loans, Plaintiff and the Class members could not escape because Defendants purposefully placed into these loans an extremely onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves from these loans. Thus, once on the hook, Plaintiff and the Class members could not escape from Defendants loans.

92.     Plaintiff and Class members were consumers who applied for a mortgage loan through Defendants. During the loan application process, in each case, Defendants uniformly promoted, advertised, and informed Plaintiff and Class members that in accepting these loan terms, Plaintiff and Class members would be able to lower their mortgage payment and save money.

93.     Defendants promoted their Option ARM loan as having a low fixed interest rate, i.e., typically between 1% and 3%. However, Defendants did not disclose that this was just a "teaser" rate, the purpose of which was to get consumers to enter into loan agreements with Defendants. Defendants did not disclose to Plaintiff and the Class members that the "teaser" rate was not the fixed rate that Defendants would actually charge Plaintiff and the Class members on their outstanding loan balances.

94.     Based on the Defendants' representations and conduct, Plaintiff and the Class members agreed to finance their primary residence through Defendants' Option ARM loan. Plaintiff and the Class members were told they were being sold a home loan with a low interest rate, fixed for the first three (3) to five (5) years of the loan. Plaintiff and the Class members were also lead to believe that if they made payments based on this advertised interest rate, and the payment schedule provided to them by Defendants, the loan was a no negative amortization home loan. After, the fixed interest period, Plaintiff and the Class members were told their rate "may" change. And, Plaintiff believed they would then be able to re-finance to another home loan. Plaintiff and the Class members believed these facts to be true because that is what the Defendants wanted consumers to believe, that is what Defendants lead consumers to believe.

///

CLASS ACTION COMPLAINT

95.    Defendants aggressively sold their product as a fixed low interest home loan. Defendants knew that if marketed in such a manner, their Option ARM loan product would be a hugely popular and profitable product for them. Defendants also knew, however, that they were marketing their product in a false and deceptive manner. While Defendants trumpeted their low, fixed rate loans to the public, Defendants knew, however, that this was not entirely true.

96.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low, fixed interest rate. Unbeknownst to Plaintiff and Class members, the actual interest rate they were charged on their loans was not fixed. After purchasing Defendants' Option ARM loan product, Plaintiff and class members never actually received the benefit of the low advertised interest rate, or, in some cases, consumers received the low rate for just a single month. Immediately, thereafter, Defendants in every instance and for every loan increased the interest rate they charged Plaintiff and the Class members. Once Plaintiff and Class members accepted Defendants' Option ARM loan, they had no viable option to extricate themselves because of these loan agreements included a draconian pre-payment penalty.

97.    Defendants perpetrated a bait and switch scheme on Plaintiff and Class members. Defendants' conduct and failure to disclose the whole truth about the loan's interest rate and to describe the loan as having a fixed interest rate was deceptive and unfair. Defendants initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

98.    Plaintiff and Class members are direct victims of the Defendants' unlawful conduct, as herein alleged, and each has suffered injury in fact, and have lost money or property as a result of Defendants' unfair competition.

## IX.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

99.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

100.    Plaintiff and Class members entered into a written home loan agreement – the Note –

1    with Defendants. The Note was drafted by Defendants and could not be modified by Plaintiff or Class

2    members. The Note describes terms and respective obligations applicable to the parties herein.

3        101.    The Note describes Plaintiff's and Class members' interest rate on the loan as a low

4    interest rate, typically between 1% and 3%. In addition, as required by federal law, the Defendants

5    provided a Truth In Lending Disclosure concerning the home loan agreement that shows a payment

6    schedule based on that low 1% to 3% interest rate. For the first three (3) to five (5) years the payment

7    schedule shows that Plaintiff's and Class members' monthly payment obligations to Defendants are the

8    exact payments necessary to pay off all principal and interest during the terms of the loans if, indeed, the

9    interest rate actually charged by Defendants on the loans was the low interest rate promised.

10        102.    Defendants expressly and/or through their conduct and actions indicate that Plaintiff's

11    and the Class members' monthly payment obligations *will* be applied to payment of both principal and

12    interest owed on the loans. Defendants breached this agreement and never applied any of Plaintiff's and

13    the Class members' payments to principal.

14        103.    The written payment schedules prepared by Defendants, and applicable to Plaintiff's and

15    Class members' loans, show that the payment amounts owed by Plaintiff and Class members to

16    Defendants in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest

17    actually charged on the loan was the low interest rate promised. If the Defendants did as promised, the

18    payments would have been sufficient to pay both principal and interest amounts.

19        104.    Instead, Defendants immediately raised Plaintiff's and Class members' interest rates and

20    applied *no part* of Plaintiff's and Class members' payments to the principal balances on their loans. In

21    fact, because Defendants charged more interest than was agreed to, the total payment was insufficient to

22    cover the interest charge and the principal balance increased (which is the negative amortization built

23    into the loan).

