REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   Jack R. Nelson (SBN 111863)
    David S. Reidy (SBN 225904)
2   Keith D. Yandell (SBN 233146)
    REED SMITH LLP
3   Two Embarcadero Center, Suite 2000
    San Francisco, CA  94111-3922
4
    **Mailing Address:**
5   P.O. Box 7936
    San Francisco, CA  94120-7936
6
    Telephone:      +1 415 543 8700
7   Facsimile:      +1 415 391 8269

8   Attorneys for Defendants World Savings Bank,
    FSB and Wachovia Mortgage Corporation

9
                UNITED STATES DISTRICT COURT
10
              NORTHERN DISTRICT OF CALIFORNIA
11
                    SAN JOSE DIVISION
12

13  DOLORES MANDRIGUES, individually and on      Case No. C07 04497
    behalf of all others similarly situated,
14                                               **EXHIBITS A AND B TO**
                        Plaintiff,               **REQUEST FOR JUDICIAL NOTICE IN**
15                                               **SUPPORT OF DEFENDANTS WORLD**
           vs.                                   **SAVINGS BANK FSB'S AND WACHOVIA**
16                                               **MORTGAGE CORPORATION'S MOTION**
    WORLD SAVINGS, INC., WORLD SAVINGS           **TO DISMISS OR, IN THE ALTERNATIVE,**
17  BANK, FSB, WACHOVIA MORTGAGE                 **MOTION TO STRIKE PORTIONS OF**
    CORPORATION, and DOES 1 through 10,          **PLAINTIFFS' FIRST AMENDED**
18  inclusive,                                   **COMPLAINT**

19                      Defendants.              Date:          January 4, 2007
                                                 Time:          9:00 a.m.
20                                               Place:         Courtroom 3, 5th Floor
                                                 Compl. Filed:  August 30, 2007
21
                                                 The Honorable Jeremy Fogel
22

23

24

25

26

27

28

No. C07 04497                                                        DOCSOAK-9890051.1

Exhibits to Request For Judicial Notice In Support Of Motion To Dismiss Or, In The Alternative, Motion to Strike
Portions Of Plaintiffs' First Amended Complaint

**EXHIBIT A**



**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

**April 21, 2006**

## CERTIFICATE OF CORPORATE EXISTENCE

**REFERENCE:**  World Savings Bank, FSB
Oakland, California

I, Nadine Y. Washington, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1. World Savings Bank, FSB, Oakland, California, was chartered under the laws of the United States to transact the business of a Federal savings bank;

2. The charter of World Savings Bank, FSB, Oakland, California, is in full force and effect;

3. The Office of Thrift Supervision has not appointed a conservator or receiver for World Savings Bank, FSB, Oakland, California; and

4. As of April 21, 2006, World Savings Bank, FSB, Oakland, California, is operating as a BIF-insured financial institution.

**Nadine Y. Washington**
**Corporate Secretary**

**EXHIBIT B**

**Date:** March 10, 1999.

**Summary Conclusion:** Federal law preempts the manner in which the California Unfair Competition Act ("California Laws") have been applied to impermissibly interfere with three aspects of a federal savings association's lending operations—advertising, the forced placement of hazard insurance, and the imposition of loan-related fees. Although the California Laws are the types of state laws that federal law generally does not preempt, these particular applications of the state laws are preempted because they have more than an incidental effect on lending, and are inconsistent with the objective of allowing a federal savings association to operate in accordance with a uniform federal scheme. The California Laws are not preempted in their entirety, but only to the extent they are used to (i) require a particular form of interest rate disclosure, (ii) limit loan fees, or (iii) limit the choice of hazard insurer or premium charged—three areas of lending that traditionally have been within the exclusive purview of federal law and regulations, and in which state law generally is preempted by federal law.

**Subject:** Home Owners' Loan Act/Savings Association Powers.



**Office of Thrift Supervision**

Department of the Treasury

**P-99-3**

*Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6251

March 10, 1999

[

]

**Re:    California Unfair Competition Act**

Dear [            ]:

This responds to your inquiry submitted on behalf of [
], a savings and loan holding company, and its two wholly-owned federal savings association subsidiaries, [                            ] ("Association A") and
[                        ] ("Association B"), located in [                    ]
(Association A and Association B are collectively referred to herein as the
"Associations"). You request that the Office of Thrift Supervision ("OTS") confirm
your conclusion that federal law preempts the application of provisions of the California
Unfair Business Practices Statute[1] and the California Deceptive, False and Misleading
Advertising Statute[2] (collectively, the "Unfair Competition Act" or "UCA") to the
Associations in three specific areas of their lending operations: (1) advertising; (2) the
forced placement of hazard insurance; and (3) the imposition of certain loan-related
fees.

In brief, we conclude that, in the narrow circumstances you describe, federal law
preempts the manner in which specified provisions of the UCA have been applied to the
Associations that interferes with the Associations' lending activities in the areas of
advertising, the forced placement of hazard insurance and the imposition of certain
specified loan-related fees.

---

[1]  Cal Bus. & Prof. Code §§ 17200 et seq.

