1  David M. Arbogast (SBN 167571)
   David@SpiroMoss.com
2  Ira Spiro (SBN 67641)
   Ira@SpiroMoss.com
3  **SPIRO MOSS BARNESS LLP**
   11377 W. Olympic Boulevard, Fifth Floor
4  Los Angeles, CA 90064-1683
   Phone: (310) 235-2468; Fax: (310) 235-2456
5
   Paul R. Kiesel, Esq. (SBN 119854)          Jonathan Shub (SBN 237708)
6  kiesel@kbla.com                             jshub@seegerweiss.com
   Patrick DeBlase, Esq. (SBN 167138)          **SEEGER WEISS LLP**
7  deblase@kbla.com                            1515 Market Street, Suite 1380
   Michael C. Eyerly, Esq. (SBN 178693)        Philadelphia, PA 19107
8  eyerly@kbla.com                             Phone: (215) 564-2300; Fax (215) 851-8029
   **KIESEL BOUCHER LARSON LLP**
9  8648 Wilshire Boulevard                     Jeffrey K. Berns, Esq. (SBN 131351)
   Beverly Hills, California 90211             jberns@jeffbernslaw.com
10 Phone: (310) 854-4444; Fax: (310) 854-0812  **LAW OFFICES OF JEFFREY K. BERNS**
                                               19510 Ventura Boulevard, Suite 200
11                                             Tarzana, California 91356
                                               Phone: (818) 961-2000; Fax: (818) 867-4820
12
   Attorneys for Plaintiffs and all others Similarly Situated
13

14              **UNITED STATES DISTRICT COURT**

15     **NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

16 DOLORES MANDRIGUES, JUANITA    )  **CASE NO. C-07-04497 JF (RS)**
   JONES, AL F. MINYEN and WILMA R. )
17 MINYEN, individually and on behalf of all )  **SECOND AMENDED CLASS ACTION**
   others similarly situated,       )  **COMPLAINT FOR:**
18                                  )
19              Plaintiff,          )  **(1)   Violations of the Truth in Lending Act, 15**
                                    )        **U.S.C. §1601, *et seq*;**
20                                  )
        v.                          )  **(2)   Fraudulent Omissions;**
21                                  )
                                    )  **(3)   Violation of Bus. & Prof. Code §17200, *et***
22 WORLD SAVINGS, INC., WORLD SAVINGS )        ***seq*. – "Unfair" and "Fraudulent" Business**
   BANK, FSB, WACHOVIA MORTGAGE     )        **Practices;**
23 CORPORATION, and DOES 1 through 10 )
   inclusive,                       )  **(4)   Breach of Contract; and**
24                                  )
              Defendants.           )  **(5)   Breach of the Covenant of Good Faith and**
25                                  )        **Fair Dealings.**
                                    )
26                                  )
                                    )
27 _____ )         **JURY TRIAL DEMANDED**
                                    )
28

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1    Plaintiffs, DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R.

2    MINYEN, individually and on behalf of all others similarly situated allege as follows:

3

4                                            **I.**

5                                    **INTRODUCTION**

6          1.      This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §1601, *et*

7    *seq.,* California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.,* and other

8    statutory and common law in effect.  Plaintiffs DOLORES MANDRIGUES, JUANITA JONES, AL F.

9    MINYEN and WILMA R. MINYEN, and on behalf of all others similarly situated, bring this action

10   against WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE

11   CORPORATION, and DOES 1-10 (collectively "Defendants"), based, in part, on Defendants' failure to

12   clearly and conspicuously disclose to Plaintiffs and the Class Members, in Defendants Option

13   Adjustable Rate Mortgage ("ARM") loan documents, and in the required Truth In Lending Disclosure

14   Statements ("TILDS"), accompanying the loans, (i)  the actual interest rate on which the payment

15   amounts listed in the TILDS are based (12 C.F.R. § 226.17 (c)); (ii) that making the payments according

16   to the payment schedule listed in the TILDS will result in negative amortization and that the principal

17   balance will increase (12 C.F.R. § 226.19); and (iii) that the payment amounts listed on the TILDS are

18   insufficient to pay both principle and interest.

19

20                                           **II.**

21                                   **THE PARTIES**

22         2.      Plaintiff, DOLORES MANDRIGUES is, and at all times relevant to this Complaint, was

23   an individual residing in Milpitas, California.  On or about August 4, 2006, Plaintiff MANDRIGUES

24   refinanced her existing home loan and entered into an Option ARM loan agreement with Defendants.

25   The Option ARM loan was secured by Plaintiff's primary residence.  Attached hereto as <u>Exhibit 1</u> is a

26   true and correct copy of the Note and the Truth In Lending Act Disclosure Statement (hereafter

27   "TILDS") pertinent to this action.

28   / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1    3.    Plaintiff, JUANITA JONES is, and at all times relevant to this Complaint, was an

2    individual residing in Los Angeles, California.  On or about January 9, 2007, Plaintiff JONES

3    refinanced her existing home loan and entered into an Option ARM loan agreement with Defendants.

4    The Option ARM loan was secured by Plaintiff's primary residence.  Attached hereto as Exhibit 2 is a

5    true and correct copy of the Note and TILDS pertinent to this action.

6    4.    Plaintiffs, AL F. MINYEN and MILDRED R. MINYEN are, and at all times relevant to

7    this Complaint, were individuals residing in San Pablo, California.  On or about May 25, 2005, Mr. and

8    Mrs. Minyen entered into an Option ARM loan agreement with Defendants.  However, Defendants did

9    not provide Mr. and Mrs. Minyen with a copy of their loan documents, including but not limited to a

10    copy of, the Note, the TILDS, and the notice of right to rescind until December 20, 2007.  The Option

11    ARM loan was secured by Plaintiffs' primary residence.  Attached hereto as Exhibit 3 is a true and

12    correct copy of the Note, TILDS and Loan Program Disclosure that Defendants produced, through their

13    counsel, on December 20, 2007.

14    5.    Plaintiffs, MARK CLAUSON and CHRISTINA CLAUSON are, and at all times relevant

15    to this Complaint, were individuals residing in Santee, California.  On or about June 24, 2005, Mr. and

16    Mrs. Clauson refinanced their existing home loan and entered into an Option ARM loan agreement with

17    Defendants.  The Option ARM loan was secured by Plaintiffs' primary residence.  Attached hereto as

18    Exhibit 4 is a true and correct copy of the Note and the Truth In Lending Act Disclosure Statement

19    (hereafter "TILDS") pertinent to this action.

20    6.    Plaintiffs, DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and

21    WILMA R. MINYEN, MARK CLAUSON and CHRISTINA CLAUSON, and members of the putative

22    Class or classes shall hereinafter be referred to collectively as "Plaintiffs."

23    7.    Defendant WORLD SAVINGS, INC. is a California corporation licensed to do, and is

24    doing business in California.  At all relevant times hereto, WORLD SAVINGS, INC., was and is

25    engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are

26    the subject of this Complaint.  WORLD SAVINGS, INC. transacts business in Santa Clara County,

27    California and at all relevant times promoted, distributed, and sold the Option Arm loans that are the

28    subject of this Complaint throughout the United States, including Santa Clara County, California.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

WORLD SAVINGS, INC. has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

8.      Defendant, WORLD SAVINGS BANK, FSB, was and is a business organization form unknown.  Plaintiffs are informed and believe and thereupon allege that Defendant WORLD SAVINGS BANK, FSB is a corporation; that Defendant WORLD SAVINGS BANK, FSB is a partnership; and that Defendant, WORLD SAVINGS BANK, FSB, is a division of Defendant, WORLD SAVINGS, INC.

9.      Defendant, WACHOVIA MORTGAGE CORPORATION ("WACHOVIA"), is a North Carolina corporation licensed to do, and is doing business in California.   At all relevant times hereto WACHOVIA was and is engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are the subject of this Complaint.   WACHOVIA transacts business in Santa Clara County, California and at all relevant times promoted, distributed, and sold the Option Arm loans throughout the United States, including Santa Clara County, California.  WACHOVIA has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

10.     Defendants,  WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1 through 10, shall hereinafter be referred to collectively as "Defendants."

11.     At all times mentioned herein, Defendants, and each of them, were engaged in the business of promoting, marketing, distributing, and selling the Option Arm loans that are the subject of this Complaint, throughout the United States, including Santa Clara County, California.

12.     Plaintiffs are informed and believe, and thereon allege that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

13.     Plaintiffs are informed and believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants (both named and DOE defendants) sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-

1  ego of each of the remaining Defendants and were at all times acting within the purpose and scope of

2  such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

3  partnership or employment and with the authority, consent, approval and ratification of each remaining

4  Defendant.

5       14.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant,

6  employee, assignee and/or joint venturer of each of the other Defendants and was acting within the

7  course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the

8  permission and consent of each of the other Defendants.

9       15.    Plaintiffs are informed and believe, and thereon allege, that Defendants, and each of

10  them, are, and at all material times relevant to this Complaint, performed the acts alleged herein and/or

11  otherwise conducted business in California.  Defendants, and each of them, are corporations or other

12  business entities, form unknown, have, and are doing business in this judicial district.

13       16.    Plaintiffs are informed and believe, and thereon allege, that DOES 1 through 10,

14  inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters,

15  CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are

16  assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace

17  the fictitious names of these entities with their true names when they are discovered by Plaintiffs herein.

18       17.    The true names and capacities, whether individual, corporate, associate or otherwise, of

19  Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and

20  Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and

21  belief, that each Doe defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of

22  Court to amend this Complaint when the names of said Doe defendants have been ascertained.

23       18.    Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein,

24  Defendants, and each of them, including without limitation those Defendants herein sued as DOES,

25  were acting in concert or participation with each other, or were joint participants and collaborators in the

26  acts complained of, and were the agents or employees of the others in doing the acts complained of

27  herein, each and all of them acting within the course and scope of said agency and/or employment by the

28  others, each and all of them acting in concert one with the other and all together.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

**III.**

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction pursuant to 15 U.S.C § 1601 *et seq.* and 28 U.S.C. § 1331.

20.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in this District within California or are corporations duly licenced to do business in California.

21.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendant because it regularly conducts business in this judicial district.

**IV.**

**FACTS COMMON TO ALL CAUSES OF ACTION**

22.     WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB and WACHOVIA are amongst the largest financial institutions in the United States.

23.     The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose important material information in a clear and conspicuous manner to Plaintiffs and the Class members, in writing, as required by law.

24.     This action also concerns Defendants' fraudulent omissions and its unlawful, fraudulent and unfair business acts or practices.  Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept this type of loan in order to maximize Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure.

25.     Plaintiffs, along with thousands of other similarly situated consumers, were sold an Option ARM home loan by Defendants.  The Option ARM loan sold to Plaintiffs and the Class is a deceptively devised financial product.  The loan has a variable rate feature with payment caps.  The product was sold based upon a low, fixed interest rate, when in fact Plaintiffs were charged a different,

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1   much greater interest rate than the rate upon which the payment amounts listed in the TILDS were

2   based. Further, Defendants failed to disclose, and by omission, failed to inform Plaintiffs the fact that

3   Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.  Further

4   still, once lured into these loans, consumers cannot easily extricate themselves from these loans because

5   Defendants' included in these loans a stiff and onerous prepayment penalty making it extremely

6   difficult, if not impossible, for borrowers to extricate themselves from these loans.

7        26.    The Option ARM loan Defendants sold to Plaintiffs violates the Truth In Lending Act

8   (TILA).  TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to

9   borrowers concerning the terms and conditions of their home loans.  Defendants failed to make these

10  disclosures in connection with the Option ARM loans sold to Plaintiffs and the Class.

11       27.    At all times relevant, Defendants sold their Option ARM loan product to consumers,

12  including Plaintiffs, in a false or deceptive manner.  Defendants sold to the general public a loan which

13  would provide a very low interest and payment rate for up to ten years and made no reference in the

14  Note and TILDS that if consumers followed Defendants schedule of payments that negative

15  amortization was absolutely certain to occur.