24        105.    Defendants breached the written contractual agreement by failing to apply any portion of

25    Plaintiff's and the Class members' monthly payments towards their principal loan balances.

26        106.    Plaintiff and the Class members, on the other hand, did all of those things the contract

27    required of them. Plaintiff and the Class members made monthly payments in the amount required by

28    the terms of the Note and reflected in the payment schedule prepared by Defendants.

-25-

107.    As a result of Defendants' breach of the agreement, Plaintiff and the Class members have suffered harm. Plaintiff and Class members have incurred additional charges to their principal loan balance. Plaintiff and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiff's and the Class members' principal loan balance. Furthermore, Defendants' breach has placed Plaintiff and Class members in danger of losing their homes through foreclosure, as Defendants have caused Plaintiff's and the Class members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

## X.

### FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against All Defendants)

108.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

109.    Defendants entered into written agreements with Plaintiff and Class members based on representations Defendants made indirectly and directly to Plaintiff and the Class members about the terms of their loans.

110.    Defendants impliedly and expressly represented to Plaintiff and Class members that it would provide loans secured by Plaintiff and the Class members' homes, and that the loans would have a fixed interest rate at promised low interest rate for a period of three (3) to five (5) years.

111.    Defendants also represented that if Plaintiff and Class members made the monthly payments in the amount prescribed by Defendants no negative amortization would occur. The Note expressly states and/or implies that Plaintiff's and the Class members' monthly payment obligation will be applied to pay both principal and interest owed on the loan. The Note further makes clear that for each monthly payment Plaintiff and Class members make, "interest shall be paid before principal."

112.    The written payment schedules prepared by Defendants, and applicable to Plaintiff's and Class members' loans, show that the payment amounts owed by Plaintiff and Class members to Defendants in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest

-26-

1   actually charged on the loan was the low interest rate promised. If the Defendants acted as it promised,

2   the payments would have been sufficient to pay both principal and interest.

3       113.    Instead, Defendants immediately raised Plaintiff's and Class members' interest rate and

4   applied *no part* of Plaintiff's and Class members' payment to principal. In fact, because Defendants

5   charged more interest than was disclosed and agreed to in the loans, Plaintiff and the Class members'

6   payments were insufficient to cover the interest that Defendants charged resulting in an increase in the

7   amount of principal Plaintiff and the Class members owed on their homes.

8       114.    Defendants unfairly interfered with Plaintiff's and Class members' rights to receive the

9   benefits of the contract. These loans will cost Plaintiff and Class members thousands of dollars more

10  than represented by Defendants. Plaintiff and Class members did not receive the fixed low interest rate

11  home loan promised them by Defendants. Defendants have caused Plaintiff and Class members to lose

12  equity in their homes and therefore have denied Plaintiff and Class members the enjoyment, security of

13  one of their most important investments.

14      115.    Plaintiff and Class members, on the other hand, did all of those things the contract

15  required of them. Plaintiff and Class members made monthly payments in the amount required by the

16  terms of the Note and reflected in the payment schedule prepared by Defendants.

17      116.    As a result of Defendants' breach of the agreement, Plaintiff and the Class members have

18  suffered harm. Plaintiff and Class members have incurred additional charges to their principal loan

19  balance. Plaintiff and Class members have incurred and will continue to incur additional interest

20  charges on the principal loan balance and surplus interest added to Plaintiff's and the Class members'

21  principal loan balance. Furthermore, Defendants' breach has placed Plaintiff and Class members in

22  danger of losing their homes through foreclosure, as Defendants have caused Plaintiff's and Class

23  members' principal loan balances to increase and limited these consumers' ability to make their future

24  house payments or obtain alternative home loan financing.

25  / / /

26  / / /

27  / / /

28

CLASS ACTION COMPLAINT

**XI.**

**SIXTH CAUSE OF ACTION**

**Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200, *et seq.*, –**

**"Unlawful" Business Acts or Practices Predicated on Violations of Cal. Financial Code § 22302**

**(Against All Defendants)**

117.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

118.    California Business and Professions Code, §17200, *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

119.    A business act or practice is "unlawful" if it violates any other law, code or statute.

120.    Defendants, and each of them, engaged in unfair competition within the meaning of §17200 by violating California Financial Code § 22302.

121.    California Financial Code § 22302 applies to consumer loan contracts. It states that a loan found to be unconscionable pursuant to Section 1670.5 of the California Civil Code shall be deemed to be a violation of Financial Code § 22302.

122.    The loan contracts prepared by Defendants and entered into between Plaintiff and Class members and Defendants were, and are, unconscionable pursuant to Section 1670.5 of the Civil Code.