[2]  Cal Bus. & Prof. Code §§ 17500 et seq.

2

# I.    Background

## A.    The Associations

The Associations are headquartered and conduct a substantial portion of their lending activities in California.  A significant portion of the Associations' business consists of originating residential and multi-dwelling mortgage loans and servicing the mortgage loans that they own.

## B.    The UCA

### 1.    The UCA as written

Under § 17203 of the UCA, any "person" (which includes corporations) engaging in "unfair competition" may be enjoined in any court of competent jurisdiction and the court may order restitution of any interest in money or property acquired by means of such unfair competition.[3]  The UCA defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) . . . of the Business and Professions Code."[4]

You have advised us that California courts have interpreted other key terms left undefined in the statute.  For instance, under the UCA, a "practice" can be based on a pattern of behavior pursued in a course of business, and can include a single act if that act affects plaintiffs on a classwide basis.[5]  "Unlawful" business practices are those that violate any predicate law, state or federal, civil or criminal, even if the predicate law does not provide for a private cause of action.[6]  An "unfair" business practice is one whose harm to the victims outweighs its benefits to society.[7]  "Fraudulent" business

---

[3]  Cal. Bus. & Prof. Code §§ 17201, 17203.

[4]  Cal. Bus. & Prof. Code § 17200.

[5]  Allied Grape Growers v. Bronco Wine Co., 249 Cal. Rptr. 872, 884 (1988); People v. Casa Blanca Convalescent Hospital, Inc., 206 Cal. Rptr. 164, 174-75 (1987).

[6]  See, e.g., Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668 (Cal. 1983); Barquis v. Merchants Collection Ass'n., 496 P.2d 817, 829-31 (Cal. 1972); Podolsky v. First Healthcare Corp., 58 Cal. Rptr.2d 89, 98 (1996).

[7]  See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980).  The court noted that this definition is intentionally broad in order to allow courts maximum discretion to prohibit new schemes to defraud.

3

conduct is any conduct by which the public is likely to be deceived; no actual deception, reasonable reliance, or damages are required.[8]

Section 17500 of the UCA forbids "untrue or misleading" advertising in connection with the disposition of real or personal property or services. This prohibition is very similar to the UCA's definition of "unfair competition" in § 17200 as "unfair, deceptive, untrue or misleading advertising."[9] The Supreme Court of California has noted that, under § 17500, an advertisement is "untrue or misleading" if it is likely to deceive the audience, and the intent of the disseminator and the knowledge of the customer are irrelevant.[10] You have informed us that alleged violations of the two statutes are generally pled and litigated as a single cause of action, and that California courts do not distinguish between the two.

California courts have noted that, under § 17200, violation of the UCA is a strict liability offense.[11] There is no need to show that the defendant intended to injure anyone.[12]

Under the UCA, the California Attorney General and county district attorneys have the express right to sue for unfair competition violations on behalf of the people of California or upon the complaint of any person, corporation or association.[13] An action also may be brought by any person acting for the interests of itself, its members or the general public.[14]

---

[8] Committee on Children's Television, 673 P.2d at 668-69.

[9] Indeed, as noted, § 17200 specifically incorporates acts that violate § 17500. Section 17500, however, appears to be narrower than § 17200 in three respects. First, § 17500 applies only to false advertising, whereas § 17200 also forbids "fraudulent business practices." Second, § 17500 is limited to advertising that concerns real or personal property or services or the circumstances of their disposition or performance, whereas § 17200 contains no such limitation. Third, a defendant violates § 17500 only if he knows the advertising is false or misleading or in the exercise of reasonable care should know it to be, whereas § 17200 imposes strict liability.

[10] Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[11] Podolsky, 58 Cal. Rptr.2d at 98.

[12] Id.; State Farm Fire and Cas. Co. v. Superior Court, 53 Cal. Rptr.2d 229, 233-34 (1996).

[13] Cal. Bus. & Prof. Code § 17204.

[14] Id.

4

The UCA authorizes a trial court to fashion a remedy to prevent unfair trade practices.[15]  The trial court can also make such orders and judgments as may be necessary to restore to a person any money or property that may have been acquired by means of unfair competition.[16]  Remedies under the UCA are cumulative to each other and to the remedies or penalties available under other state laws.[17]

In addition to injunctive relief, the UCA provides that public officials (but not private litigants) can sue for civil penalties for violations.[18]  Any civil penalties collected by state and local officials in prosecuting an unfair competition claim are required to be paid to the state and local entities bringing such suit.[19]

### 2.    The UCA as applied

You represent that the UCA has been broadly interpreted and applied and cite several aspects of the statute to support your position.  First, you maintain that the statutory terms in the UCA have been defined broadly.  For instance, you indicate that California courts interpreting the UCA have found that the UCA does not require a breach of contract, or a violation of real property, commercial or tort law, but rather merely a finding of "unfairness" to sustain a cause of action.[20]  As noted above, a business practice is "unfair" if its harm to the victims outweighs its benefits to society, and this term has been interpreted broadly to allow courts maximum flexibility to prohibit new schemes to defraud.[21]

---

[15]  Cal. Bus. & Prof. Code § 17203.