16       28.    Plaintiffs and others similarly situated were consumers who applied for a mortgage loan

17  through Defendants.  During the loan application process, in each case, Defendants represented to

18  Plaintiffs and the Class members that in accepting these loan terms, Plaintiffs would be able to lower

19  their mortgage payment and save money.  Defendants initiated this scheme in order to maximize the

20  amount of the loans issued to consumers thereby maximizing Defendants' profits.

21       29.    As a direct and proximate result of Defendants' representations, and the conduct alleged

22  herein, Plaintiffs agreed to finance their primary residence through Defendants' Option ARM loan.  The

23  loan sold to Plaintiffs and the Class had a low payment, which Plaintiffs reasonably believed would be

24  sufficient to pay both principle and interest.  However, the true facts are that the payment schedule was

25  not based on the interest rate disclosed in the Note and TILDS, but instead, was based on a much lower

26  rate and therefore, the payment schedule provided by Defendants was *guaranteed* to be insufficient to

27  pay all of the interest due, let alone both principle and interest, which was absolutely certain to result in

28  negative amortization.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

30.     Plaintiffs and the Class members reasonably believed, based on the representations contained in the documents Defendants provided to Plaintiffs and the Class members, that they would be able to refinance their loan and get a new loan before their scheduled payments significantly increased. However, the payment schedule provided by Defendants failed to disclose, and by omission, failed to inform these consumers that due to the negative amortization that was purposefully built into these loans, Plaintiffs and the Class members would be unable to refinance their homes as there would be little or no equity left to refinance.

31.     Plaintiffs believed these facts to be true because that is what the Defendants intended consumers to believe.  Defendants aggressively sold their product as a fixed, low interest home loan. Defendants knew that if they sold these loans in such a manner, their Option ARM loan product would be a hugely popular and profitable product for them.  Defendants also knew, however, that they were selling their product in a false and deceptive manner.  While Defendants trumpeted their low, fixed rate loans to the public, Defendants knew their promise of a low, fixed interest rate was illusory.

32.     In fact, Defendants' Option ARM loan possessed a low, fixed payment that was wholly unrelated to the interest rate listed in the Note and TILDS.  Unbeknownst to Plaintiffs and Class members, the actual interest rate they were charged on their loans was not used to determine the payment amount listed by Defendants in the Note and TILDS.  Defendants in every instance and for every loan, listed a payment amount that was not, in anyway, related to the interest rate disclosed in the Note and TILDS.  In fact, the only way for Plaintiffs to know that the payment rate was not based on the listed interest rate was to use a sophisticated mortgage calculation device, that is, and was, far beyond the comprehension of Plaintiffs and all other similarly situated reasonable consumers.

33.     At all times relevant, Defendants knew that the payments listed in the TILDS during the initial 10 years of the Note was not based on the interest rate listed in the Note and TILDS but instead, was based on a much lower rate that was *not* disclosed in either the Note or the TILDS as required by law.

34.     Knowing the truth, and motivated by profit and market share, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members that the payment schedule provided by Defendants was not based on the listed interest rate but instead, was based upon an

1  undisclosed, and much lower, interest rate.

2      35.    Defendants, through the standardized loan contracts they created and supplied to

3  Plaintiffs and the Class, stated that negative amortization was only a mere possibility and would occur

4  only if the payments were not sufficient.  Defendants withheld and failed to disclose the fact that the

5  loan as presented and designed, in fact, *guaranteed* negative amortization.  Defendants failed to disclose

6  and omitted the objectively material fact that negative amortization was absolutely certain to occur if

7  consumers followed the payment schedule listed by Defendants in the TILDS.   This information was

8  objectively material and necessary for consumers to make an informed decision because this information

9  would have revealed that the loan's principal balance would increase if the payment schedule was

10 followed, thereby rendering it impossible to refinance the loan at or around the time the prepayment

11 penalty expired and/or by the time the interest and payment rates re-set.   In this respect, Defendants

12 utterly failed to place any warning in the TILDS that negative amortization *was* absolutely certain to

13 occur.

14     36.    At all times relevant, once Plaintiffs and the Class members accepted Defendants' Option

15 ARM loan contract, they had no viable option by which to extricate themselves because these Option

16 ARM loan agreements included a draconian pre-payment penalty for a period of up to three years.

17     37.    The Option ARM loans sold by Defendants all have the following uniform

18 characteristics:

19         (a)    The loan has a low fixed payment amount for the first 10 years of the Note;

20         (b)    The payment amount is wholly unrelated to the interest rate listed on the Note and

21                TILDS;

22         (c)    The Note states that each payment will go to both principle and interest;

23         (d)    The payment amounts listed in the TILDS are not sufficient to pay the actual

24                interest being charged, and none of the payments up through the first ten (10)

25                years of the Note are applied to principle;

26         (e)    The low payment amount listed in the Note and TILD was intended by

27                Defendants to mislead consumers into believing that the low payments for the

28                first ten years of the loan were based on the listed interest rate;

-9-

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

(f)     The payment has a capped annual increase on the payment amount; and

(g)     The loan includes a prepayment penalty for a period of up to three (3) years.

38.     At all times relevant, Defendants knew, and failed to disclose and by omission failed inform Plaintiffs and the Class members, in a clear and conspicuous manner, that the payment amounts set forth in Defendants' schedule of payments were insufficient to cover the actual interest charged on the loans.

39.     At all times relevant, Defendants knew, and failed to disclose and by omission failed to inform Plaintiffs and the Class members, that the payment amounts set forth in Defendants' schedule of payments were insufficient to pay both principle and interest and that this was, in fact, a negative amortization loan that was absolutely certain to, and did cause Plaintiffs and the Class members to lose the equity they had in their homes.

40.     Disclosing whether a payment will result in negative amortization is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principle and interest, one of the consequences of negative amortization is a loss of equity.  Defendants are and at all times relevant hereto have been aware that clear and conspicuous disclosure of the actual interest rate and a payment rate that is sufficient to avoid negative amortization, and the concomitant loss of equity, is extremely important material information.

41.     At all times relevant, Defendants, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment amount provided to Plaintiffs was insufficient to pay both interest and principle; (ii) that negative amortization was substantially certain to occur if Plaintiffs made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiffs' residences was substantially certain to occur if Plaintiffs made payments according to the payment schedule provided by Defendants.

42.     In spite of its knowledge, Defendants sold its ARM loans as a product that would provide Plaintiffs and the Class members with a low payment for up to ten years, and at all times relevant, failed to disclose and/or concealed by making partial representations of material facts when Defendants had exclusive knowledge of the material fact that negative amortization was absolutely certain to occur. This concealed and omitted information was not known to Plaintiffs and the Class members and which,

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1  at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements

2  and partial, misleading representations to Plaintiffs and all others similarly situated.  Because the ARM

3  loans did not provide a payment amount based on the actual interest rate charged on the Notes, the

4  payment

5  rate disclosed by Defendants was insufficient to pay both principle and interest, and negative

6  amortization occurred.

7      43.    The true facts about these loans is that they do not provide Plaintiffs and the Class

8  members with a low interest rate loan with payment amounts sufficient to pay both principle and

9  interest, and thus, are certain to result, and did result, in negative amortization.

10      44.    Disclosure of a payment rate that is sufficient to pay both principle and interest on the

11  loans is of critical importance consumers.  If the disclosed payment rate is insufficient to pay both

12  principle and interest, one of the consequences is that negative amortization or loss of equity will occur.

13  Defendants are and at all times relevant hereto have been aware that the ability of the disclosed payment

14  rate to pay both principle and interest so as to avoid negative amortization is one of the most important

15  terms of a loan.

16      45.    To this day, Defendants continue to withhold and conceal material information from

17  consumers, and the public, that: (i) the payment rate provided to Plaintiffs and the Class members is and

18  was insufficient to pay both principle and interest; (ii) if the disclosed payment schedule is followed,

19  Plaintiffs and the Class members have and/or are absolutely certain to suffer negative amortization; and

20  (ii) loss of equity and/or possession of the property is absolutely certain to occur if the disclosed

21  payment schedule is followed.  Nevertheless, Defendants have refused to clearly and conspicuously

22  disclose to Plaintiffs the existence of this important material information and the injury caused thereby,

23  including but not limited to the loss of equity.

24      46.    In the end, the harm caused by Defendants failures to disclose and omissions grossly

25  outweighs any benefit that could be attributed to them.

26      47.    Knowing the truth and motivated by profit and market share, Defendants have knowingly

27  and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiffs and others

28  similarly situated.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1    48.    The ARM loans have resulted and will continue to result in significant loss and damage

2  to the Class Members, including but not limited to the loss of equity these consumers have or had in

3  their homes.

4    49.    The facts which Defendants misrepresented and concealed, as alleged in the preceding

5  paragraphs, were material to the decisions about whether to purchase the ARM loans in that Plaintiffs

6  and others similarly situated would not have purchased these loans but for Defendants' unlawful, unfair,

7  fraudulent and/or deceptive acts and/or practices as alleged herein.

8    50.    Defendants engaged in the unlawful, unfair, fraudulent, untrue and/or deceptive scheme

9  to induce consumers to purchase their ARM loans.

10    51.    Defendants unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices

11  were committed with willful and wanton disregard for whether or not Plaintiffs or others similarly

12  situated would, in fact, receive a home loan that would actually provide the low interest and payment

13  rate, as promised, for up to ten years of the loan that is sufficient to pay both principle and interest.

14    52.    Upon information and belief and at all times relevant, Defendants possessed full

15  knowledge and information concerning the above facts about the ARM loans, and otherwise sold these

16  ARM loans throughout the United States, including the State of California.

17

18    **V.**

19    **CLASS ACTION ALLEGATIONS**

20    53.    Plaintiffs bring this action on behalf of themselves, and on behalf of all others similarly

21  situated (the "Class") pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b), and the case

22  law thereunder.  The classes Plaintiffs seek to represent are defined as follows:

23          **The California Class**:  All individuals who, within the four year period
        preceding the filing of Plaintiffs' Complaint through the date notice is
24        mailed to the Class, received an Option ARM loan through Defendants on
        their primary residence located in the State of California.  Excluded from
25        the California Class are Defendants' employees, officers, directors, agents,
        representatives, and their family members; and
26

27  / / /

28  / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

**The National Class**: All individuals in the United States of America who, within the four year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America. Excluded from the National Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

An appropriate sub-Class exists for the following Class Members:

All individuals in the United States of America who, within the three year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America. Excluded from the National sub-Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

Plaintiffs reserve the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time, or propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

54. <u>Numerosity</u>: The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case. While the exact number of Class members is unknown at this time, Plaintiffs are informed and believe that the entire Class or Classes consist of approximately tens of thousands of members.

55. <u>Commonality</u>: Common questions of law or fact are shared by the Class members. This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues. Such common questions include, but are not limited to, the following:

(1)    Whether Defendants' acts and practices violate the Truth in Lending Act;

(2)    Whether Defendants' conduct violated 12 C.F.R. § 226.17;

(3)    Whether Defendants' conduct violated 12 C.F.R. § 226.19;

(4)    Whether Defendants' had a duty to disclose to Plaintiffs important material information concerning their loans, including but not limited to (i) that the payment amounts listed in the TILDS were insufficient to pay both principle and interest; (ii) that the payment schedule was not based on the listed interest rate; and (iii) that negative amortization would occur if Plaintiffs made the payments according to the schedule of payments Defendants listed in the TILDS;

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

(5)    Whether Defendants, by and through their officers, employees and agents concealed, omitted and/or otherwise failed to disclose information they were mandated to disclose under TILA;

(6)    Whether Defendants' failed to disclose, and by omission, failed to inform Plaintiffs that the payment schedule was not based on the interest rate disclosed in the Note and TILDS;

(7)    Whether Defendants' failed to disclose, and by omission, failed to inform Plaintiffs that the payment amounts listed in Note and TILDS are insufficient to cover both principle and interest;

(8)    Whether Defendants' failed to disclose, and by omission, failed to inform Plaintiffs that negative amortization was absolutely certain to occur if Plaintiffs made the payments according to payment schedule provided by Defendants;

(9)    Whether Defendants engaged in unfair business practices aimed at deceiving Plaintiffs and the Class members before and during the loan application process;

(10)   Whether Defendants' failure to apply Plaintiffs' and the Class members' payments to principal as promised in the Notes constitutes a breach of contract, including a breach of the covenant of good faith and fair dealing;

(11)   Whether Defendants' breached the covenant of good faith and fair dealing;

(12)   Whether the terms and conditions of Defendants' Option ARM home loan are unconscionable, including but not limited to: (i) listing a payment amount and interest rate which bear no relation to each other; (ii) stating that "from time to time" negative amortization "may occur" when, in fact, negative amortization was *guaranteed* to occur if consumers followed the payment schedule provided by Defendants in the TILDS; and (iii) under the terms and conditions of these loans, the prepayment penalty provision.