123.    The relative bargaining power between Plaintiff and Class members and Defendants was unequal. Plaintiff and Class members could not negotiate or change any of the particular terms related to the loan and drafted by Defendants. To secure the loan Plaintiff and Class members were given no choice but to make payments as described in the payment schedule and to accept and sign all the associating documents numbering over a hundred pages.

124.    The period of time where Defendants offered Plaintiff and Class members a low interest rate, often was for only one month. Because Defendant Lender packaged the documents in such a manner as to lead Plaintiff and Class members to believe that they had a low interest rate and therefore low payments for three to five years, Plaintiff and Class members would end up owing significantly more than before they started and with a significant chance of losing their homes through foreclosure.

-28-

CLASS ACTION COMPLAINT

125.    Defendants drafted these loan documents for use on tens of thousands of individuals. The loan process was such that individual terms could not be modified. The documents evidencing the loan were delivered to Plaintiff and Class members at the time of signature. The loan process offered by Defendants did not permit for any meaningful negotiation of terms or even review of the loan documents at the time of execution.

126.    Defendants further inserted into the loan documents a prepayment penalty that has as it sole purpose to cause Plaintiff and Class members to continue under the terms of this loans or lose thousands of dollars if Plaintiff try to refinance the loans.

127.    The loans as drafted by Defendants were so "one-sided" that they could only lead Plaintiff and Class members to one result, which was a significant loss of money. As a result of Defendants' unconscionable behavior, Plaintiff and the Class members have suffered direct and actual injury.

128.    Because Defendants' Option ARM loan contract is unconscionable pursuant to Section 1670.5 of the Civil Code, Defendants' Option ARM loan violates Financial Code § 22302 and constitutes a violation of the UCL.

129.    Plaintiff and the Class members are direct victims of the Defendants' unlawful conduct, as herein alleged, and each has suffered injury in fact, and have lost money or property as a result of Defendants' unfair competition.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and all Class members pray for judgment against each Defendant, jointly and severally, as follows:

A.    An order certifying this case as a class action and appointing Plaintiff and their counsel to represent the Class;

B.    For actual damages according to proof;

C.    For compensatory damages as permitted by law;

D.    For consequential damages as permitted by law;

E.    For statutory damages as permitted by law;

F.    For punitive damages as permitted by law;

CLASS ACTION COMPLAINT

1   G.    For rescission;

2   H.    For equitable relief, including restitution;

3   I.    For an order requiring Defendants to disgorge all profits obtained as a result of their

4         unfair competition;

5   J.    For interest as permitted by law;

6   K.    For Declaratory Relief;

7   L.    For a mandatory injunction requiring Defendants to permanently include in every Option

8         ARM loan and disclosure statement: (i) comply with 12 C.F.R. § 226.17 by clearly and

9         conspicuously disclosing the actual interest rate on the Note(s) and disclosure

10        statement(s); (ii) comply with 12 C.F.R. § 226.19 by clearly and conspicuously disclosing

11        in the Note(s) and the disclosure statement(s) that payments on the variable interest rate

12        loan during the initial period at the teaser rate will result in negative amortization and that

13        the principal balance will increase; and (iii) clearly and conspicuously disclose that the

14        initial interest rate provided is discounted and does not reflect the actual interest that

15        Plaintiff and Class members would be paying on the Note(s).

16  M.    For reasonable attorneys' fees and costs; and

17  N.    For such other relief as is just and proper.

18

19  DATED: August 26, 2007                    **SPIRO MOSS BARNESS LLP**

20

21                                            By:

22                                                David M. Arbogast, Esq.
                                                  11377 W. Olympic Boulevard, Fifth Floor
23                                                Los Angeles, CA 90064-1683
                                                  Phone: (310) 235-2468; Fax: (310) 235-2456
24
                                                  Paul R. Kiesel, Esq.
25                                                Patrick Deblase, Esq.
                                                  Michael C. Eyerly, Esq.
26                                                **KIESEL BOUCHER LARSON LLP**
                                                  8648 Wilshire Boulevard
27                                                Beverly Hills, California 90210
                                                  Phone: (310) 854-4444; Fax: (310) 854-0812

28  / / /

-30-

CLASS ACTION COMPLAINT

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Blvd, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000; Fax: (818) 867-4820

Attorneys for Plaintiff and all others Similarly
Situated

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury to the full extent permitted by law.