[16]  Id.

[17]  Cal. Bus. & Prof. Code § 17205.  This aspect of the UCA is borne out by the examples of UCA claims filed against the Association discussed infra at 7-9.  In two of those examples, UCA claims based on the forced placement of insurance and the imposition of loan-related fees, the complaints included a variety of other causes of action, such as breach of contract, conversion, RICO violations, and unjust enrichment.

[18]  Cal. Bus. & Prof. Code § 17206(a).

[19]  Id.

[20]  See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980); Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[21]  See Motor's Inc., 162 Cal. Rptr. at 546.

5

You further represent that under the UCA's definition of "fraudulent conduct," i.e., any conduct in which the public is likely to be deceived,[22] there is no requirement that a person actually be deceived or suffer any damages as a result of fraudulent conduct or reliance thereon.[23] Even a true statement can constitute "fraudulent conduct" if it is likely to deceive the public.[24]

Similarly, you indicate that under the UCA § 17200, "unfair, deceptive, untrue or misleading advertising" is advertising by which a person is likely to be deceived.[25] California courts have defined "untrue or misleading" advertising under UCA § 17500 in the same way.[26]

These broad definitions are in contrast to another state unfair business practices statute that the OTS has reviewed, the Indiana Deceptive Acts and Practices Statute, and discussed in a December 24, 1996 OTS opinion ("1996 Opinion").[27] Unlike the open-ended terms to describe "unfair" business practices in the UCA, the Indiana statute reviewed in the 1996 Opinion set out a list of specific acts or representations that were deemed to be "deceptive" acts, thereby providing some certainty as to what types of activities violated the statute.[28] (We note that the California Civil Code contains a provision, § 1770 (part of the "Consumers Legal Remedies Act"[29]), that is structured

---

[22] Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668-69 (Cal. 1983) (construing § 17200 of the UCA).

[23] Id.

[24] Id. at 668, citing Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[25] Committee on Children's Television, 673 P.2d at 668-69.

[26] See, e.g., Chern, 544 P.2d at 1316.

[27] OTS Op. Chief Counsel (December 24, 1996), construing the Indiana Deceptive Acts and Practices Statute, Ind. Code §§ 24-5-0.5-1 et seq. (1995).

[28] Ind. Code § 24-5-0.5-3(a). Statutory examples of such "deceptive" acts included: representing that a specific price advantage exists as to the subject of a consumer transaction, if it does not and the supplier knows or should reasonably know that it does not; and representing that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false. Ind. Code at §§ 24-4-0.5-3(a)(6) and (8) (1995).

[29] Cal. Civ. Code §§ 1750 et seq. (West 1998).

6

like the Indiana statute.[30]  You do not ask, however, about Civil Code § 1770, and therefore we do not consider its impact, if any, on your inquiry.)

You also indicate that the UCA's standing rules are extremely liberal and contrast sharply with the standing requirements of traditional areas of state jurisdiction, such as contract or tort law.  For instance, under the UCA, any "person" (including corporations) may bring an action "for the interests of itself, its members, or the general public,"[31] and, in cases where a plaintiff sues on behalf of the general public, the plaintiff need not prove actual harm by the allegedly unfair business practices or personal dealings with the defendant.[32]  Nor must the plaintiff bring the suit as a class action, where he must show he will fairly and adequately protect the interests of the class, and where other affected persons would be bound by the outcome.

As one commentator has noted, many states, like California, have extended to private consumers the right to sue for deceptive and unfair business practices, creating problems between enforcement of the Federal Trade Commission ("FTC") Act[33] and many state deceptive and unfair business practices statutes.[34]  The UCA's allowance for actions by private litigants is in contrast to the enforcement mechanism in the FTC Act, on which the UCA is based.[35]  The FTC Act requires that the FTC proceed only when it appears that doing so is in the public interest, and only the FTC may prosecute an

---

[30]  Cal. Civ. Code § 1770 (West 1998 and Supp. 1999).

[31]  Cal. Bus. & Prof. Code § 17204.

[32]  You maintain that the private standing to remedy unfair practices on behalf of the general public does not require the numerosity, commonality, adequacy, typicality, manageability, or other requirements of class actions under the California or Federal Rules of Civil Procedure.

[33]  15 U.S.C.A. §§ 41 et seq. (West 1997).

[34]  See Sovern, "Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Rule Model," 52 Ohio St.L.J. 437 (Spring 1991) at 437 ("While [extending private rights of action] has indeed aided injured consumers, it has also generated problems of its own") and 452 ("'Little FTC Acts' arm consumers with a powerful weapon against merchants, enabling consumers to prevail even when it may not be in society's interest for them to win").

[35]  See, e.g., Rubin v. Green, 847 P.2d 1044, 1052 (Cal. 1993) (the UCA is one of the so-called "little FTC Acts" enacted by many states).

7

action under the Act.[36] Individual consumers have no recourse when the FTC declines to bring a case.[37] But once the FTC obtains a remedy, it would benefit all consumers.

You also claim that the UCA's remedial authority is sweeping.[38] You note that California appellate courts have found that a trial court in a UCA proceeding has broad authority to fashion a remedy that not only enjoins unfair trade practices, but requires specific actions designed to deter the defendant and others from engaging in such practices in the future.[39] You further represent that there is no requirement that penalties be tied to the actual harm suffered.[40] Moreover, once calculated, penalties may be imposed jointly and severally on all defendants.[41]

You argue that this combination of broad definitions, liberal standing requirements, and generous remedial provisions makes UCA claims extremely attractive for plaintiffs to pursue and nearly impossible for the Associations to defend or obtain finality as to acceptable practices. You indicate that the UCA has been increasingly used as a vehicle to challenge aspects of the Associations' and other federal thrifts' lending operations that historically have been within the purview of federal law.

### 3. UCA claims filed against the Associations based on their lending activities

In support of your request, you inform us that the Associations have faced, or are currently facing, litigation brought under the UCA challenging certain aspects of the Associations' lending operations as "unfair." You argue that, although the UCA is

---

[36] Holloway v. Bristol-Meyers Corp., 485 F.2d 986 (D.C. Cir. 1973); Carlson v. Coca-Cola Co., 483 F.2d 279 (9th Cir. 1973). Compare 15 U.S.C. § 45(b) (FTC may issue a complaint if "it shall appear to the [FTC] that a proceeding by it in respect [to an unfair or deceptive business practice] would be in the interest of the public . . .") with Cal. Bus. & Prof. Code § 17204 (Actions may be brought "by any person acting for the interests of itself . . . ").

[37] Heckler v. Chaney, 470 U.S. 821 (1985) (Food and Drug Administration refusal to commence proceeding is not reviewable absent statute so providing).

[38] Cal. Bus. & Prof. Code § 17203.

[39] See McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 662 P.2d 916, 920 (Cal. 1983); People v. Toomey, 203 Cal. Rptr. 642, 654 (1984).

[40] People v. Toomey, 203 Cal. Rptr. at 657.

[41] People v. Bestline Products, Inc., 132 Cal. Rptr. 767, 794-96 (1976).

8

not directly aimed at federal savings associations, or lenders in general, it has been used by plaintiffs to challenge areas of the Associations' lending activities that have traditionally been governed by federal law.

You provide three examples of lending activities that have been challenged under the UCA—advertising, the forced placement of hazard insurance, and the imposition of loan-related fees—and the following information relating thereto.

### a.    Advertising

In 1994, the District Attorney's Office for the County of [        ], California, asserted an action against Association A in Superior Court alleging that Association A's advertising of one of its loan programs, which featured an adjustable rate mortgage loan with a bi-weekly payment, was misleading and constituted an unfair practice under the UCA.  The District Attorney alleged, among other things, that the advertising and promotional material that Association A used in connection with the particular loan program violated the UCA because the advertising did not include an example disclosing the maximum permissible annual percentage rate for loans offered under the program.[42]  Association A ultimately settled the case, agreeing to end the advertising program and to pay a civil penalty to the District Attorney's office, without conceding any wrongdoing.

### b.    Forced placement of insurance

Association A currently is defending a class action lawsuit alleging that during the course of force placing hazard insurance on behalf of its borrowers, as a result of the borrowers' failure to pay the insurance premiums under their existing policies, Association A did not mitigate avoidable costs that were then passed on to the borrowers.[43]  Specifically, the complaint alleges that when the borrowers' hazard insurance coverages expired, Association A force placed alternative coverage from a different insurance company at a higher cost than the cost of the lapsed policy.[44]  The

---

[42] People v. [                        ], Superior Court, [        ] County, California ([            ]).

[43] [                                            ], Superior Court, [        ] County, California ([            ]).  All the plaintiffs in the [      ] class action are private individuals who obtained mortgage loans from Association A; there are no governmental plaintiffs in the action.

[44] The complaint in [      ] alleges that the new policies, which Association A places pursuant to an arrangement it has with an unaffiliated insurance company, often cost two to five times more than the lapsed policies.

9

plaintiffs contend that Association A had an obligation to mitigate avoidable losses by maintaining the same policy in effect with the same insurance carrier at the same price (or even less). The plaintiffs allege that Association A's procedures for force placing hazard insurance constitute an "unfair business practice" in violation of § 17203 of the UCA.

Besides the UCA claim, the plaintiffs' complaint also asserts causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment and imposition of a constructive trust, and declaratory relief, all based on the forced placement of insurance.[45] You indicate that trial in this matter is currently scheduled for later this year.

### c.     Loan-related fees

You represent that Association A has faced several challenges to its imposition of certain loan-related fees. You specifically cite a legal challenge based on the UCA to two fees—"demand statement" fees and facsimile fees[46]—that Association A charges when a borrower pays off a mortgage loan.[47] In that lawsuit, the plaintiffs alleged that Association A charged impermissibly inflated demand statement and facsimile fees when borrowers refinanced their mortgage loans and that such practice constituted an "unfair business practice" under the UCA.[48] In addition to the UCA claim, the plaintiffs' complaint also asserted causes of action for breach of contract, RICO violations, and restitution.[49] You maintain that Association A has incurred substantial money and time defending such lawsuits.

---

[45] See Complaint, [                                                                          ], Superior Court,
[     ] County, California ([                    ]).

[46] When a borrower refinances a mortgage loan, the existing mortgagee generates a statement, called a demand statement or payoff statement, setting forth all outstanding amounts on the current mortgage. The current mortgagee then normally transmits the demand statement to the new mortgagee by facsimile. Association A charges a fee for each of these services.

[47] See, e.g., [                                                                                              ]
(subsequently voluntarily dismissed). The named plaintiff, who resided in Illinois, filed a claim in federal court in Illinois against Association A based on an alleged violation of the UCA.

[48] Id.

[49] See Complaint, [                                                                              ]
(subsequently voluntarily dismissed).

10

## II.    Discussion

### A.    Analytical framework

Pursuant to §§ 4(a) and 5(a) of the Home Owners' Loan Act ("HOLA"),[50] the OTS is (and before it, the Federal Home Loan Bank Board ("FHLBB") was) authorized to provide for the safe and sound operation of federal savings associations and has exclusive plenary authority to regulate all aspects of the operations of federal savings associations. Extensive judicial and other authority supports the principle that HOLA § 5(a) and the OTS's implementing regulations preempt state laws that purport to regulate the activities or operations of federal savings associations because Congress conferred on the FHLBB, and now the OTS, exclusive authority to regulate the operations of federal savings associations.[51] Extensive authority also confirms that OTS (and formerly FHLBB) regulations preempt state law where the law in question conflicts with, or is otherwise an obstacle to, the achievement of the objectives of federal regulations.[52]

In 12 C.F.R. § 560.2(a) (1998), the OTS states its intention to totally occupy the field of the regulation of the lending activities of federal savings associations. One of the express purposes of § 560.2(a) is to allow federal savings associations "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme

---

[50]  12 U.S.C.A. §§ 1463(a) and 1464(a) (West Supp. 1998).

[51]  See, e.g., Conference of Federal Savings and Loan Associations v. Stein, 604 F. 2d 1256, 1260 (9th Cir. 1979) ("[T]he regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control . . . . The broad regulatory authority over the federal associations conferred upon the [FHLBB] by HOLA does wholly preempt the field of regulatory control over these associations."), aff'd mem., 445 U.S. 921 (1980); FHLBB v. Empie, 628 F. Supp. 223, 225 (W.D. Okla. 1983) ("Congress intended the HOLA to preempt all state regulation over federally-chartered savings and loan institutions."), aff'd, 778 F.2d 1447 (10th Cir. 1985); People v. Coast Federal Savings and Loan Ass'n, 98 F. Supp. 311, 316 (S.D. Cal. 1951) ("The FHLBB has adopted comprehensive rules and regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."). See also OTS Op. Chief Counsel, (January 18, 1996) (state reporting requirements preempted); OTS Op. Chief Counsel (October 11, 1991) (deposit taking); FHLBB Op. General Counsel (April 28, 1987) (lending and examination).

[52]  Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 156, 159 (1982) (preempting state limitation on due on sale practices that conflicted with FHLBB regulation); see also First Federal Savings and Loan Ass'n of Boston v. Greenwald, 591 F. 2d 417, 425 (1st Cir. 1979) (preempting Massachusetts law requiring payment of interest on tax escrow account that conflicted with FHLBB regulation); Kupiec v. Republic Federal Savings and Loan Ass'n, 512 F.2d 147-50 (7th Cir. 1975) (preempting "common law" right to inspect and copy membership list that conflicted with FHLBB model by-law governing communication between members or depositors).

11

of regulation."[53]  The preamble to § 560.2 sets out the analytical framework to be used in determining whether a state law that affects lending is preempted by federal law.[54] Under this framework, state laws of the type listed in § 560.2(b) are preempted.  State laws of the types listed in § 560.2(c) are generally not preempted.  However, under subsection (c), a state law of the type traditionally left to the states or that the OTS finds furthers a vital state interest is nevertheless preempted if the law has more than an "incidental impact" on a thrift's lending operations or is otherwise contrary to the purposes of § 560.2(a).

Under § 560.2(b), the general types of state laws that federal law preempts based on this occupation of the field include state laws purporting to impose requirements regarding "[d]isclosure and advertising,"[55] "[t]he ability of a creditor to require private mortgage insurance, insurance for other collateral, or other credit enhancements,"[56] and "[l]oan-related fees."[57]  Under § 560.2(c), the specific types of state laws that generally are not preempted by federal law include contract and commercial law, real property law, tort law, certain homestead laws, and criminal law.[58]  Aggrieved consumers thus may use these types of laws to obtain relief.[59]

The OTS utilized this analytical framework in the 1996 Opinion, which examined whether federal law preempted the Indiana Deceptive Acts and Practices Statute.  The Indiana Deceptive Acts and Practices Statute prohibited specified acts and representations in connection with consumer transactions.  For example, the statute prohibited a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of a consumer transaction, if it does not and the [person] knows or should reasonably know that it does not," and from making oral or written representations that a consumer transaction

---

[53]  12 C.F.R. § 560.2(a) (1998).

[54]  61 Fed. Reg. 50951, 50965-67 (September 30, 1996).

[55]  12 C.F.R. § 560.2(b)(9) (1998).

[56]  12 C.F.R. § 560.2(b)(2) (1998).

[57]  12 C.F.R. § 560.2(b)(5) (1998).

[58]  12 C.F.R. § 560.2(c) (1998).

[59]  Aggrieved customers of federal savings associations may also pursue relief through OTS's consumer complaint process.  See discussion, infra at 18.

12

involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false."[60]

The 1996 Opinion reviewed the state statute in the context of a proposed lending program and there was no suggestion that the state statute was being (or would be) applied in a manner that impermissibly affected lending. The 1996 Opinion concluded that the Indiana statute fell within the category of "contract and commercial law" under § 560.2(c)(1), that the law's impact on lending was incidental, that there was no indication that the law conflicted with any federal objectives identified in § 560.2(a) of the OTS's lending regulation, and, therefore, that the Indiana statute was not preempted by federal law.[61]

We will review the UCA, as it affects the Associations' lending practices regarding advertising, insurance requirements and loan-related fees, under the same analytical framework set forth in § 560.2. We note that the UCA, as drafted, is not directly aimed at federal savings associations, or lenders generally. The question is thus whether the UCA, as applied in the three circumstances you describe, has been and is being used by both private and governmental plaintiffs as a vehicle to improperly impose requirements on the Associations' lending operations regarding matters that have traditionally been within the exclusive purview of the OTS and federal law. A preemption analysis requires consideration of the relationship between federal and state laws as they are interpreted and applied, not merely as they are written.[62]

## B.    Section 560.2(c)

As indicated above, § 560.2(c) provides that specified types of state laws, including contract and commercial laws or a law that the OTS finds furthers a vital state interest, generally are not preempted to the extent that the state law's effect on lending is only incidental and the state law is consistent with the objectives of § 560.2(a), including allowing federal savings associations to operate in accordance with uniform standards. However, if such a state law has a more than incidental impact

---

[60]   1996 Opinion at 2, citing Ind. Code § 24-4-0.5-3(6) and (8) (1995).

[61]   The 1996 Opinion also reviewed a separate Indiana statute that required specific lending disclosures by a federal savings association, and concluded that the Indiana statute was preempted under § 560.2(b)(9). Id. at 7-8.

[62]   Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977); see also DeCanas v. Bica, 424 U.S. 351, 363-65 (1976).

13

on a federal thrift's lending operations or is inconsistent with the objectives of § 560.2(a), the state law may be preempted.

In the 1996 Opinion, we concluded that the Indiana Deceptive Acts and Practices Statute fell within the category of "contract and commercial law" under § 560.2(c). The UCA may also be viewed as a form of contract and commercial law under § 560.2(c). Nevertheless, in our view the situation faced by the Associations is distinguishable from the issues and facts addressed in the 1996 Opinion because the application of the UCA in the circumstances you describe seeks to set very particular requirements on the Associations' lending operations. As such, under § 560.2(c), the application of the UCA as described above has more than an incidental impact on the Associations' lending activities and is contrary to the purpose of uniform standards of operations.

### 1.    As applied, the UCA has more than an incidental impact on lending

Unlike the statute at issue in the 1996 Opinion, it appears, based on the information you have provided, that in this case the practical effect of the application of the UCA as a basis for alleging "unfair competition" creates more than an incidental impact on the Associations' lending operations.[63]

Even though the UCA, on its face, may appear to further a state's vital interest in regulating commercial transactions and is not specifically aimed at the lending practices of federal savings associations, the UCA has been and is being used, by private and governmental parties, in an attempt to set substantive standards for the Associations' lending operations and practices. You have identified specific lawsuits in which plaintiffs have used the UCA in attempts to require particular lending disclosures, limit the Associations' choice of insurers and cap certain fees. Advertising lending programs, protecting security property, and imposing certain loan-related fees

---

[63] By contrast, the Indiana Deceptive Acts and Practices Statute did not attempt to regulate the content of a federal savings association's advertising or the amount of a loan-related fee, but rather, sought only to protect the integrity of such representations and charges once made. A federal thrift, as part of a loan contract, could decide what fees to charge and would only run afoul of the Indiana statute if it did not abide by its agreements or representations regarding those fees. Here, the UCA is being used in a manner that attempts, indirectly through the regulation of "unfair" business practices, to establish state-imposed, substantive standards for the lending activities of federal thrifts.

14

are all integral components of the Associations' lending operations, and the UCA as applied would have a significant impact on those operations.[64]

There is little doubt that the three lending activities identified by the Associations—advertising, insurance requirements, and loan-related fees—are areas in which the OTS has made clear that federal law prevails over state law to enable federal thrifts to use uniform standards of operation.[65]  Thus, to the extent that the UCA is being used to affect these activities, such an application of the UCA (i) has more than an incidental effect on a federal thrift's lending operations and (ii) is inconsistent with the purposes of § 560.2(a).

### a.     Advertising

Under § 560.2(b)(9), state laws purporting to impose requirements regarding the advertising and disclosures of federal savings associations are the types of state laws that the OTS has identified as being preempted by § 560.2(a).  Moreover, there is a specific federal regulation governing advertising by federal savings associations. OTS's advertising regulation, 12 C.F.R. § 563.27 (1998), prohibits any savings association from using advertising or making any representation "which is inaccurate in any particular or which in any way misrepresents its services, contracts, investments, or financial condition."  This definition of prohibited advertising is similar to that of "unfair competition" in the UCA.  Federal thrifts are also subject to an elaborate network of federal disclosure laws, including the Truth-in-Lending Act ("TILA") and Regulation Z, which require certain methods of interest rate disclosure.[66]  In this regard, the 1996 Opinion concluded that federal law preempted the application of a state statute requiring specific lending disclosures to a federal savings association.[67]

A state law that, on its face, purported to regulate the advertising of a federal savings association would be preempted under § 560.2(b).  Accordingly, to the extent

---

[64]   We emphasize that our conclusion as to such undue impact applies only with respect to the three areas of the Associations' lending operations described herein.

[65]   OTS regulation § 560.2(b) presupposes that state laws regarding advertising, insurance requirements and loan-related fees have a more than incidental and impermissible impact on the lending operations of federal savings associations, and provides that such laws are preempted. See 12 C.F.R. §§ 560.2(b)(2), 560.2(b)(5) and 560.2(b)(9); 61 Fed. Reg. 50951, 50966 (September 30, 1996) ("[Section] 560.2 is based on the premise that any state law that affects lending is preempted unless it clearly falls within the parameters of paragraph (c).")

[66]   15 U.S.C.A. §§ 1601 et seq. (West 1998); 12 C.F.R. Part 226 (1998).

[67]   1996 Opinion at 7-8.

15

that the UCA is being used, directly or indirectly, to require a particular form of interest rate disclosure in advertising the Associations' lending programs in order to be considered "fair" or not "misleading," the UCA is preempted.[68] We note that at least one California appellate court has ruled that 12 C.F.R. § 563.27, the OTS's advertising regulation, preempts a state UCA claim based on allegedly false and misleading advertising.[69]

### b.    Force-placed insurance

The OTS has stated that lending practices designed to protect the property securing a borrower's mortgage loan are an integral part of a federal savings association's lending operations.[70]  Under § 560.2(b)(2), state laws regarding the ability of a federal savings association to require insurance for its collateral are preempted by federal law.  Moreover, OTS regulations require a federal savings association to adopt real estate lending practices that reflect prudent underwriting standards.[71]  Such standards must reflect, inter alia, "additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments)."[72]

Until 1996, an OTS policy statement provided that a savings association was required to include in its loan documents provisions requiring a borrower to maintain hazard insurance to protect the association from loss in the event the property securing the loan was damaged or destroyed.[73]  In removing that policy statement as unnecessary, the OTS stated that the general requirement that an association maintain safe and sound lending practices by following the required prudent underwriting standards, and standard business practices in the mortgage lending industry, were

---

[68]  The UCA essentially permits an open-ended, county-by-county determination of what information must be contained in an advertisement for it to be "fair."  This contrasts sharply with the approach of the Indiana Deceptive Acts and Practices Statute examined in the 1996 Opinion, which sets forth specific acts or representations that would violate the statute.  See discussion, supra at 5, n.29 and 11, n.60.

[69]  [                                                                        ] (unpublished opinion) (UCA claims based on fraud and misrepresentation preempted by 12 C.F.R. § 563.27).

[70]  OTS Mem. Chief Counsel (Sept. 2, 1997) at 6-8.

[71]  12 C.F.R. § 560.1(b) (1998).

[72]  See Interagency Statement on Real Estate Lending, Appendix to 12 C.F.R. § 560.101 (1998).

[73]  12 C.F.R. § 571.4 (1996).

16

sufficient to authorize a federal savings association to force place hazard insurance.[74] As noted, <u>supra</u>, lending practices designed to protect the collateral that serves as security for a loan are an integral part of a federal savings association's lending operations. Accordingly, to the extent that the UCA is being used either to limit the Associations' ability to force place insurance on properties securing loans, or the Associations' choice of insurers or premiums to be charged on the forced placement of insurance, the UCA is preempted as an impermissible interference with the Associations' lending programs.[75]

### c.    Loan-related fees

Section 560.2(b) also presupposes that state laws imposing requirements on a federal savings association's charging of loan-related fees are preempted by federal law. The fees at issue in the example provided by the Associations, demand statement fees and facsimile charges, are loan-related fees.[76] Accordingly, to the extent that the UCA is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs, the UCA is preempted.

> **2.    As applied, the UCA violates the objectives of § 560.2(a), including the objective of allowing federal savings associations to exercise their lending powers in accordance with uniform standards of operation**

Moreover, as you have described the manner in which the UCA is being applied and used in these three areas, the effect of that application and use is inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers "in accordance with a uniform scheme of federal regulation."[77]

Because the statutory terms defined in the UCA are vague and there is no single enforcement body to set standards for applying the UCA, it is difficult for the

---

[74]  61 Fed. Reg. 60173, 60175-76 (November 27, 1996).

[75]  Indeed, the OTS has already found that a state law that impedes a federal savings association's ability to protect the collateral securing its loans has more than an incidental effect on lending operations. OTS Mem. Chief Counsel (Sept. 2, 1997) at 7.

[76]  <u>See</u> discussion, <u>supra</u> at 9, n.46.

[77]  12 C.F.R. § 560.2(a).

Associations and other federal savings associations to know with any certainty what lending practices will be acceptable under the UCA in any particular county in California at any particular time. As a result of how governmental and private plaintiffs have used the UCA, the Associations have been exposed or subjected to varying standards of acceptable practice in their lending operations rather than being able to operate under uniform federal standards within California as well as nationwide.

For instance, the Associations' advertising, while perhaps acceptable to one county attorney in California, might be viewed as impermissible in the eyes of another county attorney in California.[78] Similarly, UCA suits based on the Associations' efforts to protect their security interests in property by force placing insurance when borrowers allow their hazard insurance to lapse, and suits based on the charging of loan-related fees, could subject the Associations to different standards within California as well as in other states. This result is inconsistent with, and violates the objectives set forth in, § 560.2(a).[79] This result is also particularly troubling in the areas of advertising, security property, and loan-related fees, which the OTS has identified in its regulations as areas in which the OTS has determined that federal thrifts should be able to exercise their lending powers in accordance with uniform federal standards of operation.

The manner in which the provisions of the UCA have been applied to the Associations in these three areas results in a great deal of uncertainty in how the lenders should structure and operate their lending programs to comply with the UCA. As such, it violates the objective of allowing federal savings associations to conduct their lending operations in accordance with uniform standards of operation. Accordingly, as applied, the UCA does not meet the requirements of § 560.2(c) to be considered a type of state law that is not preempted by federal law.

## III.   Conclusion

Based on the foregoing, we conclude that federal law preempts the UCA as it has been applied in these instances to the Associations' advertising, forced placement of hazard insurance, and charging of loan-related fees in connection with their lending

---

[78]  We do not here address the merits of the challenge to Association A's advertising in [          ] (see n.42, supra) and do not suggest that the advertising is immune from challenge; we merely find that such a claim cannot be pursued under the UCA.

[79]  As with the claims based on Association A's advertising, we do not here address the merits of the plaintiffs claims regarding force-placed insurance and loan-related fees (see discussion, supra at 8-9). We merely find that such claims cannot be pursued under the UCA. For example, in instances where the placement of insurance and charging of fees are addressed in the loan agreement (as they were in the UCA claims against Association A discussed herein), plaintiffs could bring claims based on those practices as traditional breach of contract claims.

18

activities.  More specifically, federal law preempts application of the UCA to the Associations in a manner that (i) has more than an incidental affect on the Associations' lending activities, or (ii) is inconsistent with the objectives set forth in § 560.2(a), including the objective of allowing federal savings associations to operate in accordance with uniform standards of operation.

The practical effect of the application of the UCA to the Associations here has resulted in significant interference with the Associations' lending operations by purporting to set standards in these three areas.  The Associations have been subjected to varying standards of acceptable lending practices based on allegations regarding integral components of the Associations' lending operations.  A state law purporting on its face to regulate these areas of a federal savings association's lending operations would be preempted; the UCA cannot be used to accomplish indirectly what a state could not accomplish directly.

We wish to emphasize the extremely limited nature of our preemption determination here.  Our finding of preemption is only based on how the UCA has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law.  We do not preempt the entire UCA or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards.

We further emphasize that preempting application of the UCA in these three areas should have little practical effect on an allegedly aggrieved party's ability to seek and obtain relief.  In instances of perceived "unfair" or "misleading" advertising, an aggrieved party can invoke the OTS's advertising regulation (and, where appropriate, Regulation Z) and initiate the OTS's consumer complaint process by contacting the nearest OTS Regional office or calling the OTS's toll-free consumer number, (800) 842-6929.[80]  The plaintiffs' claims described herein based on the forced placing of insurance or the charging of loan fees may still be brought in state court based on traditional contract claims or other causes of action, such as those alleged by plaintiffs in the lawsuits against Association A discussed herein.[81]

---

[80] See A Guide to Consumer Assistance (December 1996), available from the OTS Consumer Programs Office, 1700 G St., N.W., Washington, D.C. 20552 and on the OTS's website: www.ots.treas.gov/consass.html.

[81] See discussion, supra at 8-9.

19

In reaching the foregoing conclusions, we have relied on the factual information, representations, and materials you submitted to us in writing and in subsequent conversations with OTS staff, as summarized herein. Any material differences in facts or circumstances from those described herein could result in different conclusions.

If you have any questions regarding this matter, please feel free to contact Timothy P. Leary, Counsel (Banking & Finance), at (202) 906-7170 or Vicki Hawkins-Jones, Assistant Chief Counsel, Regulations and Legislation, at (202) 906-7034.

Very truly yours,

Carolyn J. Buck
Chief Counsel

cc.    Regional Directors
       Regional Counsel