(13)   Whether Plaintiffs and the Class are entitled to declaratory relief, including but not limited to: whether Defendants' Option ARM loans violate TILA;

(14)   Whether Plaintiffs and the Class members are entitled to rescission under TILA;

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1        (15)    Whether Plaintiffs and the Class are entitled to statutory damages under TILA;

2        (16)    Whether Plaintiffs and the Class are entitled to actual damages;

3        (17)    Whether Plaintiffs and the Class members are entitled to punitive damages; and

4        (18)    Whether Plaintiffs are entitled to equitable relief, including but not limited to,

5                 restitution and injunctive relief.

6    56.    <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs

7 and the other Class members were subjected to the same kind of unlawful conduct and the claims of

8 Plaintiffs and the other Class members are based on the same legal theories.

9    57.    <u>Adequacy</u>:  Plaintiffs are adequate representatives of the Class because their interests do

10 not conflict with the interests of the other members of the Class Plaintiffs seek to represent.  Plaintiffs

11 have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend

12 on prosecuting this action vigorously.   The interests of members of the Class will be fairly and

13 adequately protected by Plaintiffs and their counsel.

14    58.    <u>Ascertainable Class</u>:  The proposed Classes are ascertainable in that the members can be

15 identified and located using information contained in Defendants' mortgage lending records.

16    59.    This case is brought and can be maintained as a class action under Rule 23(b)(1),

17 23(b)(2), and 23(b)(3):

18    (a)    <u>Risk of Inconsistent Judgments</u>:  The unlawful acts and practices of Defendants, as

19        alleged herein, constitute a course of conduct common to Plaintiffs and each Class

20        member.  Prosecution of separate actions by individual Class members would create a

21        risk of inconsistent or varying adjudications which would establish incompatible

22        standards of conduct for Defendants and/or substantially impair or impede the ability of

23        individual Class members to protect their interests;

24    (b)    <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>:  Defendants, and each of

25        them, have acted or refused to act on grounds generally applicable to the Class, thereby

26        making final injunctive relief or corresponding declaratory relief with respect to the Class

27        as a whole appropriate; and

28   / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

(c)    <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to the Class members, including those identified above, predominate over questions affecting only individual Class members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.  Further, an important public interest will be served by addressing the matter as a class action.  The cost to the court system of adjudicating each such individual lawsuit would be substantial.

## VI.

### FIRST CAUSE OF ACTION

**(Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq.*,**

**(Against All Defendants)**

60.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

61.    15 U.S.C. §1601, *et seq.*, is the Federal Truth in Lending Act ("TILA").  The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. § 226 ) and its Official Staff Commentary.  Compliance by lenders with Regulation Z became mandatory October 1, 1982.  Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

62.    The purpose of TILA is to protect consumers.  This is stated in 12 C.F.R. § 226.1, which reads:

> **§ 226.1 Authority, purpose, coverage, organization, enforcement and liability. . .**
> (b)    Purpose.  The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling . . .

63.    Reg. Z also mandates very specific disclosure requirements regarding home loans with which lenders, including Defendants, must comply:

**§ 226.17. General disclosure requirements.**

(a)  Form of disclosures. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18.

64.    The purpose of the TILA is to assure a meaningful disclosure of credit terms so that the borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing practices.

65.    Defendants' Option ARM loans violate TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board.  Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiffs as Defendants were required to do under TILA.  These violations are apparent on the face of the TILA Disclosure Forms.

66.    The TILA violations committed by Defendants are more specifically detailed as follows:

**A.    Defendants' Failure to Clearly and Conspicuously Disclose That the Payment Schedules Are Not Based on the Actual Interest Rate Violates TILA**

67.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the interest rate and payments in a clear and conspicuous manner.  Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

68.    As for Plaintiffs and the Class members Option ARM loans, Defendants violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 in that they failed to clearly and conspicuously disclose the interest rate upon which the payments listed in the TILDS are based.

69.    The scheduled payment amounts and interest rate listed in the Note and TILDS for each of the subject loans are unclear and inconspicuous.  In fact, the payment amounts are not based on the

-17-

1  interest rate listed but instead, were based upon an interest rate which was neither disclosed nor made

2  conspicuous as required under TILA.

3       70.    At all times relevant, Defendants knowingly and intentionally included in each of the

4  Notes and TILDS a schedule of payments which was not based upon the interest rate listed in these

5  same documents.  Defendants failure to clearly and conspicuously disclose the interest rate upon which

6  the payment amounts were based was, and is, deceptive.

7       71.    Further, in addition to Defendants failure to disclose in the Note and the TILDS that the

8  payments listed were not based upon the interest rate listed, Defendants knowingly and intentionally

9  stated in each of the Notes that the payments would be applied to both principle and interest.

10 Defendants further stated in the Notes that, "from time to time" the payments "may not" be enough to

11 cover all of the interest due on the Notes.  However, in truth, if Plaintiffs followed the payment schedule

12 provided by Defendants, the payments were guaranteed to be insufficient to pay the principle and

13 interest on the loan.

14      72.    At all times relevant, Defendants failed to clearly and conspicuously disclose to Plaintiffs

15 that if they made payments according to the payment schedule set forth in the TILDS, that negative

16 amortization was not just a mere possibility, it was an absolute certainty.

17      73.    At all times relevant, Defendants purposefully and intentionally failed to disclose to

18 Plaintiffs, and all others similarly situated, the interest rate upon which the payment schedule was based

19 in order to mislead and deceive Plaintiffs into believing that they would be getting a loan with a low

20 fixed payment rate that would be sufficient to pay both interest and principle

21      74.    At all times relevant, the payment amount provided by Defendants was intended to and

22 did deceive consumers into falsely believing they would, in fact, receive the low interest rate upon

23 which the payment schedule is based.  While the Note states the amount of Plaintiffs' initial monthly

24 payment, however, the initial monthly payment amounts stated in the Note and TILDS are not, in

25 anyway related to the interest rate listed in the Note(s) and TILDS.

26      75.    Defendants employed the aforementioned bait-and-switch tactics in a common and

27 uniform class-wide basis.  In particular, had Defendants clearly and conspicuously disclosed a payment

28 amount sufficient to cover both principle and interest, the payment amounts would have to have been

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1  almost double  the payment amounts listed.

2      76.    The TILDS are also deceptive for much the same reason.  The TILDS list a schedule of

3  payments, yet for up to the first ten years the listed payment amounts have no relation to, and are also

4  not based on the interest rate listed in the TILDS.

5      77.    At all times relevant, Defendants' failed  to clearly, conspicuously and accurately

6  disclose a payment amount that corresponds to the actual interest rate being charged on the loan

7  sufficient to pay both principle and interest.   The Note states "the payments will be applied to principle

8  and interest."  Thus, Plaintiffs reasonably believed that if they made the payments according to

9  Defendants payment schedule, the payments would, in fact, be paying off both principal and interest.

10  However, the true fact is that the payment amounts stated in Defendants payment schedule did not

11  include any principal on the loans at all and only covered a portion of the interest Defendants were

12  charging on these loans.

13      **B.**    **Defendants' Failure to Clearly and Conspicuously Disclose Negative Amortization**

14           **Violates the Truth in Lending Laws**

15      78.    12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential

16  home loans:

17           **§ 226.19.  Certain residential mortgage and variable-rate**

18           **transactions.** . . .

19           (b) Certain variable-rate transactions.  If the annual percentage rate may

20           increase after consummation in a transaction secured by the consumer's

21           principal dwelling with a term greater than one year, the following

22           disclosures must be provided at the time an application form is provided

23           or before the consumer pays a non-refundable fee, whichever is earlier. . .

24           (vii) *Any rules relating to changes in the index, interest rate, payment*

25           *amount, and outstanding loan balance including, for example, an*

26           *explanation of interest rate or payment limitations, negative amortization,*

27           *and interest rate carryover*. (Emphasis added.)

28  / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

79.     The negative amortization disclosure is required and must be made clearly and conspicuously, and done in a manner that does not obscure its significance. The disclosure must state whether the loan and payments established under the terms dictated by the Defendants is a negative amortizing loan.

80.     In 1995, and continuing each time new Official Staff Commentary was issued, the Federal Reserve Board made clear that when the loan was a variable rate loan with payment caps, such as those that are the subject of this lawsuit, that the disclosure required a definitive statement about negative amortization:

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Monday, April 3, 1995

AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

"For the program that gives the borrower an option to cap monthly payments, the creditor must fully disclose the rules relating to the payment cap option, including the effects of exercising it (such as **negative amortization occurs** and that the principal balance **will increase**)…" (Found at C.F.R. § 226.19)

81.     At all times relevant, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply with the Federal Reserve Board's Official Staff Commentary as well as Regulation Z and TILA.

82.     Defendants sold Plaintiffs and the Class members Option ARM loans which have a variable rate feature with payment caps. Defendants failed to include any reference in the TILDS or in the Note(s) that negative amortization would occur if Plaintiffs and the Class members followed the payment schedule provided by Defendants. The payment schedule makes no reference to negative amortization and makes it appear that the payments would, in fact, pay both principal and interest.

83.     In fact, the only place in the Note where Defendants even inferentially reference negative

amortization caused Plaintiffs and all other similarly situated reasonable persons to believe that negative amortization is only a mere possibility, rather than an absolute certainty. In fact, these loans were designed in such a way so as to make negative amortization an absolute certainty. And, even when a separate explanation was provided, Defendant omitted the important material fact that these loans and payment schedules would, in fact, guarantee negative amortization.

84.     Defendants statement that, "from time to time" negative amortization "may occur" was a half-truth and did not alert or inform Plaintiffs that the payment schedule provided by Defendants would absolutely guarantee that negative amortization was going to occur on these loans. Rather, Defendants made it appear that as long as the payments were made according to the schedule listed in the TILDS, that there would be no negative amortization.

85.     At all times relevant, Defendants' statement in the Note, TILDS, and any other disclosures they provided, described negative amortization as only a mere possibility, and therefore was misleading and deceptive. In fact, Defendants' Option ARM loan was designed in such a way as to guarantee negative amortization. TILA demands more than a statement that the payment could be less, or "may" be less, when Defendants knew that the payments were less, and would always be less, than the full amount required to pay both principle and interest.

**C.     Defendants' Failure to Clearly and Conspicuously Disclose The Interest Rate Upon Which the Payment Schedule Was Based Violates TILA**

86.     Pursuant to 12 C.F.R. § 226.17(a)(1), Defendants were required to:

> "make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18. The itemization of the amount financed under § 226.18(c)(1) must be separate from the other disclosures under that section."

87.     Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states that "this standard requires that disclosures be in a reasonably understandable form. For example, while the regulation requires no

1  mathematical progression or format, **the disclosures must be presented in a way that does not**

2  **obscure the relationship of the terms to each other**…"

3      88.     At all times relevant, Defendants Option ARM loans violated 12 C.F.R. § 226.17(a)(1) in

4  that the relationship between the interest rate listed in the Note and TILD bear no relationship to the

5  undisclosed interest rate upon which the payment schedule was based.  Therefore, as a direct and

6  proximate result, the form of disclosure used by Defendants obscured the relationship between the

7  interest rate listed in the Note(s) and TILDS and the payment schedule provided.

8      **D.     Defendants' Failure to Clearly and Conspicuously Disclose The Legal Obligation**

9          **Violates Truth in Lending Laws**

10     89.     12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the

11 legal obligation between the parties."

12     90.     Official binding staff commentary on 12 C.F.R. § 226.17(c)(1) requires that:  "[t]he

13 disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the

14 transaction.  In the case of disclosures required under § 226.20(c), the disclosures shall reflect the credit

15 terms to which the parties are legally bound when the disclosures are provided."

16     91.     The Official binding staff commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that

17 "[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the

18 agreement."

19     92.     Official Staff Commentary to 12 C.F.R. § 226.17(c)(1) states that "[i]f a loan contains a

20 rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment,

21 from changing to the rate determined by the index or formula at consummation, **the effect of that rate**

22 **or payment cap should be reflected in the disclosures**."

23     93.     At all times relevant, Defendants Option ARM loans violated 12 C.F.R. § 226.17(c) in

24 that the Note and TILD do not disclose, and by omission, failed to disclose what Plaintiffs and the Class

25 members were legally obligated to pay.  In particular, the Note(s) charged the borrowers a much higher

26 monthly amount than what Defendants disclosed.  Defendants accomplished this deception by only

27 listing a partial payment in the TILD, rather than the full payment the borrowers were being charged for

28 the loans, and were legally obligated to pay.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

94.     As a direct and proximate result of Defendants omission and failure to clearly and conspicuously disclose Plaintiffs and Class members legal obligations under the loans, Defendants took the partial payments and secretly added the deficit, each month, to principle, thereby causing negative amortization to occur.

**E.      Defendants' Failure to Clearly and Conspicuously Disclose the Effect of the Payment Cap on the True Cost of the Loan Violates Truth in Lending Laws**

95.     The Option ARM loans at issue each contained a variable rate feature with an initial (undisclosed) teaser rate with payment caps.  The payment cap is a limit on how much the payment may be increased annually.  Its purpose is to provide borrowers with a limit on how much their payment can increase from year to year.  The loans issued by Defendants had a 7.5% payment cap, which means that a borrower would only see their payment rise each year by a maximum of 7.5%.  (i.e. a $1,000 monthly payment in year one, could go to a $1,075 payment in year two.)

96.     The Official Staff Commentary to 12 C.F.R. § 226.17(c)(1)(10) iii  states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, **the effect of that rate or payment cap should be reflected in the disclosures**."  Thus, at all times relevant during the liability period, Defendants had a duty to Plaintiffs and the Class members to disclose the effect the payment caps would have on the loans in the TILD.

97.     At all times relevant during the liability period, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members that the payment cap would cause thousands of dollars, each month, to be secretly added to principle.

98.     As a direct and proximate result, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members of the effect of the payment cap in violation of 12 C.F.R. § 226.17.

99.     WHEREFORE, Plaintiffs and the Class members are entitled to an order declaring that Defendants violated TILA, 15 U.S.C. §1601, et seq., that Plaintiffs and the Class have the right to rescind pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23, damages pursuant to 15 U.S.C. § 1640, attorneys fees, litigation costs and expenses and costs of suit, and for an order rescinding Plaintiff's

1   individual mortgage and those of any class member desirous of such relief, and for an order awarding

2   other relief as the Court deems just and proper.

3

4   **VII.**

5   **THIRD CAUSE OF ACTION**

6   **(Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200 *et seq.*,**

7   **"Unfair" and "Fraudulent" Business Acts or Practices,**

8   **(Against all Defendants)**

9       100.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

10      101.    Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class, and in

11  their capacity as a private attorney generals against all Defendants for their unfair, fraudulent and/or

12  deceptive business acts and/or practices pursuant to California Business and Professions Code Sections

13  17200 et seq., which prohibits all unfair and/or fraudulent business acts and/or practices.

14      102.    Plaintiffs assert these claims as they are representatives of an aggrieved group and as

15  private attorney generals on behalf of the general public and other persons who have expended funds

16  that the Defendants should be required to pay or reimburse under the equitable and restitutionary

17  remedies provided by California Business and Professions Code Sections 17200 et seq.

18      103.    The instant claim is predicated on the generally applicable duty of any contracting party

19  to disclose important material facts, and on the duty to refrain from unfair and deceptive business

20  practices.  The Plaintiffs and the Class members hereby seek to enforce a general proscription of unfair

21  business practices and the requirement to refrain from deceptive conduct.  The instant claim is

22  predicated on duties that govern anyone engaged in any business and anyone contracting with anyone

23  else.

24      104.    At all times relevant, Defendants engaged in a pattern of deceptive conduct and

25  concealment aimed at maximizing the number of borrowers who would accept their Option ARM loans.

26  Defendants, and each of them, sold to Plaintiffs and the Class members a deceptively devised financial

27  product.  Defendants sold their Option ARM loan product to consumers, including Plaintiffs and the

28  Class members, in a false or deceptive manner.  Defendants promised that the loan would have a very

1  low, fixed payment, with only a small annual increase in the payment amount, for a period of up to ten

2  years; and that the payment amount would be based on the listed interest rate.  Defendants withheld

3  from Plaintiffs and the Class members the fact that Defendants' Option ARM loan was designed to, and

4  did, cause negative amortization to occur.

5        105.    Defendants lured Plaintiffs and the Class members into the Option ARM loans with

6  promises of low payments.  Once Plaintiffs and the Class members entered into these loans, Defendants

7  began taking away equity from Plaintiffs and the Class members homes.  And, Plaintiffs and the Class

8  members could not escape because Defendants purposefully placed into these loans an extremely

9  onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves

10  from these loans.  Thus, once on the hook, consumers could not escape from Defendants loans.

11        106.    Defendants sold their Option ARM loans as having a low payment.  However,

12  Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members that

13  the low payments listed in the Note and TILDS were completely insufficient to pay both principle and

14  interest and were, in fact, at all times relevant during the liability period, completely insufficient to pay

15  all of the interest accruing on the loans.  Further, and in addition to Defendants' failure to disclose the

16  actual cost of the loans, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and

17  the Class members that there was a discrepancy between the interest rate upon which the payments were

18  based and that actual interest Defendants charged on the loans.

19        107.    At all times relevant, Plaintiffs and the Class members agreed to finance their primary

20  residences through Defendants' Option ARM loans as a result of low interest and payment schedules.

21  In particular, Plaintiffs and the Class members were lead to believe that if they made payments

22  according to Defendants payment schedule, that the loans would only, "from time to time" result in

23  negative amortization.  However, Defendants failed to disclose, and by omission, failed to inform

24  Plaintiffs and the Class members that if they made their payments according to Defendants payment

25  schedule, that by the 11th year of the loans, each class member will have lost between 15-25% of the

26  equity in their home, making it difficult, if not impossible to re-finance to another home loan.

27        108.    Defendants aggressively sold their product based on the low payment.  Defendants

28  knew that if they sold these loans in such a manner, their Option ARM loan product would be a hugely

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1   popular and profitable product for them. Defendants also knew, however, that they were selling their

2   product in a false and deceptive manner.  While Defendants trumpeted their low payment loans to the

3   public, Defendants knew, however, that this was false, and at best, only partially true.

4        109.    In fact, Defendants' Option ARM loan possessed a low, ***fixed payment*** that was

5   unrelated to the interest rate listed.  Unbeknownst to Plaintiffs and Class members, the actual interest

6   rate Defendants charged on their loans would require a much larger payment to pay both "Principle and

7   interest."  After purchasing Defendants' Option ARM loan product, Plaintiffs and class members never

8   actually received the benefit of the loan promised to them because immediately, Defendants in every

9   instance and for every loan began secretly taking away Plaintiffs and the Class members equity.  Once

10  Plaintiffs and the Class members accepted Defendants' Option ARM loan, they had no viable option by

11  which to extricate themselves because these loan agreements included a draconian prepayment penalty.

12       110.    Defendants initiated this scheme in order to maximize the amount of the loans issued to

13  consumers and to maximize Defendants' profits.

14       111.    Defendants perpetrated this bait-and-switch scheme uniformly and in the same manner on

15  Plaintiffs and each member of the Class.

16       112.    As alleged herein, Defendants' failures to disclose important material information

17  concerning the actual cost of the loans is, and was, unfair, fraudulent, and deceptive.

18       113.    The acts, misrepresentations, omissions, and practices of Defendants alleged above

19  constitute unfair, and/or fraudulent business acts and/or practices within the meaning of California

20  Business and Professions Code Sections 17200 et seq.

21       114.    By engaging in the above-described acts and practices, Defendants have

22  committed one or more acts of unfair competition within the meaning of Business and Professions Code

23  Sections 17200, et seq.

24       115.    Defendants' conduct, as fully described above, was likely to deceive members of the

25  consuming public, and at all times relevant, Defendants' failures to disclose and omission of material

26  facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

27       116.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive

28  advantage over their competitors.

117.    As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies and continues to hold the monies expended by Plaintiffs and others similarly situated who purchased the ARM loans as described herein.

118.    In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

119.    The harm to Plaintiffs, members of the general public and others similarly situated outweighs the utility of Defendants' policies, acts and/or practices and, consequently Defendants' conduct herein constitutes an unlawful business act or practice within the meaning of California Business & Professions Code Sections 17200 et seq.

120.    The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, presents a continuing threat to members of the public to be mislead and/or deceived by Defendants ARM loans as described herein.  Plaintiffs and other members of the general public have no other remedy of law that will prevent Defendants misconduct as alleged herein from occurring and/or reoccurring in the future.

121.    As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiffs and Class Members have lost thousands if not millions of dollars of equity in their homes.  Plaintiffs and members of the Class are direct victims of the Defendants' unlawful conduct, and each have suffered injury in fact, and have lost money or property as a result of Defendants' unfair competition.

122.    WHEREFORE, Plaintiffs and members of the Classes are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair, fraudulent, and deceptive acts and/or practices, attorneys fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

/ / /

/ / /

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1

# VIII.

2

## FOURTH CAUSE OF ACTION

3

### Breach of Contract

4

### (Against All Defendants)

5    123.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

6    124.    Plaintiffs and Class members entered into a written home loan agreement – the contract

7    or Note – with Defendants.  The Note was drafted by Defendants and could not be modified by Plaintiffs

8    or Class members.  The Note describes the terms and respective obligations applicable to the parties

9    herein.

10    125.    The Note(s) state the interest rate and the payment amounts required for Plaintiffs and

11    Class members' to pay off the loan.

12    126.    The Note(s) further state that Plaintiffs' and Class members' "will pay Principle and

13    interest by making payments every month."

14    127.    The TILD, which accompanied the Note, sets forth a payment schedule for Plaintiffs and

15    Class members' to follow.

16    128.    The interest rate listed in the Note and in the TILDS was not used to calculate the

17    payment amounts stated in the Note and listed in the TILDS.  At all times relevant, Defendants knew

18    that the payment schedule was not based on the interest rate listed, but instead, was based on a much

19    lower rate which caused the loan contracts to be uncertain and ambiguous as to the amount borrowers

20    would have to pay each month in order to avoid negative amortization.  Defendants caused the

21    uncertainty and ambiguity as alleged herein, by purposefully stating in the Note that Plaintiffs "will pay

22    Principle and interest by making payments every month" and then providing Plaintiffs with a payment

23    schedule which is inconsistent with, and not based on the interest rate listed in the Note.

24    129.    At all times relevant, Defendants drafted the Note and did not allow Plaintiffs or the

25    Class members any opportunity to make changes to the Note and due to Defendants superior bargaining

26    position, the contract was offered on a take it or leave it basis.  As such, the loan contracts at issue are

27    contracts of adhesion.

28    / / /

130.    Defendants expressly and/or through their conduct and actions agreed that Plaintiffs' and the Class members' monthly payment obligations would be sufficient to pay both the principal and interest owed on the loans.  Defendants breached this agreement by failing to apply any of Plaintiffs' and the Class members' payments to principal.

131.    Instead, and in order to make up the difference between the interest rate used to calculate the payment schedule and the much higher rate listed in the notes, Defendants immediately began secretly reducing Plaintiffs' and the Class members' equity in their homes and applied no part of the payments to the principal balances on their loans.   In fact, because Defendants charged more interest than was included in the payments listed in the TILDS, the payments were insufficient to cover the interest charged on the loans and thus principal balances increased (which is the negative amortization Defendants purposefully built into these loan contracts).

132.    As a result, Defendants breached the written contractual agreement by failing to apply any portion of Plaintiffs' and the Class members' monthly payments towards their principal loan balances.

133.    Plaintiffs and the Class members, on the other hand, did all of those things the contract required of them.  Plaintiffs and the Class members made monthly payments in the amounts required under the terms of the Note and reflected in the payment schedule prepared and provided by Defendants.

134.    As a result of Defendants' breach of the agreement, Plaintiffs and the Class members have suffered harm.  Plaintiffs and Class members have incurred additional charges to their principal loan balances.  Plaintiffs and the Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and the Class members' principal loan balances.  Furthermore, Defendants' breaches have placed Plaintiffs and the Class members in danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and the Class members' principal loan balances to increase thereby limiting these consumers' ability to make future house payments or obtain alternative home loan financing.

135.    At all times relevant during the liability period, there existed a gross inequality of bargaining position between the parties to the ARM loan contracts.  At all times relevant, Defendants unreasonably and unconscionably exploited their superior bargaining position and foisted upon

1    Plaintiffs and the Class members extremely harsh, one-sided provisions in the contract, which Plaintiffs

2    and the Class members were not made aware of and did not comprehend (*e.g.* Defendants fraudulent

3    omissions and failures to clearly and conspicuously disclose as alleged herein), and which attempted to

4    severely limit Defendants obligations under the contracts at the expense of Plaintiffs and the Class

5    members, as alleged herein.  As a result of these extremely harsh, one-sided provisions, including but

6    not limited to the provisions which seek to limit the low interest rate upon which the payment amounts

7    listed in TILDS for one month or less, these provisions are unconscionable and therefore unenforceable.

8        136.    WHEREFORE, Plaintiffs and members of the Classes are entitled to declaratory relief,

9    compensatory damages proximately caused by Defendants breach of contract as alleged herein, pre-

10   judgment interest, costs of suit and other relief as the Court deems just and proper.

11

12                                          **IX.**

13                              **FIFTH CAUSE OF ACTION**

14            **Breach of Implied Covenant of Good Faith and Fair Dealing**

15                              **(Against All Defendants)**

16       137.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

17       138.    Defendants entered into written agreements with Plaintiffs and the Class members based

18   upon the terms on the loans as stated in the Note(s) and TILDS.

19       139.    The Note(s) and TILDS expressly and impliedly agreed to provide loans secured by the

20   Plaintiffs' and the Class members' residences, and that the loans would have a low payment and interest

21   rate for up to the first then (10) years of the loan.

22       140.    The Note and TILDS expressly and impliedly agreed that if Plaintiffs and the Class

23   members made the monthly payments in the amount prescribed by Defendants in the TILDS, that

24   negative amortization would not occur.  As alleged herein, the Note(s) expressly state and/or imply that

25   Plaintiffs' and Class members' monthly payment obligations **will** be applied to pay both principal and

26   interest owed on the loan.

27       141.    The written payment schedules prepared and created by Defendants, and applicable to

28   Plaintiffs' and the Class members' loans, did not disclose, and by omission, failed to inform Plaintiffs

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

1  that the payment amounts owed by Plaintiffs and the Class members to Defendants in years one through

2  ten are insufficient to cover the true costs of the loan.

3      142.   Instead, Defendants immediately began collecting more than the required payments and

4  applied no part of Plaintiffs' and the Class members' payments to principal.  In fact, Plaintiffs and the

5  Class members' payments were insufficient to cover the interest that Defendants charged resulting in an

6  increase in the amount of principal Plaintiffs and the Class members owed on their homes.

7      143.   Defendants unfairly interfered with Plaintiffs' and the Class members' rights to receive

8  the benefits of the contract.  These loans will cost Plaintiffs and Class members thousands of dollars

9  more than represented by Defendants.  Plaintiffs and the Class members did not receive the fixed low

10  interest rate home loan promised them by Defendants.  Instead, as alleged herein, Defendants foisted

11  upon Plaintiffs a loan which was guaranteed to result in negative amortization.  As a result, Defendants

12  have caused Plaintiffs and the Class members to lose equity in their homes and therefore have denied

13  Plaintiffs and the Class members the enjoyment and security of one of their most important investments.

14      144.   Plaintiffs and the Class members, on the other hand, did all of those things the contract

15  required of them.  Plaintiffs and the Class members made the monthly payments in the amounts required

16  of them by the terms of the Note and reflected in the payment schedule prepared and provided by

17  Defendants.

18      145.   At all times relevant, Defendants unreasonably denied Plaintiffs and the Class members

19  the benefits promised to them under the terms of the Note, including providing clear and conspicuous

20  disclosure of a payment amounts sufficient to pay both principle and interest so as to avoid negative

21  amortization.

22      146.   Knowing the truth and motivated by profit and market share, Defendants have knowingly

23  and willfully breached the implied covenant of good faith and fair dealing by engaging in the acts and/or

24  fraudulent omissions to mislead and/or deceive Plaintiffs and others similarly situated as alleged herein.

25      147.   Defendants breaches, as alleged herein, were committed with willful and wanton

26  disregard for whether or not Plaintiffs or others similarly situated would actually receive a home loan

27  that would provide the promised low interest and payment rate for up to ten years sufficient to pay both

28  principle and interest.

148.    Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about these loans, and otherwise sold these loans throughout the United States, including the State of California.

149.    Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and the General Public.

150.    At all times relevant, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

151.    As a result of Defendants' conduct, Plaintiffs and the Class members have suffered harm. Plaintiffs and the Class members have incurred additional charges to their principal loan balances. Plaintiffs and the Class members have incurred and will continue to incur additional interest charges on the principal loan balances and surplus interest added to Plaintiffs' and the Class members' principal loan balances.  Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and the Class members in danger of losing their homes through foreclosure and, as a direct and proximate result of said misconduct, caused Plaintiffs' and the Class members' principal loan balances to increase limiting these consumers' ability to make their future house payments or obtain alternative home loan financing.

152.    WHEREFORE, Plaintiffs and members of the Classes are entitled to declaratory relief, all damages proximately caused by Defendants breach of the implied covenant of good faith and fair dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and all Class members pray for judgment against each Defendant, jointly and severally, as follows:

A.     An order certifying the case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.     For actual damages according to proof;

C.     For compensatory damages as permitted by law;

D.     For consequential damages as permitted by law;

E.     For statutory damages as permitted by law;

F.     For punitive damages as permitted by law;

G.     For rescission;

H.     For equitable relief, including restitution;

I.     For restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

J.     For interest as permitted by law;

K.     For Declaratory Relief;

L.     For reasonable attorneys' fees and costs; and

M.     For such other relief as is just and proper.

DATED: December 31, 2007                    **SPIRO MOSS BARNESS LLP**


By:  _____/S/_____
David M. Arbogast, Esq.
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Phone: (310) 235-2468; Fax:  (310) 235-2456

Paul R. Kiesel, Esq.
Patrick Deblase, Esq.
Michael C. Eyerly, Esq.
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90210
Phone:  (310) 854-4444; Fax:  (310) 854-0812

/ / /

1    Jonathan Shub, Esq.
2    **SEEGER WEISS LLP**
     1515 Market Street, Suite 1380
3    Philadelphia, PA 19107
     Phone: (215) 564-2300; Fax (215) 851-8029

4    Jeffrey K. Berns, Esq.
5    **LAW OFFICES OF JEFFREY K. BERNS**
     19510 Ventura Blvd, Suite 200
6    Tarzana, California 91356
     Phone: (818) 961-2000; Fax:  (818) 867-4820

7    Attorneys for Plaintiffs, DOLORES MANDRIGUES,
     JUANITA JONES, AL F. MINYEN and WILMA R.
8    MINYEN, MARK CLAUSON and CHRISTINA
     CLAUSON, and all others Similarly Situated.
9

10                    <u>**DEMAND FOR JURY TRIAL**</u>

11        Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

12   DATED: December 31, 2007              **SPIRO MOSS BARNESS LLP**

13
                                    By:   _____/S/_____
14                                        David M. Arbogast, Esq.
                                          11377 W. Olympic Boulevard, Fifth Floor
15                                        Los Angeles, CA 90064-1683
                                          Phone: (310) 235-2468; Fax: (310) 235-2456
16
                                          Paul R. Kiesel, Esq.
17                                        Patrick Deblase, Esq.
                                          Michael C. Eyerly, Esq.
18                                        **KIESEL BOUCHER LARSON LLP**
                                          8648 Wilshire Boulevard
19                                        Beverly Hills, California 90210
                                          Phone: (310) 854-4444; Fax: (310) 854-0812
20
                                          Jonathan Shub, Esq.
21                                        **SEEGER WEISS LLP**
                                          1515 Market Street, Suite 1380
22                                        Philadelphia, PA 19107
                                          Phone: (215) 564-2300; Fax (215) 851-8029
23
                                          Jeffrey K. Berns, Esq.
24                                        **LAW OFFICES OF JEFFREY K. BERNS**
                                          19510 Ventura Blvd, Suite 200
25                                        Tarzana, California 91356
                                          Phone: (818) 961-2000; Fax:  (818) 867-4820
26
                                          Attorneys for Plaintiffs, DOLORES MANDRIGUES,
27                                        JUANITA JONES, AL F. MINYEN and WILMA R.
                                          MINYEN, MARK CLAUSON and CHRISTINA
28                                        CLAUSON, and all others Similarly Situated.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04497 JF (RS)

# Exhibit No. 1

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: 0043651850                              DATE:  **August 4, 2006**

BORROWER(S):  DOLORES MANDRIGUES, AN UNMARRIED WOMAN   sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **524 CESTARIC DR, MILPITAS, CA  95035-4006**

**1.  BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S.  $170,000.00 , called "Principal," plus interest, to the order of the Lender. The Lender is WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred.

**2.  INTEREST**

**(A)    Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at the yearly rate of 6.790%. The interest rate I will pay  may change as described in this Section 2.  Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)    Interest Change Dates**
The interest rate I will pay may change on the 15th day of September, 2006 and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)    Interest Rate Limit**
My lifetime maximum interest rate limit is 11.950% , called "Lifetime Rate Cap."



SD253A (2004-03-1)                    ADJUSTABLE NOTE                    CA
                                              Page 1

00001

0043651850

**(D)   Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent index figure available on each Interest Change Date is called the "Current Index."

**(E)   Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.850** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)   Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F) the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3.   PAYMENTS**

**(A)   Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **September 15, 2006**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **August 15, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)   Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **628.36**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)   Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **September, 2007** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)   Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my monthly payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

00002

0043651850

(E)   Deferred Interest; Additions to My Unpaid Principal

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

(F)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

(G)   Payment Cap Limitation; Exceptions

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

(H)   Notice of Payment Changes

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

4.   FAILURE TO MAKE ADJUSTMENTS

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

6.   MAXIMUM LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED
(A)   Late Charges for Overdue Payments

If the Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be 5.00% of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

SD253C (2004-03-1)                    ADJUSTABLE NOTE                    CA
                                           Page 3

00003

0043651850

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **524 CESTARIC DR, MILPITAS, CA  95035-4006**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

00004

0043651850

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)    Lender approves the creditworthiness of the transferee in writing;

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)    the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12.  GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13.  CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14.  LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

00005

0043651850

**SIGNATURE PAGE**

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_____ (Seal)

DOLORES MANDRIGUES

00006

**WORLD SAVINGS** | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name:
DOLORES MANDRIGUES

Date: July 24, 2006
Loan No.: 0043651850

| ANNUAL PERCENTAGE RATE

The cost of your credit as a yearly rate. | FINANCE CHARGE

The dollar amount the credit will cost you. | Amount Financed

The amount of credit provided to you or on your behalf. | Total of Payments

The amount you will have paid after you have made all payments as scheduled. | Total Sale Price

The total price of your purchase on credit including your down payment of |
|---|---|---|---|---|
| | | | | Not Applicable |
| 6.853 % | $ 283,991.46 | $ 167,713.28 | $ 451,704.74 | Not Applicable |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due:
MONTHLY beginning on |
|---|---|---|
| 12 | $   628.36 | 10/01/06 |
| 12 | 675.49 | 10/01/07 |
| 12 | 726.15 | 10/01/08 |
| 12 | 780.61 | 10/01/09 |
| 12 | 839.16 | 10/01/10 |
| 12 | 902.10 | 10/01/11 |
| 12 | 969.76 | 10/01/12 |
| 12 | 1,042.49 | 10/01/13 |
| 12 | 1,120.68 | 10/01/14 |
| 12 | 1,204.73 | 10/01/15 |
| 239 | 1,437.64 | 10/01/16 |
| 1 | 1,434.42 | 09/01/36 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance:   You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security:   You are giving a security interest in the real property located at 524 CESTARIC DR, MILPITAS, CA 95035-4006.

Filing Fees: $      80.00

Late Charge:   If a payment is late, you will be charged 5.00% of the payment.

Prepayment:   If you pay off the loan early, you MAY have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption:   SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale:   If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

ALL NUMERICAL DISCLOSURES EXCEPT THE LATE PAYMENT DISCLOSURE ARE ESTIMATED.

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

DOLORES MANDRIGUES                                       Date
_____                    _____

GF004A1 (2004-03-1)   UPFRONT                                            CA.
      DISTRIBUTION:  1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE    LENDER'S USE ONLY


0 2 2

# Exhibit No. 2

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT℠ LOAN

### CERTIFICATES OF DEPOSIT INDEX

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.**

LOAN NUMBER: **0044892941**                                DATE: **January 9, 2007**

BORROWER(S):   **JUANITA JONES, AN UNMARRIED WOMAN**   sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$248,500.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

### 2. INTEREST

**(A)   Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **7.881%**. The interest rate I will pay  may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)   Interest Change Dates**
The interest rate I will pay may change on the **1st** day of **March, 2007** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)   Interest Rate Limit**
My lifetime maximum interest rate limit is **11.950%** , called "Lifetime Rate Cap."

00001



LOAN NUMBER: **0044892941**                     DATE: **January 9, 2007**

BORROWER(S):  JUANITA JONES, AN UNMARRIED WOMAN  sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$248,500.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

### 2.  INTEREST

**(A)    Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **7.681%**. The interest rate I will pay  may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)    Interest Change Dates**

The interest rate I will pay may change on the **1st** day of **March, 2007** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)    Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**, called "Lifetime Rate Cap."

SD253A (2006-09-2)            ADJUSTABLE PICK-A-PAYMENT NOTE            CA
                                      Page 1

LENDER'S USE ONLY

00002

0044892941

**(D)  Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index". The Index is the average of the last twelve calendar months' most recently published monthly yields on 3-month certificates of deposit (secondary market) as published by the Federal Reserve Board. Lender will calculate the average by adding the twelve most recently published yields together and dividing the result by twelve. Lender will round the result of this division to the nearest one-thousandth of one percentage point (0.001%) by using the following convention: if the value of the 10,000th place is five or greater, the value of the 1,000th place will round up; if the value of the 10,000th place is less than five, the 1,000th place will not change. The most recent Index figure available on each Interest Change Date is called the "Current Index". For purposes of determining the Index, "published" means first made available to the public by the Federal Reserve Board.

**(E)  Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.600** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)  Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **1st** day of each month beginning on **March 1, 2007**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security instrument. If, on **February 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **918.51**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)  Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **1st** day of **March, 2008** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in

00003

(E)  Calculation of Interest Rate Changes

The new interest rate will be calculated by adding 2.990 percentage points to the Index. Subject to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

(F)  Alternative Index

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

3.  PAYMENTS

(A)  Time and Place of Payments

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **1st** day of each month beginning on **March 1, 2007**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **February 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

(B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. **$ 918.61**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

(C)  Payment Change Dates

My monthly payment will change as required by Section 3(D) below beginning on the **1st** day of **March, 2008** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Payment Changes

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

0044892941

**(E)    Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)    Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)    Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)    Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.    FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment".  When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.  I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal.  During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.    MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan

the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)  Payment Cap Limitation; ptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)  Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.  FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.  I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal.  During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.**

**6.  MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00%** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

SD253C (2006-09-2)                    ADJUSTABLE PICK-A-PAYMENT NOTE                    CA
Page 3

00006

0044892941

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for change of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not

amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)    No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)    Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together  This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26**:

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

SD253D (2006-09-2)                ADJUSTABLE PICK-A-PAYMENT NOTE                                CA
                                              Page 4

00008

0044892941

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

        (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

        (ii)    Lender approves the creditworthiness of the transferee in writing;

        (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

        (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and Interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

        (v)    the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12.  GOVERNING LAW; SEVERABILITY
This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13.  CLERICAL ERRORS
In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14.  LOST, STOLEN OR MUTILATED DOCUMENTS
If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS**

00009

(iii) the transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv) an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v) the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12. GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for **federally chartered savings institutions, called "Federal Law."** In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13. CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS**

00010

**WORLD SAVINGS** | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
**JUANITA JONES**

Date: January 9, 2007

Loan No : 0044892941

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total price of your purchase on credit including your down payment of **Not Applicable** |
| **7.877 %** | **$ 522,053.21** | **$ 241,656.99** | **$ 763,710.20** | **Not Applicable** |

**Your payment schedule will be:**

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $ 918.51 | 03/01/07 |
| 12 | 987.40 | 03/01/08 |
| 12 | 1,061.45 | 03/01/09 |
| 12 | 1,141.06 | 03/01/10 |
| 12 | 1,226.64 | 03/01/11 |
| 12 | 1,318.64 | 03/01/12 |
| 12 | 1,417.54 | 03/01/13 |
| 12 | 1,523.86 | 03/01/14 |
| 12 | 1,638.15 | 03/01/15 |
| 9 | 1,761.01 | 03/01/16 |
| 242 | 2,522.89 | 12/01/16 |
| 1 | 2,522.73 | 02/01/37 |

**VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.**

This loan **DOES NOT HAVE A DEMAND FEATURE.**

Insurance:    You may obtain property insurance from anyone you want who is acceptable to the Lender

Security:    You are giving a security interest in the real property located at **10719 MONA BLVD, LOS ANGELES, CA 90059-1426**.

Filing Fees    **$ .00**

Late Charge    If a payment is late, you will be charged **5.00%** of the payment

Prepayment:    If you pay off the loan early, you **MAY** have to pay a penalty and you **WILL NOT** be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption:    SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale    If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the

00011

**SIGNATURE PAGE**

0044892941

**NOTICE TO BORROWER(S):**

**BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.**

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_____ **(Seal)**

JUANITA JONES

| **WORLD SAVINGS** | **PREPAYMENT FEATURE ACKNOWLEDGEMENT** |
|---|---|

LOAN NUMBER: 0044892941

DATE: 01/09/07

LOAN PROGRAM: ADJUSTABLE RATE MORTGAGE
PICK-A-PAYMENT LOAN

BORROWER(S):
JUANITA JONES

PROPERTY ADDRESS:
10719 MONA BLVD
LOS ANGELES, CA  90059-1426

You have selected a loan program that includes a prepayment fee provision. The following is the prepayment fee provision that will appear in your loan documents:

I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

By signing below, I/we acknowledge and agree that:

1. As a federally chartered savings institution acting in accordance with the federal laws and regulations governing federally chartered savings institutions, **WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND OR ASSIGNEES**, has an enforceable legal right to the prepayment fee described above, even if there is a state or local law to the contrary.

2. The prepayment fee provision written above constitutes the entire prepayment fee provision that will appear in my/our Note and supersedes any other written or oral discussion to the contrary.

3. The fact that there is a prepayment fee provision is disclosed on the enclosed Truth-in-Lending Disclosure.

4. I/We have been given an opportunity to discuss the prepayment fee provision with a Loan Representative and I/we fully understand it.

5. If I/we select a different loan program subsequent to the date of this Acknowledgement, World will provide a new Acknowledgement that will supersede this and other forms related to the above named loan program. This Acknowledgement supersedes any previous Acknowledgement given to me/us.

6. I/We have received a copy of this form.

00013

# Exhibit No. 3

**WORLD SAVINGS BANK, FSB**

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

#### BIWEEKLY PAYMENT

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY BIWEEKLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY BIWEEKLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER **0040361222**                     DATE   **May 26, 2005**

BORROWER(S)  **AL F. MINYEN AND WILMA R. MINYEN, HUSBAND AND WIFE AND AL F. MINYEN AND WILMA R. MINYEN, TRUSTORS(S) AND TRUSTEES(S) OF THE MINYEN FAMILY TRUST, DATED MARCH 26, 1998** sometimes called "Borrower" and sometimes simply called "I" or "me "

PROPERTY ADDRESS  **2251 CYPRESS AVE, SAN PABLO, CA  94806-1058**

1.    **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U S  **$343,000.00**, called "Principal," plus interest, to the order of the Lender  The Lender is **WORLD SAVINGS BANK, FSB,  a FEDERAL SAVINGS BANK,,  ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred

2.    **INTEREST**

(A)   **Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid  I will pay interest at the yearly rate of **5.190%**  The interest rate may change as described in this Section 2  Interest will be charged on the basis of a 364-day year, divided into 26 segments of two weeks each

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

(B)   **Interest Change Dates**

The interest rate I will pay may change on the **18th day of July, 2005** and on every other Monday thereafter  Each date on which my interest rate could change is called an "Interest Change Date "  The new rate of interest will become effective on each Interest Change Date



LENDER'S USE ONLY

00001

0040361222

**(C)   Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**   called "Lifetime Rate Cap "

**(D)   Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index " The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW  Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW  The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates  The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts  If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index  The most recent Index figure available on each Interest Change Date is called the "Current Index "

**(E)   Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.800** percentage points, called the "Margin," to the Current Index  Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new "Interest Rate" until the next Interest Change Date

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date  Lender may not, at a later date, carryover or add interest to which it is not entitled under this Note on any Interest Change Date

**(F)   Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available   For purposes of this Section 2(F), the Index is not "available" if  (a) the Index is for any reason no longer published, or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note  The selection of the alternative index shall be at Lender's sole discretion  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator  The Lender will give me notice of the alternative index

3.   **PAYMENTS**

**(A)   Time and Place of Payments**

I will pay Principal and interest by making payments every two weeks

I will make my first biweekly payment on **July 4, 2005** and every other Monday thereafter  I will make these biweekly payments until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note, and (iii) any charges that may be due under the Security Instrument  If, on **June 20, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date "

I will maintain a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, and keep sufficient funds in such deposit account to allow Lender to automatically withdraw my biweekly payment on each of the biweekly payment dates stated above  The sole purpose of the deposit account is to ensure payment of the biweekly payments on the due-date of each payment and I instruct and charge Lender to withdraw the amount of each biweekly payment from the deposit account on each due date without any further instructions from me

**(B)   Amount of My Initial Biweekly Payments**

Each of my initial biweekly payments will be in the amount of U S  $ **591.89**. This amount will change as described in Sections 3(C) and 3(D) below  My initial biweekly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance

**(C)   Payment Change Dates**

My biweekly payment will change as required by Section 3(D) below beginning on the **3rd** day of **July, 2006** and every 52 weeks thereafter  Each of these dates is called a "Payment Change Date "  My biweekly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount

I will pay the amount of my new biweekly payment every other Monday beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below

00002

0040361222

**(D)   Calculation of Payment Changes**

Subject to Section 3(F) and 3(G), on the Payment Change Date my biweekly payment may be changed to an amount sufficient to pay the unpaid Principal balance, including any deferred interest as described in Section 3(E) below, by the "Modified Maturity Date." The Modified Maturity Date is the date on which this note will be paid after accounting for acceleration of the payment schedule resulting from biweekly payments rather than the monthly payment schedule used to calculate the Maturity Date described in Section 3(A) above. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 50 but not more than 90 days before the Payment Change Date.

**(E)   Deferred Interest; Additions to My Unpaid Principal**

From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due. If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)   Limit on My Unpaid Principal; Increased Biweekly Payment**

My unpaid Principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of Deferred Interest to my unpaid Principal balance, the Principal Balance Cap limitation would be exceeded on the date that my biweekly payment is due, I will instead pay a new biweekly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new biweekly payment which is equal to an amount that will be sufficient to repay my then unpaid Principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)   Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my biweekly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)   Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my biweekly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.   FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**6   BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. I may make a full Prepayment or partial Prepayment without paying any prepayment charge. If I make a partial Prepayment, there will be no changes in the due dates or amounts of my payments unless the Lender agrees in writing to those changes. My partial Prepayment may reduce the amount of my payments after the first Payment Change Date following my partial Prepayment.**

00003

0040361222

**6. MAXIMUM LOAN CHARGES**

If a law which applies to this loan and which sets maximum loan charges is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Lender has not received the full amount of any biweekly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00 %** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each biweekly payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts, or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Default - Change to Monthly Payments**

If I fail to have sufficient funds in my deposit account to make my biweekly payment on the date my biweekly payment is due on two occasions in any 12 month period or four occasions any time prior to the Maturity Date or if a garnishment, attachment or seizure is made of or against my deposit account, then I will be in default and Lender will have a right, but not a duty, to change my loan to one with payments due monthly instead of biweekly. If the Lender chooses to change my loan to one with payments due monthly, Lender will provide me with written notice of the change at least 30 days in advance of the date the first monthly payment is due. This notice will also specify the amount of the monthly payment and the date the first monthly payment is due. In such event, interest on the loan balance from the last date interest was paid to the first date of the month preceding the date the first monthly payment is due will be added to my loan balance. The amount of the first monthly payment will be determined without regard to the 7-1/2% change in amount of payment cap set forth in Section 3(D) above.

I understand that I may voluntarily change the payment mode from biweekly to monthly at any time by giving written notice to Lender at least 60 days in advance of the date on which I wish the change to take effect. If I gave Lender such notice, Lender will then provide me with written notice of the amount of the monthly payment and the date the first monthly payment shall be due. I may be required to pay a processing fee and sign a Modification Agreement with Lender converting my loan to a monthly payment loan. I understand that should the payment mode be changed from biweekly to monthly either voluntarily or due to an event of default it will not be reversible.

In the event that my payment mode is changed from biweekly to monthly, interest will be charged thereafter on the basis of a 12 month year and a 30-day month. The Interest Rate I will pay will change on the first monthly payment date and on the same day every month thereafter. This revised interest change date will be substituted for the definition of "Interest Change Date" included in Section 2(B) above. The "Payment Change Date" as defined in Section 3(C) above will change to be the date the payment is changed from a biweekly to a monthly payment as described above in this Section 7(C) and on that day every 12 months thereafter.

**(D)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(E)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full or change my loan type from biweekly to monthly at that time as described above, the Lender will still have the right to do so if I am in default at a later time.

**(F)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

00004

0040361222

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at 2261 CYPRESS AVE, SAN PABLO, CA 94806--105 or at a single alternative address if I give the Lender notice of my alternative address  I may give notice to Lender of a change of my address in writing or by calling Lender's customer service telephone number provided on my billing statement  I may designate only one mailing address at a time for notification purposes

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at  1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612, or at a different address if I am given a notice of that different address

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed  Any person who takes over these obligations is also obligated to keep all of the promises made in this Note  The Lender may enforce its rights under this Note against each person individually or against all of us together  This means that any one of us may be required to pay all of the amounts owed under this Note

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor  "Presentment" means the right to require the Lender to demand payment of amounts due  "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid

**11.  SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

<u>Acceleration of Payment of Sums Secured,</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission  Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission  However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration  If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me

<u>Exception to Acceleration of Payment of Sums Secured,</u> If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if

(i)      Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender,

(ii)     Lender approves the creditworthiness of the transferee in writing,

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards,

(iv)     an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

(v)      the transferee executes an assumption agreement which is satisfactory to Lender, such assumption agreement providing for transferee opening a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, for direct payment as provided in the secured notes

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed  The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes

00005

0040361222

**12. GOVERNING LAW; SEVERABILITY**

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note

**13. CLERICAL ERRORS**

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error

**14. LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

SD254F (2004-03-3)

BIWEEKLY ARM
Page 8

CA

00006

SIGNATURE PAGE                    0040361222

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____  (Seal)
AL F. MINYEN

_____  (Seal)
WILMA R. MINYEN

AL F MINYEN AND WILMA R. MINYEN, TRUSTOR(S) AND TRUSTEE(S) OF THE
MINYEN FAMILY TRUST, DATED MARCH 26, 1998

BY: _____  (Seal)
    AL F. MINYEN, TRUSTEE

BY: _____  (Seal)
    WILMA R. MINYEN, TRUSTEE

00007

## WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
AL F. MINYEN, ET AL.

Date May 26, 2005
Loan No 0040361222

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after you have made all payments as scheduled | The total price of your purchase on credit including your down payment of |
| | | | | Not Applicable |
| 5.331 % | $ 313,680.41 | $336,744.71 | $ 650,425.12 | Not Applicable |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due: BIWEEKLY beginning on |
|---|---|---|
| 26 | $591.89 | 07/04/05 |
| 26 | 636.28 | 07/03/06 |
| 26 | 684.00 | 07/02/07 |
| 26 | 735.30 | 06/30/08 |
| 26 | 790.45 | 06/29/09 |
| 26 | 849.73 | 06/28/10 |
| 26 | 913.46 | 06/27/11 |
| 26 | 981.97 | 06/25/12 |
| 26 | 1,055.62 | 06/24/13 |
| 417 | 1,105.79 | 06/23/14 |
| 1 | 1,104.49 | 06/17/30 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance    You may obtain property insurance from anyone you want who is acceptable to the Lender

Security    You are giving a security interest in the real property located at 2251 CYPRESS AVE, SAN PABLO, CA 94806-1058

Filing Fees    $    70.00

Late Charge    If a payment is late, you will be charged 5.00% of the payment

Prepayment    If you pay off the loan early, you WILL NOT have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption    SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale    If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE

_Al F. Minyen_    5/24/05 / Date

AL F. MINYEN

GF424A1 (2004-03-1)    UNIVERSAL    CA
FINAL    DISTRIBUTION    1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE

073    LENDER'S USE ONLY

00008

(Page 1 of 1)

# WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
AL F. MINYEN, ET AL.

Date  May 26, 2005
Loan No  0040361222

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after you have made all payments as scheduled | The total price of your purchase on credit including your down payment of<br><br>Not Applicable |
| 5.331 % | $ 313,680.41 | $336,744.71 | $ 650,425.12 | Not Applicable |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due:<br>BIWEEKLY beginning on |
|---|---|---|
| 26 | $591.89 | 07/04/05 |
| 26 | 636.28 | 07/03/06 |
| 26 | 684.00 | 07/02/07 |
| 26 | 735.30 | 06/30/08 |
| 26 | 790.45 | 06/29/09 |
| 26 | 849.73 | 06/28/10 |
| 26 | 913.46 | 06/27/11 |
| 26 | 981.97 | 06/25/12 |
| 26 | 1,055.62 | 06/24/13 |
| 417 | 1,105.79 | 06/23/14 |
| 1 | 1,104.49 | 06/17/30 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance    You may obtain property insurance from anyone you want who is acceptable to the Lender

Security    You are giving a security interest in the real property located at 2251 CYPRESS AVE, SAN PABLO, CA 94806-1058

Filing Fees   $    70.00

Late Charge  If a payment is late, you will be charged 5.00% of the payment

Prepayment  If you pay off the loan early, you WILL NOT have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption  SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale  If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE

_Wilma R Minyen_                          5-22-05
WILMA R. MINYEN                              Date

GF42A1 (2004-03-1)      UNIVERSAL                                         CA
FINAL        DISTRIBUTION    1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE


073
LENDER'S USE ONLY

00009

# LOAN PROGRAM DISCLOSURE

**0040361222**

# PICK-A-PAYMENT^sm EQUITY BUILDER^sm LOAN

**BIWEEKLY ADJUSTABLE RATE MORTGAGE**
**GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX (COSI)**

> This disclosure describes in a question-and-answer format important features of the Pick-a-Payment^sm Equity Builder^sm Loan Program you are considering. Federal Reserve Regulation Z and the rules and regulations of the federal Office of Thrift Supervision require that World give this disclosure to you. This disclosure is accurate as of the date of printing. However, World reserves the right to make subsequent changes to it at any time regarding any matter it covers. Such changes may occur because of changes in policy, law or regulation or for any other reason. Some terms of loans on non-owner occupied properties may be different from those described in this disclosure. If you are considering a loan on a non-owner occupied property, please ask a Loan Representative about the differences.

**WHAT DOES BIWEEKLY MEAN?**

The term biweekly means mortgage payments are due every two weeks instead of once a month. Each year there are 26 biweekly payments. This is the equivalent of 13 monthly payments.

**CAN THE INTEREST RATE AND PAYMENT AMOUNT CHANGE?**

Yes. Movement of an index causes the interest rate and payment amount to change. An index is an independent measure of interest rate activity.

**WHAT IS THE INDEX?**

The index for this loan is the weighted average of the rates of interest on the deposit accounts (sometimes called cost of savings) of the federally insured depository institution subsidiaries of Golden West Financial Corporation ("COSI" or "Index"). Golden West Financial Corporation is a holding company listed on the New York Stock Exchange under the trading symbol "GDW." All of the depository institution subsidiaries of GDW currently operate under the name World Savings.

The COSI consists of the weighted annualized rate of interest in effect on deposit accounts, adjusted for the effects of financial instruments related to deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. It does not include accounts owned by GDW or its subsidiaries.

GDW computes the COSI as of the last day of each calendar month and announces it on or near the last business day prior to the fifteenth day of the following calendar month. For example, GDW announces the February COSI on or near the last business day prior to the fifteenth of March. It is in effect until the announcement of the March COSI in April.

**WHERE CAN I GET INFORMATION ABOUT THE INDEX?**

You can get information about the COSI by

– writing to World Savings
 P O Box 659558
 San Antonio, Texas 78265-9558
 Attn Customer Service, or

– telephoning (800) 642-0257

**HOW DOES WORLD DETERMINE INTEREST RATE CHANGES?**

World determines interest rate changes by adding an amount (margin) that is fixed for the life of the loan to the current Index. The current Index is the most recently announced COSI value available on the date of each interest rate change. Please ask for World's current margin and interest rate.

**IS THE INITIAL INTEREST RATE BASED ON THE INDEX PLUS THE MARGIN?**

Yes.

**HOW IS THE INITIAL PAYMENT AMOUNT ESTABLISHED?**

You select an initial payment amount from a range of payment amounts provided by World. The range includes a minimum and a maximum initial payment amount. The maximum initial payment will not fully amortize the loan at the initial interest rate. The initial payment amount you select may not be sufficient to pay the full amount of interest due at the initial interest rate. This will cause the loan amount to increase as described below in the section "How Does The Principal Balance Change?" Please ask for the range of initial payments for the loan you are considering. The biweekly payment amount is one-half the amount of a monthly payment for an equivalent 30-year loan.

**HOW OFTEN CAN THE INTEREST RATE CHANGE?**

Biweekly, beginning on the due date of the second regularly scheduled payment. However, since the index value changes only once each month, some biweekly payment cycles will not involve an interest rate change.

**HOW OFTEN CAN THE PAYMENT CHANGE?**

Annually. The payment can change every 26 payments beginning with the 27th payment. Each date on which the payment may change is a "Payment Change Date."

**ARE THERE ANY LIMITS TO THE AMOUNT THE INTEREST RATE MAY CHANGE?**

Yes. The maximum interest rate limit ("Lifetime Rate Cap") is between 2.000 and 8.000 percentage points over the initial Index value plus margin. Please ask for World's current Lifetime Rate Cap.



00010

0040361222

### ARE THERE ANY LIMITS TO THE AMOUNT THAT PAYMENTS MAY CHANGE?

Yes. The biweekly payment cannot increase ("Payment Cap") more than 7-1/2% each year.

However,

- the Payment Cap does not apply on the 10th, 15th, 20th, 25th or final Payment Change Dates;

- the Payment Cap does not apply if the principal balance reaches the limits described in the section entitled "How Does the Principal Balance Change?"

### HOW DOES WORLD DETERMINE PAYMENT AMOUNT CHANGES?

On each Payment Change Date, World determines a new biweekly payment by performing a calculation according to the steps that follow

(a) Using the original term of 360 months, the then current balance and interest Rate, compute a monthly payment

(b) Divide the monthly payment amount determined in step (a) by two

(c) Using the figure determined in step (b), the then current balance and interest Rate, compute a number of biweekly payments

(d) Subtract the number of biweekly payments already made from the number of biweekly payments computed in step (c) to determine the number of then remaining biweekly payments

(e) Using the number of remaining biweekly payments determined in step (d), the then current balance and interest Rate, compute a new biweekly payment

(f) As applicable, decrease the biweekly payment amount determined in step (e) or increase it to the maximum permitted by the 7-1/2% Payment Cap

### HOW DO I MAKE MY BIWEEKLY PAYMENTS?

Loan payments are made through automatic withdrawals from your "Bank Account" at your bank, savings and loan, or other financial institution. Every other Monday, World will automatically debit your Bank Account for the amount of the mortgage payment then due. If you do not already have a Bank Account at a financial institution that is accessible by ACH (automated clearing house), then it will be necessary for you to open one and provide us with your Bank Account number before your loan closes. Please verify with your financial institution that your Bank Account is accessible by ACH

You are responsible for ensuring that sufficient available funds are on deposit in your Bank Account to cover the amount of your biweekly mortgage payment. If there are insufficient available funds, your loan payment will not be made. It will be necessary for you to make the payment within 15 days after it was due by mailing it to an address specified by World

Your Bank Account must remain open during the entire term of your biweekly loan

### UNDER WHAT CIRCUMSTANCES COULD THIS LOAN CONVERT TO A MONTHLY PAYMENT LOAN?

If there are two occasions in any 12-month period of insufficient available funds in your Bank Account to cover your biweekly mortgage payment when due or a total of four such occasions during the life of your loan, World will have a right, but not a duty, to convert your biweekly payment loan to a monthly payment loan without any prior notice. If this occurs, World may charge you then current conversion fee and will send you notice of your new monthly payment amount and due date after the conversion

If World converts your biweekly loan to a monthly payment loan, your new monthly payment will not automatically be withdrawn from your Bank Account

### HOW WOULD WORLD CALCULATE MY MONTHLY PAYMENT AFTER CONVERSION?

If your loan converted from biweekly to monthly payments, World would calculate a monthly payment sufficient to repay your then unpaid principal balance at the interest rate then in effect in substantially equal monthly installments over the remaining term of the loan

The Payment Cap would not apply at the time your loan converted to monthly payments. The monthly payment would be subject to annual changes based on changes in the interest rate as previously described in this disclosure

### HOW DOES THE PRINCIPAL BALANCE CHANGE?

The principal balance (loan amount) can change biweekly

When the biweekly payment is more than sufficient to pay the full amount of interest due, World subtracts the amount that exceeds the interest due from the principal balance, resulting in a principal reduction

At various times during the life of your loan the biweekly payment may not be sufficient to pay the full amount of interest due. This can occur if the initial payment amount that you select is less than the full amount interest due. This can also result from increases in the interest rate prior to the Payment Change Date or from a biweekly payment that did not increase sufficiently to pay the full amount of interest due, because of the 7-1/2% Payment Cap

If the biweekly payment is not sufficient to pay the full amount of interest due, World adds the accrued but unpaid interest, called Deferred Interest, to the unpaid principal balance of the loan Until repaid, Deferred Interest bears interest at the interest rate of the loan

The principal balance may never exceed

- 125% of the original principal balance amount for a loan that had an original loan amount of 85% or less of the property's appraised value or sales price (whichever is less), or

- 110% of the original principal balance amount greater than 85% of the property's appraised value or sales price (whichever is less)

If Deferred Interest caused the principal balance to reach these limits, World would immediately increase the payment without regard to the Payment Cap. The increased payment would pay off the loan at the then current interest rate over the remaining term

00011

0040361222

**WHAT ARE THE INITIAL AND MAXIMUM INTEREST RATES AND PAYMENTS FOR A $10,000 LOAN ORIGINATED IN SEPTEMBER OF 2004?**

|  | Initial payment selected * | Maximum payment and year in which maximum payment occurs ** |
|---|---|---|
| Minimum initial payment | $18 36 | $70 46     3rd year |
| Maximum initial payment | $25 67 | $72 14     4th year |

\* The initial interest rate in the examples is 4.610%, which reflects an Index value of 1.910% plus a margin of 2.700% Your initial interest rate may be different

\*\* The maximum interest rate in these examples is 12.610%, which reflects a Lifetime Rate Cap of 8.000% over the initial Index value plus margin Your Lifetime Rate Cap may be different

Your biweekly payment can increase or decrease substantially based on changes in the interest rate

**HOW CAN I CALCULATE THE INITIAL PAYMENT FOR THE AMOUNT I PLAN TO BORROW?**

To see what the initial payments would be

step 1   divide the amount you plan to borrow by $10,000, and then

step 2   multiply the resulting amount by the payment shown under the "Initial payment selected" column of the immediately previous question

For example,
the biweekly payment for a loan amount of $120,000 would be

step 1   $120,000 ÷ $10,000 = 12

step 2   12 X $18 36 = **$220.32** (minimum initial payment)
or
12 X $25 67 = **$308.04** (maximum initial payment)

**WHEN WILL I RECEIVE NOTICES OF CHANGES TO THE LOAN? WHAT INFORMATION WILL THEY INCLUDE?**

World sends a written notice at least 25 days before each Payment Change Date  The notice includes information about the payment amount, interest rate and loan balance changes

**DOES THIS LOAN HAVE AN ASSUMPTION/DUE-ON-SALE PROVISION?**

If at origination your loan is not secured by additional non-real estate collateral, World will give written approval for a transfer (assumption)

and the buyer (transferee) may assume your loan at its current interest rate provided

1)   the buyer meets World's then current credit standards,

2)   the buyer makes a cash downpayment sufficient to meet World's then current underwriting standards,

3)   World receives an assumption fee,

4)   no previous transfer of the property has occurred since the original date of the loan,

5)   you and the buyer sign all required assumption documents, and

6)   the buyer has an ACH Bank Account, as described in the section entitled "How Do I Make My Biweekly Payments?"

The buyer might not receive the same Lifetime Rate Cap that you originally did  The buyer could receive a higher Lifetime Rate Cap based on then current market conditions

If the loan program you are considering requires additional non-real estate collateral at the time of origination, the loan will not be assumable  You will receive additional information that will explain the loan program in greater detail

Under certain circumstances, World could declare the entire outstanding loan amount immediately due and payable  Failure to pay could then result in the forced sale of the property securing the loan  This could occur.

–   if there is more than one sale or transfer of the property, or

–   if you sell or transfer the property to anyone without obtaining World's prior written consent

**DOES THIS LOAN HAVE A PREPAYMENT CHARGE PROVISION?**

Some loan programs have a provision that requires that you pay a fee (a prepayment charge) if you make certain payments of principal before they are due (prepayments)  Be sure to ask whether the loan program you are considering has a prepayment charge provision

If the loan program you are considering does have a prepayment charge provision, you will receive several documents during the processing of your loan that explain the prepayment charge in detail

**HOW CAN I GET INFORMATION ABOUT WORLD'S OTHER LOAN PROGRAMS?**

A Loan Representative will be happy to answer any questions you have and provide you with disclosures for other adjustable rate loan programs

**IMPORTANT - SIGNATURE**

I have received a copy of this disclosure describing the Pick-a-Payment Equity Builder Loan Program  I understand that this disclosure is neither a commitment to make a loan nor a binding contract  The complete contractual terms and conditions of the loan are in the Note, Security Instrument, Modification(s) and Rider(s), if any

AL F MINYEN
Print Name

Signature
Wilma R Minyen

2251 CYPRESS AVE SAN PABLO, CA 94806
Property Address

5/26/05
Date

Please return a signed copy of this disclosure to World and retain a copy for your records.

AD161C (2004-03-3)     [GD1 (2004-03-3)]
BIWEEKLY COSI - PICK-A-PAYMENT LOAN

Page 3 of 3

LOAN TYPE 227
CA

00012

000013

**Exhibit No. 4**

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: **0040509770**                                             DATE: **June 24, 2005**

BORROWER(S):  **MARK CLAUSON AND CHRISTINA CLAUSON, HUSBAND AND WIFE**   sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **9342 KASCHUBE WAY, SANTEE, CA  92071-2227**

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$390,400.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

### 2.  INTEREST

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **5.320%**. The interest rate I will pay  may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Change Dates**

The interest rate I will pay may change on the **15th** day of **August, 2005** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)  Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**, called "Lifetime Rate Cap."

LENDER'S USE ONLY

00001

0040509770

**(D)  Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E)  Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.800** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)  Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available.  For purposes of this Section 2(F): the Index is not "available" if:  (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note.  The selection of the alternative index shall be at Lender's sole discretion.  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **August 15, 2005**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **July 15, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,433.26**. This amount will change as described in Sections 3(C) and 3(D) below. My initial  monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)  Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **August, 2006** and on that day every **12th**  month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap."  The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

0040509770

**(E)    Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)    Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)    Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)    Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.    FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.    BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  I may make a full Prepayment or partial Prepayment without paying any prepayment charge.  If I make a partial Prepayment, there will be no changes in the due dates or amounts of my payments unless the Lender agrees in writing to those changes. My partial Prepayment may reduce the amount of my payments after the first Payment Change Date following my partial Prepayment.**

**6.    MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)    Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00%** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

00003

0040509770

**(B)    Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)    Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)    No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)    Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **9342 KASCHUBE WAY, SANTEE, CA  92071–222**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

00004

0040509770

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)   Lender approves the creditworthiness of the transferee in writing;

(iii)  transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)  an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)   the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**12.  GOVERNING LAW; SEVERABILITY**
    This Note shall be governed by and construed under federal law and federal rules and regulations including those for **federally chartered savings institutions, called "Federal Law."** In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

**13.  CLERICAL ERRORS**
    In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

**14.  LOST, STOLEN OR MUTILATED DOCUMENTS**
    If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

00005

0040509770

**SIGNATURE PAGE**

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_____ (Seal)

MARK CLAUSON

_____ (Seal)

CHRISTINA CLAUSON

00006

| **WORLD SAVINGS** | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z |
|---|---|

Customer's Name:
**MARK CLAUSON, ET AL.**

Date: **June 9, 2005**
Loan No.: **0040509770**

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br><br>The total price of your purchase on credit including your down payment of |
|---|---|---|---|---|
| **5.469 %** | **$439,862.99** | **$381,190.96** | **$821,053.95** | **Not Applicable**<br><br>**Not Applicable** |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due: |
|---|---|---|
| | | MONTHLY beginning on |
| 12 | $ 1,431.79 | 09/01/05 |
| 12 | 1,539.17 | 09/01/06 |
| 12 | 1,654.61 | 09/01/07 |
| 12 | 1,778.71 | 09/01/08 |
| 12 | 1,912.11 | 09/01/09 |
| 12 | 2,055.52 | 09/01/10 |
| 12 | 2,209.68 | 09/01/11 |
| 12 | 2,375.41 | 09/01/12 |
| 263 | 2,430.19 | 09/01/13 |
| 1 | 2,429.98 | 08/01/35 |

**VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.**

This loan **DOES NOT HAVE A DEMAND FEATURE.**

Insurance:  You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security:  You are giving a security interest in the real property located at **9342 KASCHUBE WAY, SANTEE, CA 92071-2227.**

Filing Fees:  $    **75.00**

Late Charge:  If a payment is late, you will be charged **5.00%** of the payment.

Prepayment:  If you pay off the loan early, you **WILL NOT** have to pay a penalty and you **WILL NOT** be entitled to a refund of **ANY PART OF THE FINANCE CHARGE ALREADY PAID.**

Assumption:  **SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.**

Due on Sale:  If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

**ALL NUMERICAL DISCLOSURES EXCEPT THE LATE PAYMENT DISCLOSURE ARE ESTIMATED.**

**By signing below,** you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

_____
**MARK CLAUSON**

_6-13-05_
Date

0 2 2

GF004A1 (2004-03-1)   UPFRONT
DISTRIBUTION:  1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE

CA

LENDER'S USE ONLY

00007