DATED: August __, 2007                    **SPIRO MOSS BARNESS LLP**


By: _____
David M. Arbogast, Esq.
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Phone: (310) 235-2468; Fax: (310) 235-2456

Paul R. Kiesel, Esq.
Patrick Deblase, Esq.
Michael C. Eyerly, Esq.
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90210
Phone: (310) 854-4444; Fax: (310) 854-0812

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Blvd, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000; Fax: (818) 867-4820

Attorneys for Plaintiff and all others Similarly
Situated

-31-

CLASS ACTION COMPLAINT

**Exhibit No. 1**

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: 0043651850                           DATE: August 4, 2006

BORROWER(S):   DOLORES MANDRIGUES, AN UNMARRIED WOMAN   sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: 524 CESTARIC DR, MILPITAS, CA  95035-4006

1.  BORROWER'S PROMISE TO PAY
     In return for a loan that I have received, I promise to pay U.S. $170,000.00 , called "Principal," plus interest, to the order of the Lender. The Lender is WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred.

2.  INTEREST

    (A)   Interest Rate
     Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of 6.790%. The interest rate I will pay may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

        The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

    (B)   Interest Change Dates
     The interest rate I will pay may change on the 15th day of September, 2006 and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

    (C)   Interest Rate Limit
     My lifetime maximum interest rate limit is 11.950%, called "Lifetime Rate Cap."

LENDER'S USE ONLY

0   0   1

0043651850

(D)  Index

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

(E)  Calculation of Interest Rate Changes

Lender will calculate my new interest rate by adding **2.850** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

(F)  Alternative Index

The Lender may choose an alternative index to be the Index if the Index is no longer available.  For purposes of this Section 2(F), the Index is not "available" if:  (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note.  The selection of the alternative index shall be at Lender's sole discretion.  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

3.  PAYMENTS

(A)  Time and Place of Payments

I will pay Principal and Interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **September 15, 2006.** I will make these payments every month until I have paid (i) all the Principal and Interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **August 15, 2036,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

(B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **628.36.** This amount will change as described in Sections 3(C) and 3(D) below. My initial  monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

(C)  Payment Change Dates

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **September, 2007** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Payment Changes

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest, as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and Interest payment. This 7-1/2% limitation is called the "Payment Cap."  The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

0043651950

(E)   Deferred Interest; Additions to My Unpaid Principal

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

(F)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

(G)   Payment Cap Limitation; Exceptions

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

(H)   Notice of Payment Changes

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

4.   FAILURE TO MAKE ADJUSTMENTS

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

6.   MAXIMUM LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A)   Late Charges for Overdue Payments

If the Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be 5.00% of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

SD2SSC (2004-03-1)                                    ADJUSTABLE NOTE                                    CA
                                                          Page 3

0043651850

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **524 CESTARIC DR, MILPITAS, CA  95035-4006**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice or demand on me.

0043651850

<u>Exception to Acceleration of Payment of Sums Secured.</u> If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)    Lender approves the creditworthiness of the transferee in writing;

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)    the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12. GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13. CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

0043651850

## SIGNATURE PAGE

**NOTICE TO BORROWER(S):**

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)

DOLORES MANDRIGUES

## WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name:
DOLORES MANDRIGUES

Date: July 24, 2006
Loan No.: 0043651850

| ANNUAL PERCENTAGE RATE <br><br> The cost of your credit as a yearly rate. | FINANCE CHARGE <br><br> The dollar amount the credit will cost you. | Amount Financed <br><br> The amount of credit provided to you or on your behalf. | Total of Payments <br><br> The amount you will have paid after you have made all payments as scheduled. | Total Sale Price <br><br> The total price of your purchase on credit including your down payment of |
|---|---|---|---|---|
| | | | | Not Applicable |
| 6.853 % | $ 283,991.46 | $ 167,713.28 | $ 451,704.74 | Not Applicable |

**Your payment schedule will be:**

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $  628.36 | 10/01/06 |
| 12 | 675.49 | 10/01/07 |
| 12 | 726.15 | 10/01/08 |
| 12 | 780.61 | 10/01/09 |
| 12 | 839.16 | 10/01/10 |
| 12 | 902.10 | 10/01/11 |
| 12 | 969.76 | 10/01/12 |
| 12 | 1,042.49 | 10/01/13 |
| 12 | 1,120.68 | 10/01/14 |
| 12 | 1,204.73 | 10/01/15 |
| 239 | 1,437.64 | 10/01/16 |
| 1 | 1,434.42 | 09/01/36 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance: You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security: You are giving a security interest in the real property located at 524 CESTARIC DR, MILPITAS, CA 95035-4006.

Filing Fees: $    80.00

Late Charge: If a payment is late, you will be charged 5.00% of the payment.

Prepayment: If you pay off the loan early, you MAY have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption: SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale: If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

ALL NUMERICAL DISCLOSURES EXCEPT THE LATE PAYMENT DISCLOSURE ARE ESTIMATED.

**By signing below,** you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

_____
DOLORES MANDRIGUES

_____
Date

CA


LENDER'S USE ONLY

GF004A1 (2004-03-1)   UPFRONT
DISTRIBUTION:  1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE