1   David M. Arbogast (SBN 167571)
    David@SpiroMoss.com
2   Ira Spiro (SBN 67641)
    Ira@SpiroMoss.com
3   **SPIRO MOSS BARNESS LLP**
    11377 W. Olympic Boulevard, Fifth Floor
4   Los Angeles, CA 90064-1683
    Phone: (310) 235-2468; Fax: (310) 235-2456
5

6   Paul R. Kiesel, Esq. (SBN 119854)              Jonathan Shub (SBN 237708)
    kiesel@kbla.com                                jshub@seegerweiss.com
7   Patrick DeBlase, Esq. (SBN 167138)             **SEEGER WEISS LLP**
    deblase@kbla.com                               1515 Market Street, Suite 1380
8   Michael C. Eyerly, Esq. (SBN 178693)           Philadelphia, PA 19107
    eyerly@kbla.com                                Phone: (215) 564-2300; Fax (215) 851-8029
9   **KIESEL BOUCHER LARSON LLP**
    8648 Wilshire Boulevard                        Jeffrey K. Berns, Esq. (SBN 131351)
10  Beverly Hills, California 90211                jberns@jeffbernslaw.com
    Phone: (310) 854-4444; Fax: (310) 854-0812     **LAW OFFICES OF JEFFREY K. BERNS**
11                                                 19510 Ventura Boulevard, Suite 200
                                                   Tarzana, California 91356
12                                                 Phone: (818) 961-2000; Fax: (818) 867-4820

    Attorneys for Plaintiff and all others Similarly Situated

13

14

15              **UNITED STATES DISTRICT COURT**

16        **NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

17

18  DOLORES MANDRIGUES, JUANITA        )   **CASE NO. C-07-04497 - JF**
    JONES, AL F. MINYEN and WILMA R.   )
19  MINYEN, MARK CLAUSON and           )   Judge: Hon. Jeremy Fogel
    CHRISTINA CLAUSON, individually and on )   Ctrm:  3
20  behalf of all others similarly situated, )
                                       )   CLASS ACTION
21              Plaintiff,             )
                                       )
22      v.                             )
                                       )   **DECLARATION OF DAVID M. ARBOGAST**
23                                     )   **IN SUPPORT OF OPPOSITION TO**
    WORLD SAVINGS, INC., WORLD SAVINGS )   **DEFENDANTS MOTION TO DISMISS**
24  BANK, FSB, WACHOVIA MORTGAGE       )
    CORPORATION, and DOES 1 through 10 )
25  inclusive,                         )
                                       )
26              Defendants.            )
                                       )   Complaint Filed: August 29, 2007
27                                     )   Trial Date: Not set yet.
                                       )
28

1        1.    I am an active member of the State Bar of California, admitted December, 1993, and I am

2    a member of the Bar of this Court.  I am one of the attorneys of record for Plaintiffs in this action.

3        2.    <u>Exhibit 1</u>, attached hereto is a true and correct copy of the letter dated December 24,

4    2007 from Wachovia Mortgage to Mark and Christina Clauson;

5        3.    <u>Exhibit 2</u>, attached hereto is a true and correct copy of relevant pages from <u>Rules and

6    Regulations - Federal Reserve System</u>, 12 CFR Part 226, April 3, 1995;

7        4.    <u>Exhibit 3</u>, attached hereto is a true and correct copy of relevant pages from the November

8    2006 Update, <u>Truth-in- Lending Manual</u>, Ralph C. Clontz, Jr. & James H. Pannabecker;

9        5.    <u>Exhibit 4</u>, attached hereto is a true and correct copy of the Letter from the Office of Thrift

10    Supervision ("OTS Letter"), dated January 30, 2003,  entitled "Preemption of New York Predatory

11    Lending Law;"

12        6.    <u>Exhibit 5</u>, attached hereto is a true and correct copy of the OTS letter, dated December

13    24, 1996, entitled, "Preemption of State Laws Applicable to Credit Card Transactions;"

14        7.    <u>Exhibit 6</u>, attached hereto is a true and correct copy of the OTS Letter, dated March 10,

15    1999, entitled, "California Unfair Competition Act."

16        I declare under penalty of perjury under the laws of the United States of America that the

17    foregoing is true and correct and was executed in the State of California on February 8, 2008.

18

19                         _____*/s/*_____

20                         DAVID M. ARBOGAST

21

22

23

24

25

26

27

28

Declaration of David M. Arbogast - C-O7-04497- JF

# Exhibit No. 1

Wachovia Mortgage
P.O. Box 659558
San Antonio, TX 78265 9558

December 24, 2007                    Loan Number: 0040509770

PRE-FORECLOSURE REINSTATEMENT QUOTE

Mark Clauson
Christina Clauson
9342 Kaschube Way
Santee, CA 92071 2227


Property Address: 9342 Kaschube Way, Santee CA 92071

Dear Mark Clauson and Christina Clauson :

Your loan has been approved for commencement of foreclosure action
which may cause you to lose your property and any owner's equity.

There is still time to resolve the delinquency on the above
referenced loan; options include:

1.  Pay the delinquent amount in full of $ 7,206.08 by
    January 03, 2008.  This amount plus any subsequent payments,
    late charges, and/or fees must be received in a Wachovia Financial
    Center or at the San Antonio office no later than 6:00 p.m.,
    Eastern Time.  If lesser funds are received, they may be
    accepted, but will be accepted only as a partial payment.
2.  Contact us immediately at 800-282-3451 to discuss payment
    options, including pay-by-phone transactions, or payoff options
    if you have your property listed for sale and cannot sell it
    for enough to pay Wachovia Mortgage's loan in full.
3.  You may pay $ 7,206.08 at any Wachovia Financial Center, by mail,
    or wire to:

    Mail                           Wire
    Wachovia Mortgage              Wachovia Mortgage
    Attn: Cashiering Dept., TX1361 ABA/RT: 053000219
    P.O. Box 659568                Account No.: 01131510715329
    San Antonio, TX 78265-9568     Reference Loan Number

If you do not take action by January 03, 2008, Wachovia Mortgage may
refer your loan for a foreclosure action.  Your immediate attention
to this matter is critical to avoid any fees and costs that may be
incurred as a result of a foreclosure action, which may include
attorney fees and/or trustee fees as provided by your Note and
Security Instrument.

FP002 017 OUA

Wachovia Mortgage
P.O. Box 659558
San Antonio, TX 78265-9558

 Mark Clauson
Christina Clauson
0040509770
December 24, 2007
Page 2



You may contact us at 800-282-3451, Monday through Friday,
9:00 a.m. to 11:00 p.m., and Saturday, 9:00 a.m. to 6:00 p.m.,
Eastern Time, for assistance.

Loan Counseling Department

FP002 017 OUA

*Please be advised that payment in accordance with this notice may
not be sufficient to cure all defaults.  Unless all defaults are
cured, foreclosure proceedings may continue.

*Please be advised that Wachovia Mortgage may be attempting to collect
a debt.  If you are currently in bankruptcy or your debt has been
discharged in bankruptcy, Wachovia Mortgage is only exercising its
rights against the property and is not attempting to hold you
personally liable on the Note.

*Please be advised that Wachovia Mortgage does report late payments
and foreclosures to major credit bureaus.

**Exhibit No. 2**

Westlaw.

60 FR 16771-01                                                          Page 1
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

RULES and REGULATIONS

FEDERAL RESERVE SYSTEM

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Truth in Lending

Monday, April 3, 1995

**\*16771** AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

SUMMARY: The Board is publishing revisions to the official staff commentary to Regulation
Z (Truth in Lending).  The commentary applies and interprets the requirements of
Regulation Z.  The revisions clarify regulatory provisions and provide further guidance
on issues of general interest, such as the treatment of various fees and taxes associated
with real estate-secured loans and a creditor's **\*16772** responsibilities when
investigating a claim of the unauthorized use of a credit card.

DATES: This rule is effective April 1, 1995.  Compliance is optional until October 1,
1995.

FOR FURTHER INFORMATION CONTACT: For Subparts A and B (open-end credit), Jane Jensen Gell
or Obrea Otey Poindexter, Staff Attorneys; for Subparts A and C (closed-end credit), Kyung
Cho-Miller, Sheilah A. Goodman, W. Kurt Schumacher, Natalie E. Taylor, or Manley Williams,
Staff Attorneys, Division of Consumer and Community Affairs, Board of Governors of the
Federal Reserve System, at (202) 452-3667 or 452-2412; for the hearing impaired only,
Dorothea Thompson, Telecommunications Device for the Deaf, at (202) 452-3544.

SUPPLEMENTARY INFORMATION:

I. Background

  The purpose of the Truth in Lending Act (TILA; 15 U.S.C. 1601 et seq.) is to promote
the informed use of consumer credit.  The act requires creditors to disclose credit terms
and the cost of credit as an annual percentage rate (APR).  The act requires additional
disclosures for loans secured by a consumer's home, and permits consumers to cancel
certain transactions that involve their principal dwelling.  It also imposes limitations
on some credit transactions secured by a consumer's principal dwelling.  The act is
implemented by the Board's Regulation Z (12 CFR part 226).  The regulation authorizes
the issuance of official staff interpretations of the regulation. (See Appendix C to
Regulation Z.) The Board has published a staff commentary to Regulation Z which clarifies
existing law and provides guidance to creditors in applying the regulation to specific
transactions (Supplement I of this part). The Board updates the commentary periodically
as a substitute for individual staff interpretations.

  In December, the Board published proposed amendments to the commentary to Regulation
Z (59 FR 64351, December 14, 1994).  The Board received about 150 comments.  Nearly 90%
were from creditors or their representatives; the remainder were from consumer advocates,
government officials, and individuals.  Overall, commenters generally supported the
proposed amendments.  Views were mixed on a number of comments, and some commenters
expressed concerns about issues not addressed in the proposal.  Except as discussed
below, the commentary has been revised as proposed; some technical suggestions or concerns

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                              Page 2
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

raised by commenters are addressed.  Compliance with the amendments is mandatory on
October 1, 1995.

II. Commentary Revisions

*Subpart A--General*

Section 226.2--Definitions and Rules of Construction

*2(a) Definitions*

*2(a)(17) Creditor*

*Paragraph 2(a)(17)(i)*

   Comment 2(a)(17)(i)-8 clarifies the identity of the creditor for participant loans from
an employee savings plan, such as 401(k) plans.  The proposal would have clarified that
the plan (and not the plan trust or trustee) is the creditor for purposes of the TILA.

   Some commenters asked for further guidance when the plan's trust or trustee provide
disclosures for the plan's participant loan program.  The comment is revised from the
proposal for clarity. Creditors should look to the plan (not the trust or trustee) to
determine whether the numerical tests for coverage have been met. The person to whom the
participant's loan is initially made payable (whether the plan, the trust, or the trustee)
is responsible for Regulation Z compliance for participant loans.

Section 226.4--Finance Charge

*4(a) Definition*

   Comment 4(a)-1 is revised as proposed to indicate that section 12 of the Real Estate
Settlement Procedures Act (RESPA, 12 U.S.C. 2610) prohibits creditors from charging fees
for preparing TILA disclosure statements in RESPA-covered transactions.  The comments
generally supported the revisions.

   The Board received a substantial number of comments relating to the proposed revision
to comment 4(a)-3 on fees charged by third parties.  While most commenters believed that
the comment helped clarify the treatment of third-party fees generally, the examples of
settlement agent charges, mortgage broker fees, and taxes raised a number of questions.

   Creditors had expressed concern about some charges imposed by loan-closing agents being
imputed to the creditor.  Some had indicated that despite the fact that they require the
use of a closing agent (and in limited ways the agent acts on behalf of the creditor),
in the modern mortgage lending environment, creditors do not have control over certain
fees that may be charged to consumers by these entities, particularly where there is no
affiliation between the creditor and the third party, as is often the case.  To address
this concern, the proposed revision to comment 4(a)-3 provided by example that if a
particular fee imposed by a settlement agent is not required or retained by the creditor,
the fee is not a finance charge, even though the creditor requires use of a third party.

   Comment 4(a)-3, which applies to all types of credit extensions (not just home-purchase
or other home-secured loans), is revised in the final version to clarify the general
third-party rule.  Upon further analysis, guidance about fees charged by settlement
agents in real estate-secured transactions is provided in a separate comment 4(a)-4.
This new comment gives the general rule for evaluating settlement agent fees, and is
followed by an example. Comments previously numbered 4(a)-4 through -6 are now renumbered.

   Many commenters also requested further clarification on the example of mortgage broker
fees as a finance charge.  The proposed clarification responded to questions about the
existing mortgage broker fee example, which had been added to address programs offering
lower rates and clearly more favorable terms to borrowers who use the creditor's
affiliated mortgage broker than to borrowers who apply to the creditor directly.  The
particular example has been deleted; while the mortgage broker fee charged in this
instance is still considered a finance charge, it is a much less common practice today,

                   ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                    Page 3
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

and therefore has caused confusion.  The example of mortgage broker fees is amended to
simply reflect the general rule that a fee is a finance charge if the creditor retains
the fee.

  With regard to taxes, some commenters noted that the commentary addresses in several
areas the issue of whether taxes are finance charges. These commenters requested that
all comments referring to taxes be consolidated into one comment.  To ease compliance,
the reference to taxes currently contained in comment 4(a)-3 is removed.  The general
rules on the treatment of taxes under the TILA are contained in renumbered and revised
comment 4(a)-7, formerly comment 4(a)-6.  The current reference to taxes under 4(e)-1
has been revised and the current reference to taxes under 4(a)-1 remains unaffected.

*4(c)  Charges Excluded From the Finance Charge*

*Paragraph 4(c)(7)*

  Comment 4(c)(7)-1 clarifies certain real-estate and residential mortgage *16773
transaction costs that are excluded from the finance charge.  In response to commenters'
suggestions and upon further analysis, the comment is revised to state that fees
excludable under this section include not only the cost of the charges excludable under
this section, but also the cost of verifying or confirming information relating to
excludable item itself.  The previous language specifically stated that a credit report
fee included the cost of verifying information in the report.  This language was intended
to be read only as an example.  It is now more clearly shown as such.  Verification or
confirmation fees, like other excludable charges under this section, must be bona fide
and reasonable in amount.

  The language addressing lump sum charges has been moved to a new comment, 4(c)(7)-2.
This provision has been adopted as proposed, with some revisions for clarity.  The comment
states that a lump sum charge for conducting or attending a closing (charged, for example,
by a lawyer or a title company) is excluded from the finance charge if the charge is
primarily for services related to items listed in § 226.4(c)(7) (such as reviewing or
completing documents), even if other incidental services, such as explaining various
documents or disbursing funds for the parties, are performed.  This is an exception to
the general rule on the treatment of lump sum fees. Most commenters supported the proposal
as a clarification of the Board's existing position.  Several, however, opposed allowing
creditors to exclude fees for incidental services where the charge is primarily for
services related to items listed in § 226.4(c)(7), believing that this would result in
less accurate disclosures.

  Comment 4(c)(7)-3 (proposed as 4(c)(7)-2) has been adopted as proposed, with minor
changes for clarity.  The comment states that charges excludable under §  226.4(c)(7)
are those imposed in connection with the initial decision to grant credit--for example,
a fee to search for tax liens on the property or to determine if flood insurance is
required.  The comment also clarifies that fees for services to be performed during the
loan term, for example, to monitor a consumer's continued compliance with contract
provisions, such as paying property taxes or purchasing flood insurance, are not
excludable under §  226.4(c)(7), regardless of when they are paid. These recurring
administrative fees, paid by the consumer to protect the creditor's security interest,
are finance charges.

  Commenters generally agreed with the proposed language.  Many, however, had concerns
regarding the treatment of fees paid at closing for services attributable both to the
initial credit decision and to services to be performed periodically over the term of
the loan.  For example, certain flood certification providers charge a consolidated fee,
and it may not be clear to creditors what portion of the fee relates to the services
connected with the initial credit decision.  The final commentary addresses these
concerns by specifying that a creditor may treat the entire charge as a finance charge
if the creditor is uncertain of the portion properly attributable to the finance charge.
Such sum need not be labelled as an estimate.

*4(e)  Certain Security Interest Charges*

  Comment 4(e)-1 provides examples of security interest charges that are and are not

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 4
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

excludable as finance charges.  The proposal stated that only recording fees relating
to the obligation between the creditor and the consumer were excludable.  Most commenters
supported the proposal, although some were opposed.  The comment is adopted as proposed,
but indicates that fees to record documents such as an assignment between a creditor and
a third party are finance charges.

  In response to comments and for clarity, the portion of comment 4(e)-1 dealing with taxes
has been revised.  As discussed above, comment 4(a)-7 (formerly 4(a)-6) contains the
general rules on the treatment of taxes.

*Subpart B--Open-End Credit*

Section 226.5--General Disclosure Requirements

*5(b)  Time of Disclosures*

*5(b)(1)  Initial Disclosures*

  Comment 5(b)(1)-1 provides that initial disclosures must be provided before the consumer
makes the first purchase under an open-end plan.  The comment provides an example to
illustrate that when a consumer makes a purchase and opens an account with a retailer
contemporaneously, initial disclosures must be given to the consumer at that time.

  Comment 5(b)(1)-5 addresses the general rule as it relates to the timing of initial
disclosures when a creditor offers consumers an option to transfer outstanding balances
with other creditors as part of a preapproval or general solicitation of an open-end credit
plan.  The proposal required creditors to comply with initial disclosure requirements
under § 226.6 before the consumer authorized the balance transfer.  The purpose of the
proposal was to ensure that consumers receive initial disclosures before the first
transaction is made under the plan.

  Commenters were divided on the proposal.  Several commenters believed that the
disclosures required under § 226.5a at the time of solicitation adequately protect and
sufficiently inform the consumer about the terms of the credit plan.  The initial
disclosures required under § 226.6, however, contain important terms that are not included
in the solicitation disclosures.  For example, the initial disclosures give the cash
advance APR, information that could be an important factor in a consumer's decision to
authorize a balance transfer.  To ease compliance, card issuers that are subject to the
requirements of § 226.5a may establish procedures that comply with both sections in a
single disclosure statement.  Comment 5a-2 provides guidance on the appropriate format
for combined disclosures.  For example, a creditor could provide the § 226.5a disclosures
in a tabular format, along with the additional disclosures required by § 226.6 outside
the table.

  Other commenters requested an "opt-out" provision that would allow card issuers to comply
by establishing a procedure under which a consumer could cancel or reverse the balance
transfer after receiving initial disclosures. This option raises concerns about the
effect such an approach would have on a consumer whose balance with a third party would
be paid by the card issuer.  It could be difficult to cancel or reverse the balance
transfer transaction.

  Commenters suggested that a creditor could comply with the initial disclosure
requirements under § 226.6 by delaying the requested transfer for a period of time after
the initial disclosures are sent.  The delay would ensure that the initial disclosures
are received by the consumer before the transferred balance is applied to the new plan.
Under the revised commentary, a creditor complies with this section if initial disclosures
required under § 226.6 are furnished before a balance transfer transaction occurs.

Section 226.6--Initial Disclosure Statement

*6(b)  Other Charges*

  Comment 6(b)-1 provides guidance for disclosing a termination fee imposed in an open-end
credit plan, as proposed.  Commenters generally supported the disclosure of a termination

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                        Page 5
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

fee as an "other charge." Some commenters believed disclosing the fee as a finance charge
might better assist consumers in shopping for a credit plan.  But this approach would
not facilitate consumer **\*16774** shopping based on the APR, since the APR in the initial
disclosures reflects on finance charges based on periodic rates, and thus would not be
affected by a termination fee.  Furthermore, the consumer would gain little from
receiving an APR (disproportionately high in some cases) on what might be the last periodic
statement for a fee imposed when the consumer closes the plan.

Section 226.12--Special Credit Card Rules

*12(b)  Liability of Cardholder for Unauthorized Use*

   Comments 12(b)-2 and -3 address a card issuer's rights and responsibilities in responding
to a claim of unauthorized use under § 226.12.  Comment 12(b)-2 clarifies that a card
issuer is not required to impose any liability.  Comment 12(b)-3 clarifies that a card
issuer wishing to impose liability must investigate claims in a reasonable manner.

   Comment 12(b)-3 lists some of the procedures that may be involved in the investigation
of a claim.  The procedures involved in conducting a reasonable investigation depend on
the facts of the situation; neither a minimum nor a maximum number of steps is required
to deem a particular investigation "reasonable." Some commenters expressed concern about
card issuers advising consumers that they may be required to appear in a court action.
These commenters believed such statements would possibly be misleading and intimidating,
and that in any case a court action was independent of a card issuer's investigation.
The reference to court appearances has been deleted.

   Commenters suggested a variety of other actions that a card issuer may take, in addition
to those proposed, in a reasonable investigation of a claim of unauthorized use.  The
list has been expanded to clarify that a card issuer may request documentation to verify
the claim and may request information regarding the cardholder's knowledge of the person
who allegedly used the card or of that person's authority to do so.

   Many commenters expressed concern that the proposed comment prohibited a card issuer
from denying a claim because a cardholder refused to comply with any request for
cooperation, such as the failure to submit a signed statement. A card issuer may not
automatically deny a claim based solely on the cardholder's failure or refusal to comply
with a particular request.  For example, a cardholder may return an unsigned
questionnaire about the claim but may refuse to submit a sworn statement.   The card issuer
may not automatically deny the claim because it is unaccompanied by an affidavit.
However, the comment also makes clear that the cardholder's failure to cooperate may
affect the card issuer's ability to investigate the claim of unauthorized use.  For
example, if the cardholder fails to respond to requests for information the card issuer can
reasonably obtain only from the cardholder, the comment provides that the card issuer,
without further information, may reasonably terminate its investigation.

Section 226.15--Right of Rescission

*15(a)  Consumer's Right To Rescind*

*Paragraph 15(a)(1)*

   Comments 15(a)(1)-5 and -6 are revised to provide further guidance on the right to rescind
a transaction secured by a consumer's principal dwelling. (See also comments 23(a)(1)-3
and -4.)

*15(d)  Effects of Rescission*

   Comment 15(d)(2)-1 is revised to clarify that if a consumer rescinds a credit
transaction, the creditor must refund any broker fee that is part of the credit
transaction, even though the consumer paid the fee to the broker rather than to the
creditor.  (See comment 23(d)(2)-1.)

Section 226.16--Advertising

®  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                      Page 6
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

*16(d)  Additional Requirements for Home Equity Plans*

   Comment 16(d)-7 clarifies disclosure requirements for balloon payments in home equity
plan advertisements.  The commentary to § 226.5b(d)(5)(ii) provides that for plans in
which a balloon payment will occur if the consumer makes only the minimum payments, the
disclosure must state that fact.  A comparable requirement applies to advertisements,
since the regulatory provisions on treatment of balloon payments in home equity
advertising and in disclosures are generally parallel.

   A number of commenters thought the proposed comment would require a disclosure about
balloon payments in any advertisement for a program in which a balloon payment occurs,
regardless of whether the advertisement included a "trigger term." The proposed comment
was not intended to impose such a requirement.  The comment has been revised to clarify
that disclosure is required only if the advertisement contains a statement about a minimum
periodic payment.  The comment also addresses questions about the required content of
the disclosure, including concerns about the effect of the cross-reference to comment
5b(d)(5)(ii)-3.

*Subpart C--Closed-End Credit*

Section 226.17--General Disclosures

*17(a)  Form of Disclosures*

*Paragraph 17(a)(1)*

   Comment 17(a)(1)-5 is revised to clarify that a late payment fee on a single payment
loan is information directly related to the segregated disclosures.  The introductory
language has been revised to clarify that the list of directly related information is
exhaustive.

*17(c)  Basis of Disclosures and Use of Estimates*

*Paragraph 17(c)(4)*

   Section 226.17(c)(4) allows creditors to disregard in the payment schedule and other
calculations any small variations in the first payment due to a long or short first period.
Comment 17(c)(4)-4 clarifies that prepaid finance charges, such as "odd-days" or
"per-diem" interest paid at or prior to closing, may not be considered as the first payment
on a loan.  Thus, "odd-days" interest paid at or prior to closing cannot be considered
a part of the payment schedule and disregarded as a irregularity in disclosing the finance
charges in the payment schedule.  The language has been adopted as proposed, with a minor
change made to state that the comment applies to "pre-paid" and "odd-days" interest, using
those terms by name.

   Commenters favored treating odd-days or per-diem interest collected at closing as being
the first payment for the purposes of these "minor irregularities" provisions when the
consummation date is subject to change outside of the lender's control (for example, in
some escrow-closing states).  If interest collected at, or prior to, consummation meets
the definition of a prepaid finance charge, it must be treated as such.

   The regulation does not require creditors to collect odd-days or per-diem interest at,
or prior to, consummation.  If that interest is collected as part of the first periodic
payment, instead, the minor irregularities provisions of § 226.17(c)(4) would apply to
the extent the amount is within those parameters.

*17(f)  Early Disclosures*

   Comment 226.17(f)-1 is revised to clarify that the regulation requires redisclosure not
only if the APR, at consummation, differs from the earlier disclosed APR by more than
the allowable 1/8 or 1/4 of 1 percent *16775 tolerance, but also if the early disclosures
were not marked as estimates, and the terms at consummation, other than the APR, differ
from the earlier disclosed terms.  Language has been added to the second example to
illustrate the case when terms at consummation differ from those previously disclosed,

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                                Page 7
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

where they were not marked as estimates.  To facilitate comparison of the two examples,
the dates in the second example have been changed to those stated in the first example.
A third example has been added to illustrate circumstances when the regulation does not
require redisclosure even though the consummated terms, including the APR, differ from
the disclosed terms.

Section 226.18--Content of Disclosures

*18(c) Itemization of Amount Financed*

*Paragraph 18(c)(1)(iv)*

  Comment 18(c)(1)(iv)-2 clarifies disclosure requirements under the TILA that are
affected by new aggregate accounting rules under the Real Estate Settlement Procedures
Act (RESPA; 12 U.S.C. 2601). The comment provides that creditors may use the amount on
line 1002 of the HUD-1 or HUD-1A, without adjustment, to calculate the prepaid finance
charge under the TILA.

  In October 1994, the Department of Housing and Urban Development (HUD), which implements
Real Estate Settlement Procedures Act (RESPA; 12 U.S.C. 2601) through Regulation X (24
CFR Part 3500), amended its regulation to implement new procedures for calculating the
amount consumers must pay into escrow accounts associated with RESPA-covered home
mortgage loans (59 FR 53890, October 26, 1994, and 60 FR 8812, February 15, 1995).  These
procedures are being phased in over time for existing escrow accounts; all new escrow
accounts established on or after April 24, 1995, must comply with the new procedures.
Eventually, all lenders will be required to use an aggregate accounting method instead
of a single-item method for RESPA transactions.  The use of the aggregate method will
affect disclosure requirements under Regulation Z.

  Currently, in calculating the amounts required to be paid into escrow accounts at
closing, most lenders use what is referred to as the single-item analysis. (Property
taxes, insurance, and mortgage insurance premiums are common examples of escrow items.)
Under single-item analysis, lenders account separately for each item to be collected at
closing and held in escrow.

  Under the aggregate accounting method, rather than accounting for each item separately,
the amount for escrow is determined as a whole.  This will make it difficult for a creditor
to determine how much of the aggregate amount is actually allocated to each escrow item.

  Regardless of how they collect the funds under RESPA, lenders will continue to disclose
escrow items on the HUD settlement statement using the single-item analysis.  If the
amount actually collected at settlement is affected by the aggregate accounting method,
the settlement statement will reflect the adjustment on a separate line in the 1000 series
(§ 3500.8(c)(1), 60 FR 8816, February 15, 1995).  Mortgage insurance premiums, one of
the items typically paid at settlement and included in the escrow account, are listed
on line 1002 of the HUD statement.  This amount is also a prepaid finance charge under
Regulation Z.

  If a creditor is collecting the settlement charges using aggregate analysis the amount
actually collected may be less than the amount listed on line 1002. Guidance had been
requested on what amount lenders should use as the prepaid finance charge, since the amount
disclosed is not precisely the amount collected.  Various alternatives were considered
to ensure as accurate and uniform a disclosure as possible.  Comment 18(c)(1)(iv)-2
provides that creditors may use the amount on line 1002, without adjustment, to calculate
the prepaid finance charge under the TILA.  This approach will ease compliance and provide
consumers with an easily identifiable amount for the mortgage insurance.  While this
method does slightly overstate the amount of the prepaid finance charge for mortgage
insurance, nonetheless this method seems to provide the more accurate and equitable
treatment possible given the problems associated with identifying the amount of any single
item in an aggregate accounting analysis.

  Commenters generally supported this approach.  Several commenters requested further
clarification on whether the approach is mandatory, whether the figure used is considered
an estimate, and how the tolerance is applied in this situation.  A sentence has been

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 8
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

added to the comment to clarify that the Board is deeming the figure used on the HUD-1
or HUD-1A as accurate, for purposes of Regulation Z, as long as that amount is computed
in accordance with RESPA. Accordingly, the figure is not considered an estimate, and the
tolerance would apply as it does for all other figures disclosed under Regulation Z. As
long as the figure disclosed is accurate for purposes of RESPA, the figure is accurate
to determine the finance charge tolerance.    The approach is mandatory for all loans closed
using the aggregate accounting method required by RESPA.

*18(d)  Finance Charge*

  Comment 18(d)-2 has been adopted as proposed, with some minor revisions for clarity.
The comment states that although there is no specific tolerance for the amount financed,
an error in that figure--resulting from an error in the finance charge--does not violate
the act or the regulation provided the finance charge disclosed under § 226.18(d) is within
the permissible tolerance provided in footnote 41 of the regulation.   This same
interpretation applies to other disclosures for which the regulation provides no specific
tolerance, such as the total of payments.

  Most commenters were in favor of the proposal.   Views were split among those commenters
opposing the proposal.   Some suggested that a maximum tolerance of $10 was insufficient
to adequately protect lenders.   Several others opposed any tolerance for errors in the
amount financed or the other disclosures that was not currently addressed in the
regulation.

  Several commenters pointed out that the language suggested the error must result from
an error in the finance charge "that constitutes a part of the amount financed." This
phrase has been deleted as unnecessary.

Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions

*19(b)  Certain Variable-Rate Transactions*

*Paragraph 19(b)(2)(vii)*

  Comment 19(b)(2)(vii)-2, with the exception of a few technical changes, is adopted as
proposed.   It states that loans with more than one way to trigger negative amortization
are separate variable-rate loan programs requiring separate disclosures to the extent
they vary from each other.   For example, a loan which provides for monthly interest rate
changes but only annual payment changes and an option for the borrower to cap the amount
of monthly payments whenever the new payment would exceed the old payment by more than
a certain margin, contains two separate variable-rate programs.   Each program may trigger
negative amortization requiring separate disclosures.   (See comments 226.19(b)(2)-2 and
-3 for a discussion on the definition of a variable-rate program and consolidation of
disclosures for more than one program.) *16776 For the program that gives the borrower
an option to cap monthly payments, the creditor must fully disclose the rules relating
to the payment cap option, including the effects of exercising it (such as negative
amortization occurs and that the principal balance will increase), except that the
disclosure in § 226.19(b)(2)(viii) need not be given for the option.

Section 226.22--Determination of the Annual Percentage Rate

*22(a)  Accuracy of the Annual Percentage Rate*

*Paragraph 22(a)(1)*

  Comment 22(a)(1)-5 corrects an erroneous footnote reference.

Section 226.23--Right of Rescission

*23(a)  Consumer's Right To Rescind*

*Paragraph 23(a)(1)*

  Comment 23(a)(1)-4, which contains an exception to the "one principal dwelling" rule

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 9
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

in comment 23(a)(1)-3, is revised.  Under the exception, a consumer may have, in effect,
two principal dwellings for a time.  Even if a consumer is acquiring or constructing a
new principal dwelling, any loan subject to Regulation Z may be rescinded when the
consumer's current principal dwelling secures the loan.  A typical example is a bridge
loan.

  The proposed comment provided, by example, that a loan secured by the new home and the
current home is a residential mortgage transaction.  While many commenters agreed with
the proposal, some viewed it as a change in the existing interpretation.  Upon further
analysis, the proposed example would negate the exception to the general rule.  The
existing language of comment 23(a)(1)-4 has been retained with language and examples added
for clarification.  Accordingly, even if a loan is a purchase-money loan secured by the
new home (that is, a residential mortgage transaction) where that loan also is secured
by the consumer's current home, the loan is rescindable.

*23(d)  Effects of Rescission*

*Paragraph 23(d)(2)*

  Comment 23(d)(2)-1 has been revised to clarify that if a consumer rescinds a credit
transaction, the creditor must refund to the consumer any broker fee that is part of the
credit transaction, even though the consumer paid the fee to the broker rather than to
the creditor.  Several commenters expressed concern that the literal language of the
comment could be construed to encompass a fee paid to a broker who did not participate
in the credit transaction.  Some commenters wanted broker fees covered only to the extent
that the lender required the use of a broker.  Creditors must refund to the consumer any
broker's fee paid as part of the credit transaction, whether or not the creditor required
the use of a broker.

*(23)(f)  Exempt Transactions*

*Paragraph (23)(f)(4)*

  Comment 23(f)-4 clarifies that § 226.23(f)(2) exempts from the right of rescission
refinancings by original creditors--to whom a written agreement was originally payable.
Therefore, if a consumer refinances with any other creditor, the general rescission model
form (model form H-8) is the appropriate form to provide to the consumer.

  Several commenters opposed the proposal, which they believe would result in an anomaly.
That is, if the original creditor assigns the mortgage to a third party and the consumer
returns to the original creditor to refinance (with no new advances), the original
creditor would be excused from providing the consumer with the right of rescission.

  In certain circumstances the application of this rule may produce an anomalous result.
Nevertheless, this interpretation is required by section 103(f) of the act and §
226.2(a)(17) of the regulation, which define "creditor" as "* * * the person to whom the
debt arising from the consumer credit transaction is initially payable.* * *".

  The comment also clarifies that in a merger, consolidation or acquisition, the acquiring
creditor would be considered the original creditor for purposes of the exemption in §
226.23(f)(2).  For example, if two lending institutions merge, the resulting institution
is considered the original creditor for refinancing mortgages previously originated by
either of the two institutions.  Accordingly, the new institution may use model form H-9
if new money is advanced.  (See comment 2(a)(25)-6.)

Appendix J--Annual Percentage Rate Computations for Closed-End Credit Transactions

  As proposed, the Board has revised the 1981 changes paragraph in the reference section
to make a technical correction to the second sentence.

List of Subjects in 12 CFR Part 226

  Advertising, Banks, banking, Consumer protection, Credit, Federal Reserve System,
Mortgages, Reporting and recordkeeping requirements, Truth in lending.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For the reasons set forth in the preamble, the Board amends 12 CFR part 226 as follows:

PART 226--TRUTH IN LENDING (REGULATION Z)

 1.  The authority citation for part 226 continues to read as follows:

Authority: 12 U.S.C. 3806; 15 U.S.C. 1604 and 1637(c)(5).

                              12 CFR § 226.2

 2.  In Supplement I to Part 226, under Section 226.2--Definitions and Rules of
Construction, under Paragraph 2(a)(17)(i)., paragraph 8. is revised to read as follows:

Supplement I--Official Staff Interpretations

* * * * *

Subpart A--General

* * * * *

Section 226.2--Definitions and Rules of Construction

* * * * *
 Paragraph 2(a)(17)(i).

* * * * *
 8.  Loans from employee savings plan. Some employee savings plans permit participants
to borrow money up to a certain percentage of their account balances, and use a trust
to administer the receipt and disbursement of funds. Unless each participant's account
is an individual plan and trust, the creditor should apply the numerical tests to the
plan as a whole rather than to the individual account, even if the loan amount is determined
by reference to the balance in the individual account and the repayments are credited
to the individual account.  The person to whom the obligation is originally made payable
(whether the plan, the trust, or the trustee) is the creditor for purposes of the act
and regulation.

* * * * *
 3.  In Supplement I to Part 226, under Section 226.4--Finance Charge, the following
amendments are made:

 a.  Under 4(a) Definition., paragraphs 1., and 3. are revised, paragraphs 4., 5., and
6 are redesignated as paragraphs 5., 6., and 7., a new paragraph 4. is added, and newly
designated paragraph 7. is revised;

 b.  Under Paragraph 4(c)(7)., paragraph 1. is revised and new paragraphs 2. and 3. are
added; and

 c.  Under (4)(e) Certain security interest charges., paragraph 1. is revised.

 The revisions and additions read as follows:

* * * * *

Section 226.4--Finance Charge

 4(a) Definition.

 1.  Charges in comparable cash transactions.  Charges imposed uniformly in cash and
credit transactions are not finance charges. In determining whether an item is a *16777
finance charge, the creditor should compare the credit transaction in question with a
similar cash transaction.  A creditor financing the sale of property or services may

         ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compare charges with those payable in a similar cash transaction by the seller of the property or service.

   i.  For example, the following items are not finance charges:

   A.  Taxes, license fees, or registration fees paid by both cash and credit customers.

   B.  Discounts that are available to cash and credit customers, such as quantity discounts.

   C.  Discounts available to a particular group of consumers because they meet certain criteria, such as being members of an organization or having accounts at a particular financial institution.  This is the case even if an individual must pay cash to obtain the discount, provided that credit customers who are members of the group and do not qualify for the discount pay no more than the nonmember cash customers.

   D.  Charges for a service policy, auto club membership, or policy of insurance against latent defects offered to or required of both cash and credit customers for the same price.

   ii.  In contrast, the following items are finance charges:

   A.  Inspection and handling fees for the staged disbursement of construction loan proceeds.

   B.  Fees for preparing a Truth in Lending disclosure statement, if permitted by law (for example, the Real Estate Settlement Procedures Act prohibits such charges in certain transactions secured by real property).

   C.  Charges for a required maintenance or service contract imposed only in a credit transaction.

   iii.  If the charge in a credit transaction exceeds the charge imposed in a comparable cash transaction, only the difference is a finance charge.  For example:

   A.  If an escrow agent is used in both cash and credit sales of real estate and the agent's charge is $100 in a cash transaction and $150 in a credit transaction, only $50 is a finance charge.

   2.  Costs of doing business.  * * *

   3.  Charges by third parties.  Charges imposed on the consumer by someone other than the creditor are finance charges (unless otherwise excluded) if the creditor requires the use of a third party as a condition of or incident to the extension of credit, even if the consumer can choose the third party, or the creditor retains the charge.  For example:

   i.  The cost of required mortgage insurance, even if the consumer is allowed to choose the insurer.

   ii. A mortgage broker fee, to the extent that the broker shares the fee with the creditor.

   4.  Charges by settlement agents.  Charges imposed on the consumer by a settlement agent (such as an attorney, escrow agent, or title company) are finance charges only if the creditor requires the particular services for which the settlement agent is charging the borrower and the charge for those services is not otherwise excluded from the finance charge.  For example, a fee for courier service charged by a settlement agent to send a document to the title company or some other party is not a finance charge, provided that the creditor has not required the use of a courier or retained the charge.

   5.  Forfeitures of interest. * * *

   6.  Treatment of fees for use of automated teller machines. * * *

   7.  Taxes.  i. Generally, a tax imposed by a state or other governmental body solely

                    ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                      Page 12
60 FR 16771-01, 1995 WL 139019 (F.R.)
(Cite as: 60 FR 16771)

on a creditor is a finance charge if the creditor separately imposes the charge on the consumer.

ii. In contrast, a tax is not a finance charge (even if the tax is collected by the creditor) if applicable law imposes the tax:

A.  Solely on the consumer;

B.  On the creditor and the consumer jointly;

C.  On the credit transaction, without indicating which party is liable for the tax; or

D.  On the creditor, if applicable law directs or authorizes the creditor to pass the tax on to the consumer.  (For purposes of this section, if applicable law is silent as to passing on the tax, the law is deemed not to authorize passing it on.)

iii. For example, a stamp tax, property tax, intangible tax, or any other state or local tax imposed on the consumer, or on the credit transaction, is not a finance charge even if the tax is collected by the creditor.

iv. In addition, a tax is not a finance charge if it is excluded from the finance charge by an other provision of the regulation or commentary (for example, if the tax is imposed uniformly in cash and credit transactions).

* * * * *
Paragraph 4(c)(7).

1.  Real estate or residential mortgage transaction charges.  The list of charges in § 226.4(c)(7) applies both to residential mortgage transactions (which may include, for example, the purchase of a mobile home) and to other transactions secured by real estate. The fees are excluded from the finance charge even if the services for which the fees are imposed are performed by the creditor's employees rather than by a third party.  In addition, the cost of verifying or confirming information connected to the item is also excluded. For example, credit report fees cover not only the cost of the report, but also the cost of verifying information in the report.  In all cases, charges excluded under § 226.4(c)(7) must be bona fide and reasonable.

2.  Lump sum charges. If a lump sum charged for several services includes a charge that is not excludable, a portion of the total should be allocated to that service and included in the finance charge.  However, a lump sum charged for conducting or attending a closing (for example, by a lawyer or a title company) is excluded from the finance charge if the charge is primarily for services related to items listed in § 226.4(c)(7) (for example, reviewing or completing documents), even if other incidental services such as explaining various documents or disbursing funds for the parties are performed.  The entire charge is excluded even if a fee for the incidental services would be a finance charge if it were imposed separately.

3.  Charges assessed during the loan term.  Real estate or residential mortgage transaction charges excluded under § 226.4(c)(7) are those charges imposed solely in connection with the initial decision to grant credit.  This would include, for example, a fee to search for tax liens on the property or to determine if flood insurance is required.  The exclusion does not apply to fees for services to be performed periodically during the loan term, regardless of when the fee is collected.  For example, a fee for one or more determinations during the loan term of the current tax lien status or flood insurance requirements is a finance charge, regardless of whether the fee is imposed at closing, or when the service is performed.  If a creditor is uncertain about what portion of a fee to be paid at consummation or loan closing is related to the initial decision to grant credit, the entire fee may be treated as a finance charge.

* * * * *
(4)(e) Certain security interest charges.

1.  Examples.

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                           Page 13
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

i.  Excludable charges.  Sums must be actually paid to public officials to be excluded
from the finance charge under § 226.4(e)(1).  Examples are charges or other fees required
for filing or recording security agreements, mortgages, continuation statements,
termination statements, and similar documents, and intangible property or other taxes
imposed by the state solely on the creditor and payable by the consumer (if the tax must
be paid to record a security agreement).

ii.  Charges not excludable.  If the obligation is between the creditor and a third party
(an assignee, for example), charges or other fees for filing or recording security
agreements, mortgages, continuation statements, termination statements, and similar
documents relating to that obligation are not excludable from the finance charge under
this section.

* * * * *
4.  In Supplement I to Part 226, under Section 226.5--General Disclosure Requirements,
under 5(b)(1) Initial disclosures., in paragraph 1., the first and second sentences are
revised, and a new paragraph 5. is added to read as follows:

* * * * *

Subpart B--Open-End Credit

*Section 226.5--General Disclosure Requirements*

* * * * *
5(b)(1) Initial disclosures.

1.  Disclosure before the first transaction.  The rule that the initial disclosure
statement must be furnished "before the first transaction" requires delivery of the
initial disclosure statement before the consumer becomes obligated on the plan.  For
example, the initial disclosures must be given before the consumer makes the first
purchase (such as when a consumer opens a credit plan and makes purchases
contemporaneously at a retail store), receives the first advance, or pays any fees or
charges under the plan other than an application fee or refundable membership fee (see
below).* * *

* * * * *
*16778 5.  Balance transfers. A creditor that solicits the transfer by a consumer of
outstanding balances from an existing account to a new open-end plan must comply with
§ 226.6 before the balance transfer occurs.  Card issuers that are subject to the
requirements of § 226.5a may establish procedures that comply with both sections in a
single disclosure statement.

* * * * *
5.  In Supplement I to Part 226, under Section 226.6--Initial Disclosure Statement,
under 6(b) Other charges., paragraph 1. is revised to read as follows:

* * * * *

*Section 226.6--Initial Disclosure Statement*

* * * * *
6(b) Other charges.

1.  General; examples of other charges.  Under § 226.6(b), significant charges related
to the plan (that are not finance charges) must also be disclosed.  For example:

i.  Late payment and over-the-credit-limit charges.

ii. Fees for providing documentary evidence of transactions requested under §  226.13
(billing error resolution).

iii. Charges imposed in connection with real estate transactions such as title,

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 14
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

appraisal, and credit report fees (see § 226.4(c)(7)).

iv. A tax imposed on the credit transaction by a state or other governmental body, such as a documentary stamp tax on cash advances (see the commentary to § 226.4(a)).

v.   A membership or participation fee for a package of services that includes an open-end credit feature, unless the fee is required whether or not the open-end credit feature is included.  For example, a membership fee to join a credit union is not an "other charge," even if membership is required to apply for credit.

vi. Automated teller machine (ATM) charges described in comment 4(a)-5 that are not finance charges.

vii. Charges imposed for the termination of an open-end credit plan.

* * * * *
6.  In Supplement I to Part 226, under Section 226.12--Special Credit Card Provisions, under 12(b) Liability of cardholder for unauthorized use., new paragraphs 2. and 3. are added to read as follows:

* * * * *

*Section 226.12--Special Credit Card Provisions*

* * * * *
12(b) Liability of cardholder for unauthorized use.

* * * * *
2.   Imposing liability.  A card issuer is not required to impose liability on a cardholder for the unauthorized use of a credit card; if the card issuer does not seek to impose liability, the issuer need not conduct any investigation of the cardholder's claim.

3.   Reasonable investigation.  If a card issuer seeks to impose liability when a claim of unauthorized use is made by a cardholder, the card issuer must conduct a reasonable investigation of the claim.  In conducting its investigation, the card issuer may reasonably request the cardholder's cooperation.  The card issuer may not automatically deny a claim based solely on the cardholder's failure or refusal to comply with a particular request; however, if the card issuer otherwise has no knowledge of facts confirming the unauthorized use, the lack of information resulting from the cardholder's failure or refusal to comply with a particular request may lead the card issuer reasonably to terminate the investigation. The procedures involved in investigating claims may differ, but actions such as the following represent steps that a card issuer may take, as appropriate, in conducting a reasonable investigation:

i.   Reviewing the types or amounts of purchases made in relation to the cardholder's previous purchasing pattern.

ii. Reviewing where the purchases were delivered in relation to the cardholder's residence or place of business.

iii. Reviewing where the purchases were made in relation to where the cardholder resides or has normally shopped.

iv. Comparing any signature on credit slips for the purchases to the signature of the cardholder or an authorized user in the card issuer's records, including other credit slips.

v.   Requesting documentation to assist in the verification of the claim.

vi. Requesting a written, signed statement from the cardholder or authorized user.

vii. Requesting a copy of a police report, if one was filed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 15
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

   viii.  Requesting information regarding the cardholder's knowledge of the person who
allegedly used the card or of that person's authority to do so.

* * * * *
   7.  In Supplement I to Part 226, under Section 226.15 --Right of Rescission, the
following amendments are made:

   a.  Under Paragraph 15(a)(1)., paragraph 5. is revised;

   b.  Under Paragraph 15(a)(1)., paragraph 6. is revised; and

   c.  Under Paragraph 15(d)(2)., in paragraph 1., the third sentence is revised.

   The additions and revisions read as follows:

* * * * *

*Section 226.15--Right of Rescission*

* * * * *
 Paragraph 15(a)(1).

* * * * *
   5.  Principal dwelling.  A consumer can only have one principal dwelling at a time.
(But see comment 15(a)(1)-6.) A vacation or other second home would not be a principal
dwelling.  A transaction secured by a second home (such as a vacation home) that is not
currently being used as the consumer's principal dwelling is not rescindable, even if
the consumer intends to reside there in the future.  When a consumer buys or builds a
new dwelling that will become the consumer's principal dwelling within one year or upon
completion of construction, the new dwelling is considered the principal dwelling if it
secures the open-end credit line.  In that case, the transaction secured by the new
dwelling is a residential mortgage transaction and is not rescindable.  For example, if
a consumer whose principal dwelling is currently A builds B, to be occupied by the consumer
upon completion of construction, an advance on an open-end line to finance B and secured
by B is a residential mortgage transaction.  Dwelling, as defined in § 226.2, includes
structures that are classified as personalty under state law.  For example, a transaction
secured by a mobile home, trailer, or houseboat used as the consumer's principal dwelling
may be rescindable.

   6.  Special rule for principal dwelling.  Notwithstanding the general rule that
consumers may have only one principal dwelling, when the consumer is acquiring or
constructing a new principal dwelling, a credit plan or extension that is subject to
Regulation Z and is secured by the equity in the consumer's current principal dwelling
is subject to the right of rescission regardless of the purpose of that loan (for example,
an advance to be used as a bridge loan).  For example, if a consumer whose principal
dwelling is currently A builds B, to be occupied by the consumer upon completion of
construction, a loan to finance B and secured by A is subject to the right of rescission.
Moreover, a loan secured by both A and B is, likewise, rescindable.

* * * * *
 Paragraph 15(d)(2).

   1.  Refunds to consumer.  * * * "Any amount" includes finance charges already accrued,
as well as other charges such as broker fees, application and commitment fees, or fees
for a title search or appraisal, whether paid to the creditor, paid by the consumer
directly to a third party, or passed on from the creditor to the third party.  * * *

* * * * *
   8.  In Supplement I to Part 226, under Section 226.16--Advertising, under 16(d)
Additional Requirements for Home Equity Plans, a new paragraph 7. is added to read as
follows:

* * * * *

                    ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                      Page 16
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

*Section 226.16--Advertising*

\* \* \* \* \*
  16(d) Additional Requirements for Home Equity Plans.

\* \* \* \* \*
  7.  Balloon payment. In some programs, a balloon payment will occur if only the minimum payments under the plan are made.  If an advertisement for such a program contains any statement about a minimum periodic payment, the advertisement must also state that a balloon payment will result (not merely that a balloon payment "may" result).  (See comment 5b(d)(5)(ii)-3 for guidance on items not required to be stated in the advertisement, and on situations in which the balloon payment requirement does not apply.)

\* \* \* \* \*
  9.  In Supplement I to Part 226, under Section 226.17--General Disclosure **\*16779** Requirements, the following amendments are made:

  a.  Under Paragraph 17(a)(1)., paragraph 5. is revised;

  b.  Under Paragraph 17(c)(4)., a new paragraph 4. is added; and

  c.  Under 17(f) Early disclosures., paragraph 1. is revised.

  The revisions and additions read as follows:

\* \* \* \* \*

Subpart C--Closed-End Credit

*Section 226.17--General Disclosure Requirements*

\* \* \* \* \*
  Paragraph 17(a)(1).

\* \* \* \* \*
  5.  Directly related.  The segregated disclosures may, at the creditor's option, include any information that is directly related to those disclosures. The following is directly related information:

  i.  A description of a grace period after which a late payment charge will be imposed. For example, the disclosure given under § 226.18(l) may state that a late charge will apply to "any payment received more than 15 days after the due date."

  ii. A statement that the transaction is not secured.  For example, the creditor may add a category labelled "unsecured" or "not secured" to the security interest disclosures given under § 226.18(m).

  iii. The basis for any estimates used in making disclosures.  For example, if the maturity date of a loan depends solely on the occurrence of a future event, the creditor may indicate that the disclosures assume that event will occur at a certain time.

  iv. The conditions under which a demand feature may be exercised.  For example, in a loan subject to demand after five years, the disclosures may state that the loan will become payable on demand in five years.

  v.  An explanation of the use of pronouns or other references to the parties to the transaction.  For example, the disclosures may state, "'You' refers to the customer and 'we' refers to the creditor."

  vi. Instructions to the creditor or its employees on the use of a multiple-purpose form. For example, the disclosures may state, "Check box if applicable."

  vii. A statement that the borrower may pay a minimum finance charge upon prepayment in a simple-interest transaction.  For example, when state law prohibits penalties, but

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would allow a minimum finance charge in the event of prepayment, the creditor may make
the § 226.18(k)(1) disclosure by stating, "You may be charged a minimum finance charge."

  viii.   A brief reference to negative amortization in variable-rate transactions.  For
example, in the variable-rate disclosure, the creditor may include a short statement such
as "Unpaid interest will be added to principal." (See the commentary to §
226.18(f)(1)(iii).)

  ix. A brief caption identifying the disclosures.  For example, the disclosures may bear
a general title such as "Federal Truth in Lending Disclosures" or a descriptive title
such as "Real Estate Loan Disclosures."

  x.   A statement that a due-on-sale clause or other conditions on assumption are contained
in the loan document.  For example, the disclosure given under §  226.18(q) may state,
"Someone buying your home may, subject to conditions in the due-on-sale clause contained
in the loan document, assume the remainder of the mortgage on the original terms."

  xi. If a state or Federal law prohibits prepayment penalties and excludes the charging
of interest after prepayment from coverage as a penalty, a statement that the borrower
may have to pay interest for some period after prepayment in full.  The disclosure given
under § 226.18(k) may state, for example, "If you prepay your loan on other than the regular
installment date, you may be assessed interest charges until the end of the month."

  xii. More than one hypothetical example under § 226.18(f)(1)(iv) in transactions with
more than one variable-rate feature.  For example, in a variable-rate transaction with
an option permitting consumers to convert to a fixed-rate transaction, the disclosures
may include an example illustrating the effects on the payment terms of an increase
resulting from conversion in addition to the example illustrating an increase resulting
from changes in the index.

  xiii.   The disclosures set forth under § 226.18(f)(1) for variable-rate transactions
subject to § 226.18(f)(2).

  xiv. A statement whether or not a subsequent purchaser of the property securing an
obligation may be permitted to assume the remaining obligation on its original terms.

  xv. A late-payment fee disclosure under § 226.18(l) on a single payment loan.

* * * * *
 Paragraph 17(c)(4).

* * * * *
 4.   Relation to prepaid finance charges.  Prepaid finance charges, including
"odd-days" or "per-diem" interest, paid prior to or at closing may not be treated as the
first payment on a loan. Thus, creditors may not disregard an irregularity in disclosing
such finance charges.

* * * * *
17(f) Early disclosures.

 1.   Change in rate or other terms.  Redisclosure is required for changes that occur
between the time disclosures are made and consummation if the annual percentage rate in
the consummated transaction exceeds the limits prescribed in § 226.22(a) ( 1/8 of 1
percentage point in regular transactions and 1/4 of 1 percentage point in irregular
transactions).  Redisclosure is also required, even if the annual percentage rate is
within the permitted tolerance, if the disclosures were not based on estimates in
accordance with § 226.17(c)(2) and labelled as such.  To illustrate:

 i.   If disclosures are made in a regular transaction on July 1, the transaction is
consummated on July 15, and the actual annual percentage rate varies by more than 1/8
of 1 percentage point from the disclosed annual percentage rate, the creditor must either
redisclose the changed terms or furnish a complete set of new disclosures before
consummation.  Redisclosure is required even if the disclosures made on July 1 are based
on estimates and marked as such;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                              Page 18
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

ii. If disclosures are made on July 1, the transaction is consummated on July 15, and the finance charge increased by $35 but the disclosed annual percentage rate is within the permitted tolerance, the creditor must at least redisclose the changed terms that were not marked as estimates.  (See § 226.18(d) and footnote 41 of this part); and

iii. If early disclosures are marked as estimates and the disclosed annual percentage rate is within tolerance at consummation, the creditor need not redisclose the changed terms (including the annual percentage rate).

* * * * *
10. In Supplement I to Part 226, under Section 226.18--Content of Disclosures, the following amendments are made:

a.  Under Paragraph 18(c)(1)(iv)., a new paragraph 2. is added; and

b.  Under 18(d) Finance charge., paragraph 2. is revised.

The additions and revisions read as follows:

* * * * *

*Section 226.18--Content of Disclosures*

* * * * *
Paragraph 18(c)(1)(iv).

* * * * *
2.  Prepaid mortgage insurance premiums.  RESPA requires creditors to give consumers a settlement statement disclosing the costs associated with mortgage loan transactions. Included on the settlement statement are mortgage insurance premiums collected at settlement, which are prepaid finance charges.  In calculating the total amount of prepaid finance charges, creditors should use the amount for mortgage insurance listed on the line for mortgage insurance on the settlement statement (line 1002 on HUD-1 or HUD 1-A), without adjustment, even if the actual amount collected at settlement may vary because of RESPA's escrow accounting rules. Figures for mortgage insurance disclosed in conformance with RESPA shall be deemed to be accurate for purposes of Regulation Z.

18(d) Finance charge.

* * * * *
2.  Tolerance.  A tolerance for the finance charge is provided in footnote 41 of this part.  When a miscalculation of the amount financed, or of some other numerical disclosure for which the regulation provides no specific tolerance, results from an error in a finance charge, the miscalculated amount financed or other numerical disclosure does not violate the act or the regulation if the finance charge disclosed under § 226.18(d) is within the permissible tolerance under footnote 41 of this part.

* * * * *
11. In Supplement I to Part 226, under Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions, under paragraph *16780 19(b)(2) (vii)., paragraph 2. is revised to read as follows:

*Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions*

* * * * *
Paragraph 19(b)(2)(vii).

* * * * *
2.  Negative amortization and interest rate carryover.  A creditor must disclose, where applicable, the possibility of negative amortization.  For example, the disclosure might state, "If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount." Loans that provide for more than one way to trigger negative amortization are separate variable-rate programs requiring separate

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                    Page 19
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

disclosures. (See the commentary to § 226.19(b)(2) for a discussion on the definition of a variable-rate loan program and the format for disclosure.) If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase); however, the disclosure in § 226.19(b)(2)(viii) need not be provided.

* * * * *

12. In Supplement I to Part 226, under Section 226.22--Determination of the Annual Percentage Rate, under Paragraph 22(a)(1)., in paragraph 5., the reference "Footnote 45a" is revised to read "Footnote 45d".

13. In Supplement I to Part 226, under Section 226.23--Right of Rescission, the following amendments are made:

a.  Under Paragraph 23(a)(1)., paragraph 3.is revised;

b.  Under Paragraph 23(a)(1)., paragraph 4. is revised;

c.  Under Paragraph 23(d)(2)., in paragraph 1., the third sentence is revised; and

d.  Under 23(f) Exempt transactions., in paragraph 4., two new sentences are added following the first sentence, and a new sentence is added at the end of the paragraph.

The additions and revisions read as follows:

* * * * *

*Section 226.23--Right of Rescission*

* * * * *
Paragraph 23(a)(1).

* * * * *
3.  Principal dwelling.  A consumer can only have one principal dwelling at a time. (But see comment 23(a)(1)-4.) A vacation or other second home would not be a principal dwelling.  A transaction secured by a second home (such as a vacation home) that is not currently being used as the consumer's principal dwelling is not rescindable, even if the consumer intends to reside there in the future.  When a consumer buys or builds a new dwelling that will become the consumer's principal dwelling within one year or upon completion of construction, the new dwelling is considered the principal dwelling if it secures the acquisition or construction loan.  In that case, the transaction secured by the new dwelling is a residential mortgage transaction and is not rescindable.  For example, if a consumer whose principal dwelling is currently A builds B, to be occupied by the consumer upon completion of construction, a construction loan to finance B and secured by B is a residential mortgage transaction.  Dwelling, as defined in § 226.2, includes structures that are classified as personalty under state law.  For example, a transaction secured by a mobile home, trailer, or houseboat used as the consumer's principal dwelling may be rescindable.

4.  Special rule for principal dwelling.  Notwithstanding the general rule that consumers may have only one principal dwelling, when the consumer is acquiring or constructing a new principal dwelling, any loan subject to Regulation Z and secured by the equity in the consumer's current principal dwelling (for example, a bridge loan) is subject to the right of rescission regardless of the purpose of that loan.  For example, if a consumer whose principal dwelling is currently A builds B, to be occupied by the consumer upon completion of construction, a construction loan to finance B and secured by A is subject to the right of rescission.  A loan secured by both A and B is, likewise, rescindable.

* * * * *
Paragraph 23(d)(2).

1.  Refunds to consumer.  * * * "Any amount" includes finance charges already accrued,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                    Page 20
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

as well as other charges, such as broker fees, application and commitment fees, or fees
for a title search or appraisal, whether paid to the creditor, paid directly to a third
party, or passed on from the creditor to the third party.  * * *

* * * * *
 23(f) Exempt transactions.

* * * * *
 4.  New advances. * * * The original creditor is the creditor to whom the written
agreement was initially made payable.  In a merger, consolidation or acquisition, the
successor institution is considered the original creditor for purposes of the exemption
in § 226.23(f)(2).  * * * The general rescission notice (model form H-8) is the appropriate
form for use by creditors not considered original creditors in refinancing transactions.

* * * * *
 14. In Supplement I to Part 226, under Appendix J, under the heading References, under
1981 changes:, the last sentence is revised to read as follows:

* * * * *

Appendix J--Annual Percentage Rate Computations for Closed-End Credit Transactions

* * * * *

References

* * * * *
 1981 changes: * * * Paragraph (b)(5)(vi) has been revised to permit creditors in
single-advance, single-payment transactions in which the term is less than a year and
is equal to a whole number of months, to use either the 12-month method or the 365-day
method to compute the number of unit-periods per year.

 By order of the Board of Governors of the Federal Reserve System, acting through the
Secretary of the Board under delegated authority, March 28, 1995.

William W. Wiles,

Secretary of the Board.

[FR Doc. 95-8071 Filed 3-31-95; 8:45 am]

BILLING CODE 6210-01-P

 60 FR 16771-01, 1995 WL 139019 (F.R.)

END OF DOCUMENT

®  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit No. 3**

Westlaw.

**A.S. Pratt & Sons**
**Truth-In-Lending Manual: Text and Forms**
Ralph C. Clontz, Jr. & James H. Pannabecker
**Current through the November 2006 Update**

APPENDIX B. REGULATION Z, ANNOTATED WITH OFFICIAL STAFF COMMENTARY

SUBPART A--GENERAL

§ 226.1. Authority, purpose, coverage, organization, enforcement and liability.

(a) *Authority.* This regulation, known as Regulation Z, is issued by the Board of Governors of the Federal Reserve System to implement the Federal Truth in Lending Act, which is contained in title I of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq.*). This regulation also implements title XII, section 1204 of the Competitive Equality Banking Act of 1987 (Pub. L. 100-86, 101 Stat. 552). Information-collection requirements contained in this regulation have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 3501 *et seq.* and have been assigned OMB number 7100-0199.

(b) The purpose of this regulation is to promote the informed use of consumer credit by requiring **disclosures** about its terms and cost. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling, regulates certain credit card practices, and provides a means for fair and timely resolution of credit billing disputes. The regulation does not govern charges for consumer credit. The regulation requires a maximum interest rate to be stated in variable-rate contracts secured by the consumer's dwelling. It also imposes limitations on home equity plans that are subject to the requirements of Sec. 226.5b and mortgages that are subject to the requirements of Sec. 226.32. The regulation prohibits certain acts or practices in connection with credit secured by a consumer's principal dwelling.

(c) *Coverage.* (1) In general, this regulation applies to each individual or business that offers or extends credit when four conditions are met: (1) The credit is offered or extended to consumers; (ii) the offering or extension of credit is done regularly; [FN1] (iii) the credit is subject to a finance charge or is payable by a written agreement in more than 4 installments; and (iv) the credit is primarily for personal, family, or household purposes.

(2) If a credit card is involved, however, certain provisions apply even if the credit is not subject to a finance charge, or is not payable by a written agreement in more than 4 installments, or if the credit card is to be used for business purposes.

(3) In addition, certain requirements of § 226.5b apply to persons who are not creditors but who provide applications for home equity plans to consumers.

(d) *Organization.* The regulation is divided into subparts and appendices as follows:

(1) Subpart A contains general information. It sets forth: (i) The authority, purpose, coverage, and organization of the regulation; (ii) the definitions of basic terms; (iii) the transactions that are exempt from coverage; and (iv) the method of determining the finance charge.

(2) Subpart B contains the rules for open-end credit. It requires that initial **disclosures** and periodic statements be provided, as well as additional **disclosures** for credit and charge card applications and solicitations and for home equity plans subject to the requirements of § § 226.5a and 226.5b, respectively.

(3) Subpart C relates to closed-end credit. It contains rules on **disclosures,** treatment of credit balances, annual percentage rate calculations, rescission requirements, and advertising.

(4) Subpart D contains rules on oral **disclosures,** Spanish language **disclosure** in Puerto Rico, record retention, effect on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5. *Split buydowns*. In certain transactions, a third party (such as a seller) and a consumer both pay an amount to the creditor to reduce the interest rate. The creditor must include the portion paid by the consumer in the finance charge and disclose the corresponding multiple payment levels and composite annual percentage rate. The portion paid by the third party and the corresponding reduction in interest rate, however, should not be reflected in the **disclosures** unless the lower rate is reflected in the credit contract. (See the discussion on third-party and consumer buydown transactions elsewhere in the commentary to § 226.17(c).)

6. *Wrap-around financing*. Wrap-around transactions, usually loans, involve the creditor's wrapping the outstanding balance on an existing loan and advancing additional funds to the consumer. The pre-existing loan, which is wrapped, may be to the same consumer or to a different consumer. In either case, the consumer makes a single payment to the new creditor, who makes the payments on the pre-existing loan to the original creditor. Wrap-around loans or sales are considered new single-advance transactions, with an amount financed equaling the sum of the new funds advanced by the wrap creditor and the remaining principal owed to the original creditor on the pre-existing loan. In disclosing the itemization of the amount financed, the creditor may use a label such as "the amount that will be paid to creditor X" to describe the remaining principal balance on the pre-existing loan. This approach to Truth in Lending calculations has no effect on calculations required by other statutes, such as state usury laws.

7. *Wrap-around financing with balloon payments*. For wrap-around transactions involving a large final payment of the new funds before the maturity of the pre-existing loan, the amount financed is the sum of the new funds and the remaining principal on the pre-existing loan. The **disclosures** should be based on the shorter term of the wrap loan, with a large final payment of both the new funds and the total remaining principal on the pre-existing loan (although only the wrap loan will actually be paid off at that time).

8. *Basis of disclosures in variable-rate transactions*. The **disclosures** for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the **disclosures** only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the **disclosures** on the initial rate and should not assume that this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer buydown, or a discounted or premium rate, **disclosures** should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term. (See the commentary to § 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature.)

9. *Use of estimates in variable-rate transactions*. The variable-rate feature does not, by itself, make the **disclosures** estimates.

10. *Discounted and premium variable-rate transactions*. In some variable-rate transactions, creditors may set an initial interest rate that is not determined by the index or formula used to make later interest rate adjustments. Typically, this initial rate charged to consumers is lower than the rate would be if it were calculated using the index or formula. However, in some cases the initial rate may be higher. In a discounted transaction, for example, a creditor may calculate interest rates according to a formula using the six-month Treasury bill rate plus a 2 percent margin. If the Treasury bill rate at consummation is 10 percent, the creditor may forgo the 2 percent spread and charge only 10 percent for a limited time, instead of setting an initial rate of 12 percent.

i. When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the **disclosures** should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation. The rate at consummation need not be used if a contract provides for a delay in the implementation of changes in an index value. For example, if the contract specifies that rate changes are based on the index value in effect 45 days before the change date, creditors may use any index value in effect during the 45 day period before consummation in calculating a composite annual percentage rate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ii. The effect of the multiple rates must also be reflected in the calculation and **disclosure** of the finance charge, total of payments, and payment schedule.

iii. If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the **disclosures.**

iv. Because these transactions involve irregular payment amounts, an annual percentage rate tolerance of 1/4 of 1 percent applies, in accordance with § 226.22(a)(3).

v. Examples of discounted variable-rate transactions include:

A. A 30-year loan for $100,000 with no prepaid finance charges and rates determined by the Treasury bill rate plus 2 percent. Rate and payment adjustments are made annually. Although the Treasury bill rate at the time of consummation is 10 percent, the creditor sets the interest rate for one year at 9 percent, instead of 12 percent according to the formula. The **disclosures** should reflect a composite annual percentage rate of 11.63 percent based on 9 percent for one year and 12 percent for 29 years. Reflecting those two rate levels, the payment schedule should show 12 payments of $804.62 and 348 payments of $1,025.31. The finance charge should be $266,463.32 and the total of payments $366,463.32.

B. Same loan as above, except with a 2 percent rate cap on periodic adjustments. The **disclosures** should reflect a composite annual percentage rate of 11.53 percent based on 9 percent for the first year, 11 percent for the second year, and 12 percent for the remaining 28 years. Reflecting those three rate levels, the payment schedule should show 12 payments of $804.62, 12 payments of $950.09, and 336 payments of $1,024.34. The finance charge should be $265,234.76 and the total of payments $365,234.76.

C. Same loan as above, except with a 7 1/2 percent cap on payment adjustments. The **disclosures** should reflect a composite annual percentage rate of 11.64 percent, based on 9 percent for one year and 12 percent for 29 years. Because of the payment cap, five levels of payments should be reflected. The payment schedule should show 12 payments of $804.62, 12 payments of $864.97, 12 payments of $929.84, 12 payments of $999.58, and 312 payments of $1,070.04. The finance charge should be $277,040.60, and the total of payments $377,040.60.

vi. A loan in which the initial interest rate is set according to the index or formula used for later adjustments but is not set at the value of the index or formula at consummation is not a discounted variable-rate loan. For example, if a creditor commits to an initial rate based on the formula on a date prior to consummation, but the index has moved during the period between that time and consummation, a creditor should base its **disclosures** on the initial rate.

11. *Examples of variable-rate transactions.* Variable-rate transactions include:

• Renewable balloon-payment instruments where the creditor is both unconditionally obligated to renew the balloon-payment loan at the consumer's option (or is obligated to renew subject to conditions within the consumer's control) and has the option of increasing the interest rate at the time of renewal. **Disclosures** must be based on the payment amortization (unless the specified term of the obligation with renewals is shorter) and on the rate in effect at the time of consummation of the transaction. (Examples of conditions within a consumer's control include requirements that a consumer be current in payments or continue to reside in the mortgaged property. In contrast, setting a limit on the rate at which the creditor would be obligated to renew or reserving the right to change the credit standards at the time of renewal are examples of conditions outside a consumer's control.) If, however, a creditor is not obligated to renew as described above, **disclosures** must be based on the term of the balloon-payment loan. **Disclosures** also must be based on the term of the balloon-payment loan in balloon-payment instruments in which the legal obligation provides that the loan will be renewed by a "refinancing" of the obligation, as that term is defined by § 226.20(a). If it cannot be determined from the legal obligation that the loan will be renewed by a "refinancing," **disclosures** must be based either on the term of the balloon-payment loan or on the payment amortization, depending on whether the creditor is unconditionally obligated to renew the loan as described above. (This discussion does not apply to construction loans subject to § 226.17(c)(6).)

• "Shared-equity" or "shared-appreciation" mortgages that have a fixed rate of interest and an appreciation share based on the consumer's equity in the mortgaged property. The appreciation share is payable in a lump sum at a specified time.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit No. 4**

Westlaw.

2003 WL 24040101 (O.T.S.)                                                    Page 1

2003 WL 24040101 (O.T.S.)

Office of Thrift Supervision (OTS)

[Letter]
**PREEMPTION**
OF NEW YORK PREDATORY LENDING LAW

P-2003-2

January 30, 2003

[* * *]

Dear [* * *]:

This responds to your recent letter on behalf of * * * ("Association"), a federal savings association. In your letter, you ask the Office of Thrift Supervision ("OTS") to confirm that federal law **preempts** the application to the Association of the recently enacted New York Predatory Lending Law ("NY law").[FN1] We conclude that NY law provisions purporting to regulate the terms of credit, loan-related fees, disclosure and advertising, and mortgage origination, refinancing, and servicing are **preempted** by federal law from applying to federal savings associations.[FN2]

**Background**

The NY law imposes requirements on "high-cost home loans," including such loans made by federal savings associations.[FN3] High-cost home loans are subject to certain requirements on the terms of credit, loan-related fees, disclosure and advertising, and mortgage origination, refinancing, and servicing. Requirements concerning the terms of credit and loan-related fees include prohibiting call provisions, balloon payments, negative amortization, default interest rates, modification or deferral fees, and single premium insurance financing, as well as limiting advance payments and the financing of points and fees.[FN4] Requirements concerning disclosure and advertising include mandating a disclosure at application concerning financial counseling, a pre-closing disclosure which, among other things, warns about possible foreclosure and home loss in the event of default and encourages shopping and credit counseling, and a legend on the mortgage instrument identifying the loan as high-cost, as well as prohibiting the encouragement of default.[FN5] Requirements concerning mortgage origination, refinancing, and servicing include limiting the circumstances in which a refinancing may occur, prohibiting lending without regard to repayment ability, prohibiting the payment of referral fees to mortgage brokers, restricting payments to home improvement contractors from loan proceeds, and mandating reporting of payment history to a consumer credit bureau.[FN6]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The NY law also contains a multifaceted compliance scheme. The NY law grants authorization to the NY Attorney General, the NY Superintendent of Banks, or any party to a high-cost home loan to enforce the law through litigation.[FN7] Remedies available include actual and statutory damages, attorneys' fees, injunctive and declaratory relief, for intentional violations voiding of loan agreements and borrower recoupment of payments made, and rescission of the loan transaction without time limitation.[FN8] Further, the NY law uses state foreclosure law as an additional tool to compel compliance with the predatory lending law. The NY law makes a violation of the predatory lending law a foreclosure defense and requires a lender to affirmatively prove compliance with the NY law as a prerequisite to obtain the entry of judgment in a foreclosure action.[FN9]

## Discussion

The NY law provisions discussed above, which purport to regulate the terms of credit, loan-related fees, disclosure and advertising, and mortgage origination, refinancing, and servicing are **preempted** by federal law from applying to federal savings associations.[FN10] In enacting the Home Owners' Loan Act ("**HOLA**"),[FN11] Congress required the Federal Home Loan Bank Board ("FHLBB"), and now the OTS, to provide for the organization, incorporation, examination, operation, and regulation of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States."[FN12] Consistent with this language, OTS has made clear in its lending regulations its intent to carry out this congressional objective by giving federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.[FN13] That uniform federal scheme occupies the field of regulation for lending activities. The comprehensiveness of the **HOLA** language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary.[FN14]

OTS occupies the field to enhance safety and soundness and enable federal savings associations to conduct their operations in accordance with best practices by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden.[FN15] Under OTS regulation 560.2(a), federal savings associations may extend credit as authorized under federal law without regard to state laws purporting to regulate or otherwise affect their credit activities. As described above, the NY law imposes a number of specific restrictions and requirements on home loans. The NY law would regulate areas covered by regulation 560.2 and therefore does not apply to federal savings associations' home lending.

OTS has described with specificity the scope of its occupation of the field of lending regulation by noting the types of state laws encompassed within the **preemption**. They include many of the types of provisions found in the NY law. For example, 12 C.F.R. § 560.2(b)(4) **preempts** state laws on terms of credit, § 560.2(b)(5) **preempts** state laws on loan-related fees, § 560.2(b)(9) **preempts** state laws on disclosure and advertising, and § 560.2(b)(10) **preempts** state laws on processing, origination, servicing, sale, purchase, investment, and participation in mortgages. This conclusion is further supported by numerous opinions of OTS, and its predecessor, the FHLBB.[FN16]

The NY law would thwart the more general congressional objective that OTS have exclusive responsibility for regulating the operations of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States.[FN17] Congress gave OTS, not the States, the task of determining the best practices for thrift institutions and creating nationally uniform rules. OTS conducts regular

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

examinations of thrift lending operations for safety and soundness and compliance with established consumer protections. OTS also maintains a toll-free consumer hotline to respond to consumer questions and complaints. OTS seeks to assure that the thrift appropriately responds to the consumer's concern. If OTS's review indicates a violation of federal consumer laws or regulations occurred, OTS may require the institution to take appropriate corrective action.

Federal savings associations must comply with the requirements of federal law, including restrictions on abusive practices such as those in the Home Ownership Equity Protection Act ("HOEPA"), the Real Estate Settlement Procedures Act ("RESPA"), and their implementing regulations.[FN18] Subjecting federal savings associations to the burdens of complying with a "hodgepodge of conflicting and overlapping state lending requirements" would undermine the federal objective of permitting federal savings associations to exercise their lending powers "under a single set of uniform federal laws and regulations. This [uniformity] furthers both the 'best practices' and safety and soundness objectives of the **HOLA** by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden."[FN19]

You also ask whether the NY law's multifaceted compliance scheme, including the potential threat of litigation and application of the foreclosure provisions, is **preempted** for federal savings associations. The NY law's compliance scheme could not be applied to federal savings associations in a manner that would compel them to comply with the **preempted** provisions, including intrusive lending restrictions. Such a result would have more than an incidental affect on the lending operations of federal savings associations and would run contrary to **HOLA's** purpose of allowing federal savings association to exercise their lending powers in accordance with a uniform federal scheme.[FN20]

We trust that this responsive to your inquiry. If you have further questions, please contact Richard Bennett, Counsel (Banking and Finance), at (202) 906-7409.

Sincerely,
Carolyn J. Buck
Chief Counsel

FN1. The NY law is codified as N.Y. Banking Law § 6-1, N.Y. Gen. Bus. Law § 771-a, and N.Y. Real Prop. Acts. Law § 1302. The NY law takes effect April 2003.

FN2. The same conclusion would apply to **preemption** for federal savings association operating subsidiaries. OTS has consistently indicated that state laws purporting to regulate the activities of a federal savings association's operating subsidiary are **preempted** by federal law to the same extent such laws are **preempted** for the federal savings association itself. See 12 C.F.R. § 559.3(n)(1) (2002); OTS Op. Chief Counsel (January 21, 2003); OTS Op. Chief Counsel (July 26, 1999) (and authorities cited therein).

FN3. A "high-cost home loan" is a mortgage loan (including a home equity loan, but excluding a reverse mortgage) to a natural person secured by a one to four-family owner-occupied principal dwelling located in New York, where the principal amount does not exceed the lesser of $300,000 (or the Fannie Mae conforming loan limit which is $322,700 for 2003 for a single-family dwelling), and which exceeds specified annual percentage rate or point/fee thresholds. N.Y. Banking Law § 6-1(1)(d)-(h). The NY law purports to apply to federal savings associations. N.Y. Banking Law §§ 6-1(1)(i) and 590(1)(e).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. N.Y. Banking Law § 6-1(2)(a)-(f), (h), (m), and (q).

FN5. N.Y. Banking Law §§ 6-1(2)(1)(i)-(ii) and (o) and 6-1(2-a)(a).

FN6. N.Y. Banking Law §§ 6-1(2)(i)-(k), (n), and (p) and 6-1(2-a)(b).

FN7. N.Y. Banking Law § 6-1(5)-(6).

FN8. N.Y. Banking Law § 6-1(7)-(12).

FN9. N.Y. Real Prop. Acts. Law § 1302.

FN10. As per a January 16, 2003 telephone discussion between you and OTS staff, however, this opinion does not address the restriction on mandatory arbitration clauses in N.Y. Banking Law § 6-1(2)(g). Nor does it address the responsibilities of home improvement contractors under N.Y. Gen. Bus. Law § 771-a, since the Association is not a home improvement contractor.

FN11. 12 U.S.C.A. § 1461 et seq. (West 2001).

FN12. **HOLA** § 5(a); 12 U.S.C.A. § 1464(a) (West 2001).

FN13. 12 C.F.R. § 560.2(a) (2002).

FN14. See *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982); Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31 (1996)*. OTS regulations **preempt** the field of lending regulation for federal savings associations whether or not OTS adopts a regulation governing the precise subject of the state law. *Lopez v. World Savings and Loan Ass'n*, No. A095666, 2003 WL 152956 (Cal. App. 1 Dist. Jan. 23, 2003).

FN15. 12 C.F.R. § 560.2(a) (2002).

FN16. See, *e.g.*, OTS Op. Chief Counsel (January 21, 2003) (**preemption** of state predatory lending law); OTS Op. Counsels (Banking and Finance) (May 16, 2001) (**preemption** of state law on terms of credit); FHLBB Op. Gen. Counsel (February 1, 1982) (same); OTS Ops. Chief Counsel, (December 14, 2001, April 21, 2000, and March 10, 1999) (**preemption** of state law on loan-related fees); OTS Op. Chief Counsel (December 24, 1996) (**preemption** of state law on loan-related fees and disclosures); OTS Mem. Dep. Chief Counsel (May 10, 1995) (**preemption** of state law on disclosures).

FN17. 12 U.S.C.A. § 1464(a) (West 2001).

FN18. See *15 U.S.C.A. § 1639* (WESTLAW 2002) (HOEPA); 12 C.F.R. pt. 226, subpart E (2002) (HOEPA regulations); *12 U.S.C.A. § 2601 et seq.* (WESTLAW 2002) (RESPA); 24 C.F.R. pt. 3500 (2002) (RESPA regulations).

FN19. 61 Fed. Reg. 50,951, 50,965 (Sept. 30, 1996) (Final Rule: Lending and Investment).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 24040101 (O.T.S.)                                                    Page 5

FN20. *See* 12 C.F.R. § 560.2(a) (2002). Real property laws are not **preempted** to the extent that they only incidentally affect the lending operations of federal savings associations or are consistent with **HOLA's** purposes. *See* 12 C.F.R. § 560.2(c) and (c)(2) (2002). The NY law's foreclosure provisions, however, would not appear to fit that description since they would be used to compel compliance with the lending restrictions in the NY law.

2003 WL 24040101 (O.T.S.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit No. 5**

Westlaw.

P-96-14                                                                    Page 1
1996 WL 767462 (O.T.S.)

                          Office of Thrift Supervision (OTS)

                                      (Letter)

            **PREEMPTION** OF STATE LAWS APPLICABLE TO CREDIT CARD TRANSACTIONS

                                December 24, 1996

Dear ***

     This responds to your inquiry, submitted on behalf of *** (the "Association"), to
the Office of Thrift Supervision ("OTS") regarding the application of three specific
**Indiana** laws to the Association's proposed *** credit card loan program. Your inquiry
raises issues regarding federal **preemption** and application of the Most Favored Lender
("MFL") provision of the Home Owners' Loan Act ("HOLA"). [FN1]

     In brief, we conclude that federal law does not **preempt** the cited **Indiana** law
prohibiting fraudulent and deceptive loan practices. Federal law does, however, **preempt**
the cited **Indiana** laws that pertain to disclosure and loan-related charges (except for
charges that constitute "interest" under the MFL provision). Moreover, under the MFL
provision, the Association may elect to charge interest (including charges that
constitute interest) up to the maximum amount authorized by the laws of **Indiana** for the
state's most favored lender, notwithstanding any contrary provision in **Indiana's** laws
or the laws of any other states where borrowers reside.

I. Background

     The Association is a federal savings bank located in **Indiana**. The Association proposes
to issue *** credit cards to customers nationwide.

     You indicate that the **Indiana** Uniform Consumer Credit Code (the "UCCC") regulates all
persons making consumer loans in **Indiana**, including unsecured credit card loans. [FN2]
The UCCC addresses two areas: (1) finance charge rates and other charges; [FN3] and (2)
disclosure requirements incorporated from the federal Truth in Lending Act (the "TILA")
and Federal Reserve Board Regulation Z. [FN4] You also represent that the **Indiana**
deceptive acts and practices statute (the "DAP") regulates the activities of lenders
by prohibiting specified acts and representations in connection with consumer
transactions. [FN5]

     You inquire whether the Association must comply with these three **Indiana** laws in
connection with *** credit card loans issued to borrowers located in **Indiana** and in other
states.

II. Discussion

     A complete response to the Association's inquiry requires examination of both HOLA's
MFL provision and OTS's lending regulations.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

When a savings association issues credit cards, it may utilize the MFL rate authorized
by section 4(g) of the HOLA. This provision permits savings associations to charge
interest on loans at the most favorable rate allowed any lender by the laws of the state
in which the association is located, notwithstanding any contrary state law. Moreover,
a savings association may "export" the favorable MFL rate of the location state when
making loans to borrowers who reside in other states. [FN6] The practical effect of
section 4(g) is to **preempt** state usury laws to a limited extent.

Beyond the MFL provision, the HOLA also authorizes OTS to promulgate regulations that
have **preemptive** effect. Prior to enactment of the HOLA, " 'the states had developed a
hodgepodge of savings and loan laws and regulations.... [[When enacting HOLA,] Congress
hoped that [the] ... rules [of the Federal Home Loan Bank Board and now OTS] would set
an example for uniform and sound savings and loan regulation.' " [FN7] Consistent with
this intent, courts have long recognized that federal savings associations are uniquely
federalized financial institutions--even more so than national banks. [FN8] As the
Supreme Court has recognized:

    Congress directed that in regulating federal [savings associations], the [ [Bank
Board and now OTS should] consider "the best practices of local mutual thrift and home
financing institutions in the United States," which were at the time all state-chartered.
By so stating, Congress plainly envisioned that federal savings [associations] would
be governed by what the [Bank Board and now OTS]--not any particular state--deemed to
be the best practices, and approved the ... promulgation of regulations superseding state
law.... [FN9]

Consistent with the foregoing, the OTS has authority to issue regulations **preempting**
state laws that affect the operations of federal savings associations.

The OTS and the Bank Board have long taken the position that federal lending laws and
regulations are intended to occupy the entire field of lending regulation for federal
savings associations, leaving no room for state regulation. [FN10] For these purposes,
the field of lending regulation has been defined to encompass all laws affecting lending
by federal thrifts, except certain specified areas where state law furthers a vital state
interest and has only an incidental effect on lending operations.

The preamble to OTS's recent final rule streamlining its lending and investment
regulations explains the rationale for this position:

    [I]nstead of being subject to a hodgepodge of conflicting and overlapping state
lending requirements, federal thrifts [should] be free to originate loans under a single
set of uniform federal laws and regulations. This furthers both the "best practices"
and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver
low-cost credit to the public free from undue regulatory duplication and burden. At the
same time, the interests of borrowers are protected by the elaborate network of federal
borrower-protection statutes applicable to federal thrifts.... In addition, in those
instances where OTS has detected a gap in the federal protections provided to borrowers,
the agency has promulgated regulations imposing additional consumer protection
requirements on federal thrifts. [FN11]

Accordingly, OTS has **preempted** most state laws affecting lending by federal thrifts.
This position was previously reflected in the OTS regulation at 12 C.F.R. § 545.2 (1996),

P-96-14                                                                          Page 3
1996 WL 767462 (O.T.S.)

has been confirmed and carried forward in OTS's recent final rule updating and
streamlining its lending and investment regulations, and will be codified in OTS
regulations at 12 C.F.R. § 560.2. [FN12]

The preamble to OTS's recent final rule describes the analytic framework to be used
in determining whether a particular state law that affects lending is, or is not **preempted**
by federal law. The preamble states:

When analyzing the status of state laws under § 560.2, the first step will be to
determine whether the type of law in question is listed [among the illustrative examples
of **preempted** state laws] in paragraph (b) [of § 560.2]. If so, the analysis will end
there; the law is **preempted.** If the law is not covered by paragraph (b), the next question
is whether the law affects lending. If it does, then, in accordance with paragraph (a),
the presumption arises that the law is **preempted.** This presumption can be reversed only
if the law can clearly be shown to fit within the confines of [the types of state laws
not **preempted,** as described in § 560.2(c) ]. For these purposes, paragraph (c) is intended
to be interpreted narrowly. [FN13]

We have examined the three cited **Indiana** laws under this analytic framework.

A. Interest Rates and Related Charges

The new OTS lending regulation specifically addresses your inquiry regarding federal
**preemption** of state laws regulating interest rates and related charges. The illustrative
list of **preempted** state laws at § 560.2(b) indicates, in subparagraph (12), that state
interest rate ceilings are **preempted** to the extent provided in the MFL provision of the
HOLA. Thus, when the Association issues a credit card under the MFL provision, it may
"charge interest at the maximum rate permitted to any state-chartered or licensed lending
institution by the law of [**Indiana**]," notwithstanding any contrary provisions in **Indiana**
law or the law of the states where borrowers reside. [FN14] The OTS MFL regulation defines
interest as follows:

The term 'interest' ... includes any payment compensating a creditor or prospective
creditor for an extension of credit.... It includes, among other things, the following
fees connected with credit extension or availability: numerical periodic interest rates,
late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance
fees, and membership fees. It does not ordinarily include appraisal fees, premiums and
commissions attributable to insurance guaranteeing repayment of any extension of credit,
finders' fees, fees for document preparation or notarization, or fees incurred to obtain
credit reports. [FN15]

Loan-related fees not covered by the definition of interest under the MFL provision
of the HOLA are governed by subparagraph (5) of § 560.2(b). [FN16] This provision **preempts**
state laws regulating "loan-related fees, including without limitation, initial charges,
late charges, prepayment penalties, servicing fees, and overlimit fees," but does not
apply to numerical interest rates. Subparagraph (5) reflects OTS's determination that
federal thrifts should be free to contract with customers for fees that are driven by
the market for financial services, rather than government regulation, provided adequate
loan-fee disclosure is given to consumers (as federal law mandates).

We note that at least one type of fee (late fees) listed as **preempted** in subparagraph
(5) also falls within the scope of the term "interest" under the OTS MFL regulation.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-96-14                                                                                        Page 4
1996 WL 767462 (O.T.S.)

Because the statutory MFL provision is a specific expression of Congressional intent, any overlap between that provision and subparagraph (5) must be resolved in favor of the MFL provision whenever a lender originates a loan under the MFL provision. What this means for the Association is as follows.

Indiana's UCCC sets a maximum finance charge for supervised consumer loans that varies based on the amount of the unpaid balance of the loan. Under the UCCC, the finance charge is broadly defined to include "all charges payable directly or indirectly to the lender as an incident to the extension of credit." [FN17] This language is broad enough to encompass all fees and charges that constitute "interest" under the MFL provision. Thus, when issuing a credit card loan under the MFL provision, the Association must abide by any limits in the Indiana UCCC governing not only the numerical interest rate, but also late fees, NSF fees, overlimit fees, annual fees, cash advance fees, and membership fees.

The Indiana UCCC also purports to apply its usury limits to any charges imposed by the Association "for any guarantee or insurance protecting the lender against the debtor's default or other credit loss; and charges incurred for investigating the collateral or credit-worthiness of the debtor." [FN18] These charges, however, are expressly excluded from the definition of "interest" under OTS's MFL regulation. [FN19] As provided in the MFL regulation at § 560.110(b), the status of state laws that are not encompassed by the MFL regulation are governed by the general principles of preemption set forth in § 560.2. As noted above, § 560.2(b)(5) preempts state laws that attempt to "impose requirements regarding ... loan-related fees." This language encompasses fees charged for appraisals required for loan origination and premiums charged for credit insurance.

Thus, when issuing credit cards, the Association will be required to limit all fees and charges that constitute "interest" (as defined in § 560.110(a)) to the maximum rate authorized for Indiana's most favored lender. No other state's laws will apply to these fees and charges, even if the Association's borrowers reside in another state. All state laws that purport to address loan-related fees that are not included within the MFL definition of interest are preempted by federal law.

B. Disclosure Requirements

The new OTS lending regulation also addresses federal preemption of disclosure requirements. Section 560.2(b)(9) provides that state laws imposing lending disclosure and advertising requirements are preempted. State laws within the purview of § 560.2(b)(9) include those that require specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents. The provision of the Indiana UCCC requiring specific lending disclosures by the Association is preempted by this federal regulation. [FN20] Instead, the Association is required to comply with the elaborate federal network of disclosure laws, including TILA and Regulation Z. [FN21]

This conclusion is not altered by the fact that the MFL provision will apply to the Association's credit card program. Although institutions utilizing the MFL provision must comply with any provisions of state law that are "material to the determination of the permitted interest rate." [FN22] Indiana's disclosure laws are not material to this determination.

In the past, state laws have been deemed to be material to the determination of the interest rate in only two instances. First, whenever a state authorizes an interest rate

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-96-14                                                                                          Page 5
1996 WL 767462 (O.T.S.)

for a particular category of loan, the provisions of law defining the fundamental characteristics of that category of loan must be observed. [FN23] Second, state laws defining how interest is to be computed must also be observed. [FN24]

**Indiana's** UCCC disclosure law, however, neither defines the fundamental characteristics of the category of loans covered by the usury rates in question nor affects the manner of computing the interest rate. Accordingly, the UCCC disclosure law is not material to the interest rate and is not encompassed by the MFL provision. [FN25]

Thus, general principles of federal **preemption** determine what disclosure requirements apply to loans made by the Association under the MFL provision. [FN26] As indicated above, § 560.2(b)(9) **preempts** the **Indiana** disclosure law.

You have also asked whether federal law would **preempt** a cited Ohio disclosure law which requires lenders to provide written statements notifying borrowers of their rights under state anti-discrimination statutes. [FN27] Specifically, this statute requires that credit application forms (or where there is a multi-state distribution, notices of acceptance or rejection of the application) include the following statement: "Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers." As already discussed above, the OTS regulation at § 560.2(b)(9) **preempts** state laws imposing disclosure requirements, including the cited Ohio disclosure law. [FN28] Accordingly, the Association need not comply with this disclosure provision.

C. Deceptive Acts and Practices Statute

Your final **preemption** inquiry involves **Indiana's** DAP law. State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of **preempted** laws in § 560.2(b). Thus, a more extensive **preemption** analysis of **Indiana's** DAP statute is required. The DAP statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit. [FN29] Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly, under the analysis described above, a presumption arises that the DAP statute would be **preempted** in connection with loans made by the Association.

The OTS has indicated, however, that it does not intend to **preempt** state laws that establish the basic norms that undergird commercial transactions. [FN30] Accordingly, in § 560.2(c), the OTS has identified certain categories of state law that are not **preempted**. [FN31] A state law that falls within the specified categories will not be **preempted** if the law only incidentally affects the lending operations of federal savings associations, or is otherwise consistent with the objectives that underlie OTS's **preemption** position, as set forth in paragraph (a) of § 560.2. [FN32] Paragraph (a) indicates that the OTS's objectives are to facilitate the safe and sound operation of federal savings associations, to enable federal associations to conduct their operations in accordance with best practices of thrift institutions in the United States, and to further other purposes of the HOLA.

The **Indiana** DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute--the regulation of the ethical practices of all businesses engaged in commerce in **Indiana**.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-96-14                                                                Page 6
1996 WL 767462 (O.T.S.)

There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, **Indiana's** general prohibition on deception should have no measurable impact on their lending operations. Accordingly, we conclude that the **Indiana** DAP is not **preempted** by federal law. [FN33]

You have asked whether the Association may "export" the **Indiana** DAP prohibitions when issuing credit cards to borrowers located in other states under the MFL provision. In other words, may the Association comply with **Indiana's** DAP in lieu of the deceptive practices laws of any other state?

As noted above, only state laws that set the maximum amount of interest or that are material to the determination of interest are covered by the MFL provision. **Indiana's** DAP does not establish the maximum interest permitted under **Indiana** law, does not prescribe unique characteristics of a specified class of loans permitted under **Indiana** law, and does not address the manner in which interest is computed. Accordingly, the DAP is not covered by the MFL provision.

Thus, general principles of federal **preemption** govern. As indicated above, nothing in federal law **preempts** general deceptive practices statutes. The Association is required to comply with the **Indiana** DAP and those deceptive practices statutes of other states that are worded in a manner to apply to the Association's loans. The applicability of conflicting state requirements should be resolved under traditional conflicts of laws principles and may turn on the facts of the specific transaction. Under some circumstances, the deceptive practices laws of more than one state may apply to the same transaction.

In reaching the foregoing conclusions, we have relied upon the representations made in the materials you submitted and in subsequent discussions. Our conclusions depend upon the accuracy and completeness of those representations. Any material difference in facts or circumstances from those described herein could result in different conclusions.

If you have any questions regarding this matter, please feel free to contact Karen Osterloh, Counsel (Banking and Finance), (202) 906-6639.

Very truly yours,

Carolyn J. Buck

Chief Counsel

FN1 12 U.S.C.A. § 1463(g) (West Supp.1996).

FN2 See Ind.Code § 24-4.5-1-101 et seq. (1995).

FN3 Ind.Code § 24-4.5-3-508 (1995), as amended by 750 IAC 1-1-1, provides that the maximum finance charge permissible for supervised consumer loans is 36% for unpaid balances of less than $870; 21% for unpaid balances between $870 and $2,900; and 15% for unpaid loan balances in excess of $2,900.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-96-14                                                                                        Page 7
1996 WL 767462 (O.T.S.)

FN4 The UCCC directs the creditor to "disclose to the debtor to whom credit is extended with respect to a consumer loan the information required by the Federal Consumer Credit Protection Act." Ind.Code § 24-4.5-3-301(2) (1995). The UCCC defines "Federal Consumer Credit Protection Act" to mean the federal Truth in Lending Act (15 U.S.C.A. § 1601 et seq.) as amended by the Truth in Lending Simplification and Reform Act (Pub.L. 96-221, 94 Stat. 168), and any regulations issued thereunder. Ind.Code §§ 24-4.5-1-102(4) and 24-4.5-1- 302 (1995). Regulation Z implements TILA and is located at 12 C.F.R. Part 225 (1996).

FN5 See Ind.Code §§ 24-5-0.5-1 et seq. (1995). For example, the statute prohibits a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of the consumer transaction, if it does not and the [person] knows or should reasonably know that it does not" and from making oral or written representations that a consumer transaction involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false." Ind.Code § 24-5-0.5- 3(6) & (8) (1995).

FN6 See Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299 (1978).

FN7 Conference of Federal Savings and Loan Associations v. Stein, 604 F.2d 1256 (9th Cir.1979) (citations omitted).

FN8 People v. Coast Federal Savings and Loan Association, 98 F.Supp. 311, 319 (S.D.Calif.1951).

FN9 Fidelity Federal Savings and Loan Association v. de la Cuesta, 458 U.S. 141, 153-154 (1982).

FN10 For a general discussion of the principles of federal **preemption,** see OTS Op. Chief Counsel (Oct. 11, 1991).

FN11 61 Fed.Reg. 50951 at 50965-50966 (Sept. 30, 1996).

FN12 See 61 Fed.Reg. at 50972. The preamble to this regulation, which became effective on October 30, 1996, contains an extensive discussion of the scope of, and the legal basis for, the OTS authority to **preempt** by regulation. See 61 Fed.Reg. at 50965-67. A copy of the preamble is enclosed for your reference.

FN13 61 Fed.Reg. at 50966.

FN14 The OTS recently conformed the text of its regulation implementing HOLA § 4(g) to the regulation implementing a similar statutory MFL provision for national banks. See 61 Fed.Reg. at 50981 (to be codified at 12 C.F.R. § 560.110). The Office of the Comptroller of the Currency's ("OCC") rule implementing 12 U.S.C.A. § 85 (West 1989) is found at 61 Fed.Reg. 4849, 4869 (Feb. 9, 1996) (to be codified at 12 C.F.R. § 7.4001).

FN15 12 C.F.R. § 560.110(a).

FN16 See 12 C.F.R. § 560.110(b) ("Except as provided in this paragraph, the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

applicability of state law to Federal savings associations shall be determined in
accordance with § 560.2 of this part.")

   FN17 Ind.Code § 24-4.3-109(1) (1995).


   FN18 Id.


   FN19 12 C.F.R. § 560.110(a) (Interest "does not ordinarily include appraisal fees,
premiums and commissions attributable to insurance guaranteeing repayment of any
extension of credit .... or fees incurred to obtain credit reports.")


   FN20 This conclusion is consistent with the agency's longstanding position that state
disclosure laws are **preempted.** See e.g., OTS Op. Dep. Chief Counsel (Oct. 18, 1994) (state
law requiring a savings association to provide copies of credit reports held by the
savings association); OTS Op. Chief Counsel (Jan. 3, 1991) (state law requiring
disclosure of information on escrow accounts for mortgages); FHLBB Op. by Gen. Counsel
(Apr. 28, 1987) (state regulations purporting to regulate lending disclosure); and FHLBB
Op. by Gen. Counsel (Nov. 12, 1985) (state truth in lending laws).


   FN21 Because the **Indiana** law merely incorporates by reference already-applicable
federal requirements under TILA and Regulation Z, we recognize that the practical effect
of **preemption,** in this instance, would be negligible.


   FN22 12 C.F.R. § 560.110(b).


   FN23 See OCC Interpretive Letter No. 354 [1985-87 Transfer Binder] Fed. Bank L.Rep.
(CCH) ¶ 85.524. The OTS and the FHLBB have long looked to OCC precedent interpreting
the national bank MFL provision for guidance in interpreting section 4(g) and the OTS
implementing regulation. See e.g. OTS Op. Chief Counsel, Dec. 24, 1992, pp. 3-4.


   FN24 Id.


   FN25 Accord OCC Interpretive Letter No. 178, [1981-82 Transfer Binder] Fed.Bank.L.Rep.
(CCH) ¶ 85.259; OCC Interpretive Letter No. 333, [1985-87 Transfer Binder]
Fed.Bank.L.Rep. (CCH) ¶ 85.503. This determination is consistent with the preamble to
the OTS regulation which states that a disclosure provision will be material to the
determination of the interest rate only in "rare instances." 61 Fed.Reg. 50968. This
position reflects a change in the OTS's interpretation of the MFL statute. Under the
prior OTS regulation at 12 C.F.R. § 571.22 (1996), thrifts were required to comply with
consumer protection laws, including disclosure provisions, of the state in which they
were located when making loans under the MFL provision. Id. Under the new regulation,
consumer protection laws no longer automatically apply.


   FN26 12 C.F.R. § 560.110(b).


   FN27 Ohio Rev.Code Ann. § 4112.021(g) (Anderson 1996).


   FN28 We note that the Ohio law is largely duplicative of the disclosure requirement
contained in Regulation B which implements the Equal Credit Opportunity Act. See 12 C.F.R.
§ 202.9(a)(2) (1996). This regulation requires lenders to provide a notice setting forth
the protections contained in section 701(a) of the Act "whenever an adverse action is
taken with regard to a credit application."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

FN29 See Ind.Code § 24-5-0.5-2(1) (1995) (definition of consumer transaction).

FN30 61 Fed.Reg. at 50966.

FN31 12 C.F.R. § 560.2(c)(1) through (5). These categories include: contract and commercial law, real property law, homestead laws, tort law and criminal law.

FN32 12 C.F.R. § 560.2(c).

FN33 This conclusion is consistent with relevant case law. See Morse v. Mutual Federal Savings and Loan Association of Whittingham, 536 F.Supp. 1271 (D.Mass.1982) (federal savings associations are subject to a general Massachusetts statute proscribing unfair and deceptive trade practices).

P-96-14

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit No. 6

Westlaw.

P-99-3                                                                    Page 1
1999 WL 413698 (O.T.S.)


Office of Thrift Supervision (OTS)

(Letter)

CALIFORNIA UNFAIR COMPETITION ACT

P-99-3

March 10, 1999


***

Dear ***:

   This responds to your inquiry submitted on behalf of ***, a savings and loan holding
company, and its two wholly-owned federal savings association subsidiaries, ***
("Association A") and *** ("Association B"), located in *** (Association A and
Association B are collectively referred to herein as the "Associations"). You request
that the Office of Thrift Supervision ("OTS") confirm your conclusion that federal law
**preempts** the application of provisions of the California Unfair Business Practices
Statute [FN1] and the California Deceptive, False and Misleading Advertising Statute
[FN2] (collectively, the "Unfair Competition Act" or "UCA") to the Associations in three
specific areas of their lending operations: (1) advertising; (2) the forced placement
of hazard insurance; and (3) the imposition of certain loan-related fees.

   In brief, we conclude that, in the narrow circumstances you describe, federal law
**preempts** the manner in which specified provisions of the UCA have been applied to the
Associations that interferes with the Associations' lending activities in the areas of
advertising, the forced placement of hazard insurance and the imposition of certain
specified loan-related fees.

I. Background

A. The Associations

   The Associations are headquartered and conduct a substantial portion of their lending
activities in California. A significant portion of the Associations' business consists
of originating residential and multi-dwelling mortgage loans and servicing the mortgage
loans that they own.

B. The UCA

1. The UCA as written

   Under § 17203 of the UCA, any "person" (which includes corporations) engaging in "unfair
competition" may be enjoined in any court of competent jurisdiction and the court may

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3                                                                                      Page 2
1999 WL 413698 (O.T.S.)

order restitution of any interest in money or property acquired by means of such unfair competition. [FN3] The UCA defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) ... of the Business and Professions Code." [FN4]

You have advised us that California courts have interpreted other key terms left undefined in the statute. For instance, under the UCA, a "practice" can be based on a pattern of behavior pursued in a course of business, and can include a single act if that act affects plaintiffs on a classwide basis. [FN5] "Unlawful" business practices are those that violate any predicate law, state or federal, civil or criminal, even if the predicate law does not provide for a private cause of action. [FN6] An "unfair" business practice is one whose harm to the victims outweighs its benefits to society. [FN7] "Fraudulent" business conduct is any conduct by which the public is likely to be deceived; no actual deception, reasonable reliance, or damages are required. [FN8]

Section 17500 of the UCA forbids "untrue or misleading" advertising in connection with the disposition of real or personal property or services. This prohibition is very similar to the UCA's definition of "unfair competition" in § 17200 as "unfair, deceptive, untrue or misleading advertising." [FN9] The Supreme Court of California has noted that, under § 17500, an advertisement is "untrue or misleading" if it is likely to deceive the audience, and the intent of the disseminator and the knowledge of the customer are irrelevant. [FN10] You have informed us that alleged violations of the two statutes are generally pled and litigated as a single cause of action, and that California courts do not distinguish between the two.

California courts have noted that, under § 17200, violation of the UCA is a strict liability offense. [FN11] There is no need to show that the defendant intended to injure anyone. [FN12]

Under the UCA, the California Attorney General and county district attorneys have the express right to sue for unfair competition violations on behalf of the people of California or upon the complaint of any person, corporation or association. [FN13] An action also may be brought by any person acting for the interests of itself, its members or the general public. [FN14]

The UCA authorizes a trial court to fashion a remedy to prevent unfair trade practices. [FN15] The trial court can also make such orders and judgments as may be necessary to restore to a person any money or property that may have been acquired by means of unfair competition. [FN16] Remedies under the UCA are cumulative to each other and to the remedies or penalties available under other state laws. [FN17]

In addition to injunctive relief, the UCA provides that public officials (but not private litigants) can sue for civil penalties for violations. [FN18] Any civil penalties collected by state and local officials in prosecuting an unfair competition claim are required to be paid to the state and local entities bringing such suit. [FN19]

2. The UCA as applied

You represent that the UCA has been broadly interpreted and applied and cite several aspects of the statute to support your position. First, you maintain that the statutory terms in the UCA have been defined broadly. For instance, you indicate that California

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

courts interpreting the UCA have found that the UCA does not require a breach of contract, or a violation of real property, commercial or tort law, but rather merely a finding of "unfairness" to sustain a cause of action. [FN20] As noted above, a business practice is "unfair" if its harm to the victims outweighs its benefits to society, and this term has been interpreted broadly to allow courts maximum flexibility to prohibit new schemes to defraud. [FN21]

You further represent that under the UCA's definition of "fraudulent conduct," i.e., any conduct in which the public is likely to be deceived, [FN22] there is no requirement that a person actually be deceived or suffer any damages as a result of fraudulent conduct or reliance thereon. [FN23] Even a true statement can constitute "fraudulent conduct" if it is likely to deceive the public. [FN24]

Similarly, you indicate that under the UCA § 17200, "unfair, deceptive, untrue or misleading advertising" is advertising by which a person is likely to be deceived. [FN25] California courts have defined "untrue or misleading" advertising under UCA § 17500 in the same way. [FN26]

These broad definitions are in contrast to another state unfair business practices statute that the OTS has reviewed, the Indiana Deceptive Acts and Practices Statute, and discussed in a December 24, 1996 OTS opinion ("1996 Opinion"). [FN27] Unlike the open-ended terms to describe "unfair" business practices in the UCA, the Indiana statute reviewed in the 1996 Opinion set out a list of specific acts or representations that were deemed to be "deceptive" acts, thereby providing some certainty as to what types of activities violated the statute. [FN28] (We note that the California Civil Code contains a provision, § 1770 (part of the "Consumers Legal Remedies Act" [FN29]), that is structured like the Indiana statute. [FN30] You do not ask, however, about Civil Code § 1770, and therefore we do not consider its impact, if any, on your inquiry.)

You also indicate that the UCA's standing rules are extremely liberal and contrast sharply with the standing requirements of traditional areas of state jurisdiction, such as contract or tort law. For instance, under the UCA, any "person" (including corporations) may bring an action "for the interests of itself, its members, or the general public," [FN31] and, in cases where a plaintiff sues on behalf of the general public, the plaintiff need not prove actual harm by the allegedly unfair business practices or personal dealings with the defendant. [FN32] Nor must the plaintiff bring the suit as a class action, where he must show he will fairly and adequately protect the interests of the class, and where other affected persons would be bound by the outcome.

As one commentator has noted, many states, like California, have extended to private consumers the right to sue for deceptive and unfair business practices, creating problems between enforcement of the Federal Trade Commission ("FTC") Act [FN33] and many state deceptive and unfair business practices statutes. [FN34] The UCA's allowance for actions by private litigants is in contrast to the enforcement mechanism in the FTC Act, on which the UCA is based. [FN35] The FTC Act requires that the FTC proceed only when it appears that doing so is in the public interest, and only the FTC may prosecute an action under the Act. [FN36] Individual consumers have no recourse when the FTC declines to bring a case. [FN37] But once the FTC obtains a remedy, it would benefit all consumers.

You also claim that the UCA's remedial authority is sweeping. [FN38] You note that California appellate courts have found that a trial court in a UCA proceeding has broad authority to fashion a remedy that not only enjoins unfair trade practices, but requires specific actions designed to deter the defendant and others from engaging in such

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3                                                                                          Page 4
1999 WL 413698 (O.T.S.)

practices in the future. [FN39] You further represent that there is no requirement that
penalties be tied to the actual harm suffered. [FN40] Moreover, once calculated,
penalties may be imposed jointly and severally on all defendants. [FN41]

You argue that this combination of broad definitions, liberal standing requirements,
and generous remedial provisions makes UCA claims extremely attractive for plaintiffs
to pursue and nearly impossible for the Associations to defend or obtain finality as
to acceptable practices. You indicate that the UCA has been increasingly used as a vehicle
to challenge aspects of the Associations' and other federal thrifts' lending operations
that historically have been within the purview of federal law.

3. UCA claims filed against the Associations based on their lending activities

In support of your request, you inform us that the Associations have faced, or are
currently facing, litigation brought under the UCA challenging certain aspects of the
Associations' lending operations as "unfair." You argue that, although the UCA is not
directly aimed at federal savings associations, or lenders in general, it has been used
by plaintiffs to challenge areas of the Associations' lending activities that have
traditionally been governed by federal law.

You provide three examples of lending activities that have been challenged under the
UCA--advertising, the forced placement of hazard insurance, and the imposition of
loan-related fees--and the following information relating thereto.

a. Advertising

In 1994, the District Attorney's Office for the County of ***, California, asserted
an action against Association A in Superior Court alleging that Association A's
advertising of one of its loan programs, which featured an adjustable rate mortgage loan
with a bi-weekly payment, was misleading and constituted an unfair practice under the
UCA. The District Attorney alleged, among other things, that the advertising and
promotional material that Association A used in connection with the particular loan
program violated the UCA because the advertising did not include an example disclosing
the maximum permissible annual percentage rate for loans offered under the program.
[FN42] Association A ultimately settled the case, agreeing to end the advertising program
and to pay a civil penalty to the District Attorney's office, without conceding any
wrongdoing.

b. Forced placement of insurance

Association A currently is defending a class action lawsuit alleging that during the
course of force placing hazard insurance on behalf of its borrowers, as a result of the
borrowers' failure to pay the insurance premiums under their existing policies,
Association A did not mitigate avoidable costs that were then passed on to the borrowers.
[FN43] Specifically, the complaint alleges that when the borrowers' hazard insurance
coverages expired, Association A force placed alternative coverage from a different
insurance company at a higher cost than the cost of the lapsed policy. [FN44] The
plaintiffs contend that Association A had an obligation to mitigate avoidable losses
by maintaining the same policy in effect with the same insurance carrier at the same
price (or even less). The plaintiffs allege that Association A's procedures for force
placing hazard insurance constitute an "unfair business practice" in violation of § 17203
of the UCA.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3
1999 WL 413698 (O.T.S.)

Besides the UCA claim, the plaintiffs' complaint also asserts causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment and imposition of a constructive trust, and declaratory relief, all based on the forced placement of insurance. [FN45] You indicate that trial in this matter is currently scheduled for later this year.

c. Loan-related fees

You represent that Association A has faced several challenges to its imposition of certain loan-related fees. You specifically cite a legal challenge based on the UCA to two fees--"demand statement" fees and facsimile fees [FN46]--that Association A charges when a borrower pays off a mortgage loan. [FN47] In that lawsuit, the plaintiffs alleged that Association A charged impermissibly inflated demand statement and facsimile fees when borrowers refinanced their mortgage loans and that such practice constituted an "unfair business practice" under the UCA. [FN48] In addition to the UCA claim, the plaintiffs' complaint also asserted causes of action for breach of contract, RICO violations, and restitution. [FN49] You maintain that Association A has incurred substantial money and time defending such lawsuits.

II. Discussion

A. Analytical framework

Pursuant to §§ 4(a) and 5(a) of the Home Owners' Loan Act ("HOLA"), [FN50] the OTS is (and before it, the Federal Home Loan Bank Board ("FHLBB") was) authorized to provide for the safe and sound operation of federal savings associations and has exclusive plenary authority to regulate all aspects of the operations of federal savings associations. Extensive judicial and other authority supports the principle that HOLA § 5(a) and the OTS's implementing regulations **preempt** state laws that purport to regulate the activities or operations of federal savings associations because Congress conferred on the FHLBB, and now the OTS, exclusive authority to regulate the operations of federal savings associations. [FN51] Extensive authority also confirms that OTS (and formerly FHLBB) regulations **preempt** state law where the law in question conflicts with, or is otherwise an obstacle to, the achievement of the objectives of federal regulations. [FN52]

In 12 C.F.R. § 560.2(a) (1998), the OTS states its intention to totally occupy the field of the regulation of the lending activities of federal savings associations. One of the express purposes of § 560.2(a) is to allow federal savings associations "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation." [FN53] The preamble to § 560.2 sets out the analytical framework to be used in determining whether a state law that affects lending is **preempted** by federal law. [FN54] Under this framework, state laws of the type listed in § 560.2(b) are **preempted.** State laws of the types listed in § 560.2(c) are generally not **preempted.** However, under subsection (c), a state law of the type traditionally left to the states or that the OTS finds furthers a vital state interest is nevertheless **preempted** if the law has more than an "incidental impact" on a thrift's lending operations or is otherwise contrary to the purposes of § 560.2(a).

Under § 560.2(b), the general types of state laws that federal law **preempts** based on this occupation of the field include state laws purporting to impose requirements regarding "[d]isclosure and advertising," [FN55] "[t]he ability of a creditor to require

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

private mortgage insurance, insurance for other collateral, or other credit enhancements," [FN56] and "[l]oan-related fees." [FN57] Under § 560.2(c), the specific types of state laws that generally are not **preempted** by federal law include contract and commercial law, real property law, tort law, certain homestead laws, and criminal law. [FN58] Aggrieved consumers thus may use these types of laws to obtain relief. [FN59]

The OTS utilized this analytical framework in the 1996 Opinion, which examined whether federal law **preempted** the Indiana Deceptive Acts and Practices Statute. The Indiana Deceptive Acts and Practices Statute prohibited specified acts and representations in connection with consumer transactions. For example, the statute prohibited a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of a consumer transaction, if it does not and the [person] knows or should reasonably know that it does not," and from making oral or written representations that a consumer transaction involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false." [FN60]

The 1996 Opinion reviewed the state statute in the context of a proposed lending program and there was no suggestion that the state statute was being (or would be) applied in a manner that impermissibly affected lending. The 1996 Opinion concluded that the Indiana statute fell within the category of "contract and commercial law" under § 560.2(c)(1), that the law's impact on lending was incidental, that there was no indication that the law conflicted with any federal objectives identified in § 560.2(a) of the OTS's lending regulation, and, therefore, that the Indiana statute was not **preempted** by federal law. [FN61]

We will review the UCA, as it affects the Associations' lending practices regarding advertising, insurance requirements and loan-related fees, under the same analytical framework set forth in § 560.2. We note that the UCA, as drafted, is not directly aimed at federal savings associations, or lenders generally. The question is thus whether the UCA, as applied in the three circumstances you describe, has been and is being used by both private and governmental plaintiffs as a vehicle to improperly impose requirements on the Associations' lending operations regarding matters that have traditionally been within the exclusive purview of the OTS and federal law. A **preemption** analysis requires consideration of the relationship between federal and state laws as they are interpreted and applied, not merely as they are written. [FN62]

B. Section 560.2(c)

As indicated above, § 560.2(c) provides that specified types of state laws, including contract and commercial laws or a law that the OTS finds furthers a vital state interest, generally are not **preempted** to the extent that the state law's effect on lending is only incidental and the state law is consistent with the objectives of § 560.2(a), including allowing federal savings associations to operate in accordance with uniform standards. However, if such a state law has a more than incidental impact on a federal thrift's lending operations or is inconsistent with the objectives of § 560.2(a), the state law may be **preempted.**

In the 1996 Opinion, we concluded that the Indiana Deceptive Acts and Practices Statute fell within the category of "contract and commercial law" under § 560.2(c). The UCA may also be viewed as a form of contract and commercial law under § 560.2(c). Nevertheless, in our view the situation faced by the Associations is distinguishable from the issues and facts addressed in the 1996 Opinion because the application of the UCA in the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

circumstances you describe seeks to set very particular requirements on the Associations'
lending operations. As such, under § 560.2(c), the application of the UCA as described
above has more than an incidental impact on the Associations' lending activities and
is contrary to the purpose of uniform standards of operations.

1. As applied, the UCA has more than an incidental impact on lending

    Unlike the statute at issue in the 1996 Opinion, it appears, based on the information
you have provided, that in this case the practical effect of the application of the UCA
as a basis for alleging "unfair competition" creates more than an incidental impact on
the Associations' lending operations. [FN63]

    Even though the UCA, on its face, may appear to further a state's vital interest in
regulating commercial transactions and is not specifically aimed at the lending practices
of federal savings associations, the UCA has been and is being used, by private and
governmental parties, in an attempt to set substantive standards for the
Associations'lending operations and practices. You have identified specific lawsuits
in which plaintiffs have used the UCA in attempts to require particular lending
disclosures, limit the Associations' choice of insurers and cap certain fees. Advertising
lending programs, protecting security property, and imposing certain loan-related fees
are all integral components of the Associations' lending operations, and the UCA as
applied would have a significant impact on those operations. [FN64]

    There is little doubt that the three lending activities identified by the
Associations--advertising, insurance requirements, and loan-related fees--are areas in
which the OTS has made clear that federal law prevails over state law to enable federal
thrifts to use uniform standards of operation. [FN65] Thus, to the extent that the UCA
is being used to affect these activities, such an application of the UCA (i) has more
than an incidental effect on a federal thrift's lending operations and (ii) is
inconsistent with the purposes of § 560.2(a).

a. Advertising

    Under § 560.2(b)(9), state laws purporting to impose requirements regarding the
advertising and disclosures of federal savings associations are the types of state laws
that the OTS has identified as being **preempted** by § 560.2(a). Moreover, there is a specific
federal regulation governing advertising by federal savings associations. OTS's
advertising regulation, 12 C.F.R. § 563.27 (1998), prohibits any savings association
from using advertising or making any representation "which is inaccurate in any
particular or which in any way misrepresents its services, contracts, investments, or
financial condition." This definition of prohibited advertising is similar to that of
"unfair competition" in the UCA. Federal thrifts are also subject to an elaborate network
of federal disclosure laws, including the Truth-in-Lending Act ("TILA") and Regulation
Z, which require certain methods of interest rate disclosure. [FN66] In this regard,
the 1996 Opinion concluded that federal law **preempted** the application of a state statute
requiring specific lending disclosures to a federal savings association. [FN67]

    A state law that, on its face, purported to regulate the advertising of a federal savings
association would be **preempted** under § 560.2(b). Accordingly, to the extent that the
UCA is being used, directly or indirectly, to require a particular form of interest rate
disclosure in advertising the Associations' lending programs in order to be considered
"fair" or not "misleading," the UCA is **preempted.** [FN68] We note that at least one
California appellate court has ruled that 12 C.F.R. § 563.27, the OTS's advertising

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3
1999 WL 413698 (O.T.S.)

regulation, **preempts** a state UCA claim based on allegedly false and misleading advertising. [FN69]

b. Forced-placed insurance

   The OTS has stated that lending practices designed to protect the property securing a borrower's mortgage loan are an integral part of a federal savings association's lending operations. [FN70] Under § 560.2(b)(2), state laws regarding the ability of a federal savings association to require insurance for its collateral are **preempted** by federal law. Moreover, OTS regulations require a federal savings association to adopt real estate lending practices that reflect prudent underwriting standards. [FN71] Such standards must reflect, inter alia, "additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments)." [FN72]

   Until 1996, an OTS policy statement provided that a savings association was required to include in its loan documents provisions requiring a borrower to maintain hazard insurance to protect the association from loss in the event the property securing the loan was damaged or destroyed. [FN73] In removing that policy statement as unnecessary, the OTS stated that the general requirement that an association maintain safe and sound lending practices by following the required prudent underwriting standards, and standard business practices in the mortgage lending industry, were sufficient to authorize a federal savings association to force place hazard insurance. [FN74] As noted, supra, lending practices designed to protect the collateral that serves as security for a loan are an integral part of a federal savings association's lending operations. Accordingly, to the extent that the UCA is being used either to limit the Associations' ability to force place insurance on properties securing loans, or the Associations' choice of insurers or premiums to be charged on the forced placement of insurance, the UCA is **preempted** as an impermissible interference with the Associations' lending programs. [FN75]

c. Loan-related fees

   Section 560.2(b) also presupposes that state laws imposing requirements on a federal savings association's charging of loan-related fees are **preempted** by federal law. The fees at issue in the example provided by the Associations, demand statement fees and facsimile charges, are loan-related fees. [FN76] Accordingly, to the extent that the UCA is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs, the UCA is **preempted.**

2. As applied, the UCA violates the objectives of § 560.2(a), including the objective of allowing federal savings associations to exercise their lending powers in accordance with uniform standards of operation

   Moreover, as you have described the manner in which the UCA is being applied and used in these three areas, the effect of that application and use is inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers "in accordance with a uniform scheme of federal regulation." [FN77]

   Because the statutory terms defined in the UCA are vague and there is no single enforcement body to set standards for applying the UCA, it is difficult for the Associations and other federal savings associations to know with any certainty what

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

lending practices will be acceptable under the UCA in any particular county in California at any particular time. As a result of how governmental and private plaintiffs have used the UCA, the Associations have been exposed or subjected to varying standards of acceptable practice in their lending operations rather than being able to operate under uniform federal standards within California as well as nationwide.

For instance, the Associations' advertising, while perhaps acceptable to one county attorney in California, might be viewed as impermissible in the eyes of another county attorney in California. [FN78] Similarly, UCA suits based on the Associations' efforts to protect their security interests in property by force placing insurance when borrowers allow their hazard insurance to lapse, and suits based on the charging of loan-related fees, could subject the Associations to different standards within California as well as in other states. This result is inconsistent with, and violates the objectives set forth in, § 560.2(a). [FN79] This result is also particularly troubling in the areas of advertising, security property, and loan-related fees, which the OTS has identified in its regulations as areas in which the OTS has determined that federal thrifts should be able to exercise their lending powers in accordance with uniform federal standards of operation.

The manner in which the provisions of the UCA have been applied to the Associations in these three areas results in a great deal of uncertainty in how the lenders should structure and operate their lending programs to comply with the UCA. As such, it violates the objective of allowing federal savings associations to conduct their lending operations in accordance with uniform standards of operation. Accordingly, as applied, the UCA does not meet the requirements of § 560.2(c) to be considered a type of state law that is not **preempted** by federal law.

III. Conclusion

Based on the foregoing, we conclude that federal law **preempts** the UCA as it has been applied in these instances to the Associations' advertising, forced placement of hazard insurance, and charging of loan-related fees in connection with their lending activities. More specifically, federal law **preempts** application of the UCA to the Associations in a manner that (i) has more than an incidental affect on the Associations' lending activities, or (ii) is inconsistent with the objectives set forth in § 560.2(a), including the objective of allowing federal savings associations to operate in accordance with uniform standards of operation.

The practical effect of the application of the UCA to the Associations here has resulted in significant interference with the Associations' lending operations by purporting to set standards in these three areas. The Associations have been subjected to varying standards of acceptable lending practices based on allegations regarding integral components of the Associations' lending operations. A state law purporting on its face to regulate these areas of a federal savings association's lending operations would be **preempted;** the UCA cannot be used to accomplish indirectly what a state could not accomplish directly.

We wish to emphasize the extremely limited nature of our **preemption** determination here. Our finding of **preemption** is only based on how the UCA has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. We do not **preempt** the entire UCA or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3                                                                                    Page 10
1999 WL 413698 (O.T.S.)

the objective of allowing federal savings associations to operate in accordance with uniform standards.

   We further emphasize that **preempting** application of the UCA in these three areas should have little practical effect on an allegedly aggrieved party's ability to seek and obtain relief. In instances of perceived "unfair" or "misleading" advertising, an aggrieved party can invoke the OTS's advertising regulation (and, where appropriate, Regulation Z) and initiate the OTS's consumer complaint process by contacting the nearest OTS Regional office or calling the OTS's toll-free consumer number, (800) 842-6929. [FN80] The plaintiffs' claims described herein based on the forced placing of insurance or the charging of loan fees may still be brought in state court based on traditional contract claims or other causes of action, such as those alleged by plaintiffs in the lawsuits against Association A discussed herein. [FN81]

   In reaching the foregoing conclusions, we have relied on the factual information, representations, and materials you submitted to us in writing and in subsequent conversations with OTS staff, as summarized herein. Any material differences in facts or circumstances from those described herein could result in different conclusions.

   If you have any questions regarding this matter, please feel free to contact Timothy P. Leary, Counsel (Banking & Finance), at (202) 906-7170 or Vicki Hawkins-Jones, Assistant Chief Counsel, Regulations and Legislation, at (202) 906-7034.

Very truly yours,

Carolyn J. Buck

Chief Counsel

   FN1 Cal.Bus. & Prof.Code §§ 17200 et seq.

   FN2 Cal.Bus. & Prof.Code §§ 17500 et seq.

   FN3 Cal.Bus. & Prof.Code §§ 17201, 17203.

   FN4 Cal.Bus. & Prof.Code § 17200.

   FN5 Allied Grape Growers v. Bronco Wine Co., 249 Cal.Rptr. 872, 884 (1988); People v. Casa Blanca Convalescent Hospital, Inc., 206 Cal.Rptr. 164, 174-75 (1987).

   FN6 See, e.g., Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668 (Cal.1983); Barquis v. Merchants Collection Ass'n., 496 P.2d 817, 829-31 (Cal.1972); Podolsky v. First Healthcare Corp., 58 Cal.Rptr.2d 89, 98 (1996).

   FN7 See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal.Rptr. 543, 546 (1980). The court noted that this definition is intentionally broad in order to allow courts maximum discretion to prohibit new schemes to defraud.

   FN8 Committee on Children's Television, 673 P.2d at 668-69.

   FN9 Indeed, as noted, § 17200 specifically incorporates acts that violate § 17500.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3
1999 WL 413698 (O.T.S.)

Section 17500, however, appears to be narrower than § 17200 in three respects. First, § 17500 applies only to false advertising, whereas § 17200 also forbids "fraudulent business practices." Second, § 17500 is limited to advertising that concerns real or personal property or services or the circumstances of their disposition or performance, whereas § 17200 contains no such limitation. Third, a defendant violates § 17500 only if he knows the advertising is false or misleading or in the exercise of reasonable care should know it to be, whereas § 17200 imposes strict liability.

FN10 Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal.1976).

FN11 Podolsky, 58 Cal.Rptr.2d at 98.

FN12 Id.; State Farm Fire and Cas. Co. v. Superior Court, 53 Cal.Rptr.2d 229, 233-34 (1996).

FN13 Cal.Bus. & Prof.Code § 17204.

FN14 Id.

FN15 Cal.Bus. & Prof.Code § 17203.

FN16 Id.

FN17 Cal.Bus. & Prof.Code § 17205. This aspect of the UCA is borne out by the examples of UCA claims filed against the Association discussed infra at 7-9. In two of those examples, UCA claims based on the forced placement of insurance and the imposition of loan-related fees, the complains included a variety of other causes of action, such as breach of contract, conversion, RICO violations, and unjust enrichment.

FN18 Cal.Bus. & Prof.Code § 17206(a).

FN19 Id.

FN20 See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal.Rptr. 543, 546 (1980); Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal.1976).

FN21 See Motor's Inc., 162 Cal.Rptr. at 546.

FN22 Committee on Children's Television v. General Foods Corp., 63 P.2d 660, 668-69 (Cal.1983) (construing § 17200 of the UCA).

FN23 Id.

FN24 Id. at 668, citing Chem v. Bank of America, 544 P.2d 1310, 1316 (Cal.1976).

FN25 Committee on Children's Television, 673 P.2d at 668-69.

FN26 See, e.g., Chern, 544 P.2d at 1316.

FN27 OTS Op. Chief Counsel (December 24, 1996), construing the Indiana Deceptive Acts

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

and Practices Statute, Ind.Code §§ 24-5-0.5-1 et seq. (1995).

  FN28 Ind.Code § 24-5-0.5-3(a). Statutory examples of such "deceptive" acts included;
representing that a specific price advantage exists as to the subject of a consumer
transaction, if it does not and the supplier knows or should reasonably know that it
does not; and representing that a consumer transaction involves or does not involve a
warranty, a disclaimer of warranties, or other rights, remedies or obligations, if the
representation is false and if the supplier knows or should reasonably know that the
representation is false. Ind.Code at §§ 24-4-0.5-3(a)(6) and (8) (1995).

  FN29 Cal.Civ.Code §§ 1750 et seq. (West 1998).

  FN30 Cal.Civ.Code § 1770 (West 1998 and Supp.1999).

  FN31 Cal.Bus. & Prof.Code § 17204.

  FN32 You maintain that the private standing to remedy unfair practices on behalf of
the general public does not require the numerosity, commonality, adequacy, typicality,
manageability, or other requirements of class actions under the California or Federal
Rules of Civil Procedure.

  FN33 15 U.S.C.A. §§ 41 et seq. (West 1997).

  FN34 See Sovern, "Private Actions Under the Deceptive Trade Practices Acts:
Reconsidering the FTC Act as Rule Model," 52 Ohio St.L.J. 437 (Spring 1991) at 437 ("While
[extending private rights of action] has indeed aided injured consumers, it has also
generated problems of its own") and 452 (" 'Little FTC Acts' arm consumers with a powerful
weapon against merchants, enabling consumers to prevail even when it may not be in
society's interest for them to win").

  FN35 See, e.g., Rubin v. Green, 847 P.2d 1044, 1052 (Cal.1993) (the UCA is one of the
so-called "little FTC Acts" enacted by many states).

  FN36 Holloway v. Bristol-Meyers Corp., 485 F.2d 986 (D.C.Cir.1973); Carlson v.
Coca-Cola Co., 483 F.2d 279 (9th Cir.1973). Compare 15 U.S.C. § 45(b) (FTC may issue
a complaint if "it shall appear to the [FTC] that a proceeding by it in respect [to an
unfair or deceptive business practice] would be in the interest of the public ...") with
Cal.Bus. & Prof.Code § 17204 (Actions may be brought "by any person acting for the
interests of itself ...").

  FN37 Heckler v. Chaney, 470 U.S. 821 (1985) (Food and Drug Administration refusal to
commence proceeding is not reviewable absent statute so providing).

  FN38 Cal.Bus. & Prof.Code § 17203.

  FN39 See McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 662 P.2d 916, 920
(Cal.1983); People v. Tooney, 203 Cal.Rptr. 642, 654 (1984).

  FN40 People v. Tooney, 203 Cal.Rptr. at 657.

  FN41 People v. Bestline Products, Inc., 132 Cal.Rptr. 767, 794-96 (1976).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

P-99-3                                                                    Page 13
1999 WL 413698 (O.T.S.)

FN42 People v. ***, Superior Court, *** County, California (***).

FN43 ***, Superior Court, *** County, California (***). All the plaintiffs in the *** class action are private individuals who obtained mortgage loans from Association A; there are no governmental plaintiffs in the action.

FN44 The complaint in *** alleges that the new policies, which Association A places pursuant to an arrangement it has with an unaffiliated insurance company, often cost two to five times more than the lapsed policies.

FN45 See Complaint, ***, Superior Court, *** County, California (***).

FN46 When a borrower refinances a mortgage loan, the existing mortgagee generates a statement, called a demand statement or payoff statement, setting forth all outstanding amounts on the current mortgage. The current mortgagee then normally transmits the demand statement to the new mortgagee by facsimile. Association A charges a fee for each of these services.

FN47 See, e.g., *** (subsequently voluntarily dismissed). The named plaintiff, who resided in Illinois, filed a claim in federal court in Illinois against Association A based on an alleged violation of the UCA.

FN48 Id.

FN49 See Complaint, *** (subsequently voluntarily dismissed).

FN50 12 U.S.C.A. §§ 1463(a) and 1464(a) (West Supp.1998).

FN51 See, e.g., Conference of Federal Savings and Loan Associations v. Stein, 604 F.2d 1256, 1260 (9th Cir.1979) ("[T]he regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control.... The broad regulatory authority over the federal associations conferred upon the [FHLBB] by HOLA does wholly **preempt** the field of regulatory control over these associations."), aff'd mem., 445 U.S. 921 (1980); FHLBB v. Empie, 628 F.Supp. 223, 225 (W.D.Okla.1983) ( "Congress intended the HOLA to **preempt** all state regulation over federally-chartered savings and loan institutions,"), aff'd, 778 F.2d 1147 (10th Cir.1985); People v. Coast Federal Savings and Loan Ass'n, 98 F.Supp. 311, 316 (S.D.Cal.1951) ( "The FHLBB has adopted comprehensive rules and regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."). See also OTS Op. Chief Counsel, (January 18, 1996) (state reporting requirements **preempted**)**;** OTS Op. Chief Counsel (October 11, 1991) (deposit taking); FHLBB Op. General Counsel (April 28, 1987) (lending and examination).

FN52 Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 156, 159 (1982) (**preempting** state limitation on due on sale practices that conflicted with FHLBB regulation); see also First Federal Savings and Loan Ass'n of Boston v. Greenwald, 591 F.2d 417, 425 (1st Cir.1979) (**preempting** Massachusetts law requiring payment of interest on tax escrow account that conflicted with FHLBB regulation); Kupiec v. Republic Federal Savings and Loan Ass'n, 512 F.2d 147-50 (7th Cir.1975) (**preempting** "common law" right to inspect and copy membership list that conflicted with FHLBB model by-law governing communication between members or depositors).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

FN53 12 C.F.R. § 560.2(a) (1998).

FN54 61 Fed.Reg. 50951, 50965-67 (September 30, 1996).

FN55 12 C.F.R. § 560.2(b)(9) (1998).

FN56 12 C.F.R. § 560.2(b)(2) (1998).

FN57 12 C.F.R. § 560.2(b)(5) (1998).

FN58 12 C.F.R. § 560.2(c) (1998).

FN59 Aggrieved customers of federal savings associations may also pursue relief through OTS's consumer complaint process. See discussion, infra at 18.

FN60 1996 Opinion at 2, citing Ind.Code § 24-4-0.5-3(6) and (8) (1995).

FN61 The 1996 Opinion also reviewed a separate Indiana statute that required specific lending disclosures by a federal savings association, and concluded that the Indiana statute was **preempted** under § 560.2(b)(9). Id. at 7-8.

FN62 Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977); see also DeCanas v. Bica, 424 U.S. 351, 363-65 (1976).

FN63 By contrast, the Indiana Deceptive Acts and Practices Statute did not attempt to regulate the content of a federal savings association's advertising or the amount of a loan-related fee, but rather, sought only to protect the integrity of such representations and charges once made. A federal thrift, as part of a loan contract, could decide what fees to charge and would only run afoul of the Indiana statute if it did not abide by its agreements or representations regarding those fees. Here, the UCA is being used in a manner that attempts, indirectly through the regulation of "unfair" business practices, to establish state-imposed, substantive standards for the lending activities of federal thrifts.

FN64 We emphasize that our conclusion as to such undue impact applies only with respect to the three areas of the Associations' lending operations described herein.

FN65 OTS regulation § 560.2(b) presupposes that state laws regarding advertising, insurance requirements and loan-related fees have a more than incidental and impermissible impact on the lending operations of federal savings associations, and provides that such laws are **preempted.** See 12 C.F.R. §§ 560.2(b)(2), 560.2(b)(5) and 560.2(b)(9); 61 Fed.Reg. 50951, 50966 (September 30, 1996) ("[Section] 560.2 is based on the premise that any state law that affects lending is **preempted** unless it clearly falls within the parameters of paragraph (c).")

FN66 15 U.S.C.A. §§ 1601 et seq. (West 1998); 12 C.F.R. Part 226 (1998).

FN67 1996 Opinion at 7-8.

FN68 The UCA essentially permits an open-ended, county-by-county determination of what

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

information must be contained in an advertisement for it to be "fair." This contrasts sharply with the approach of the Indiana Deceptive Acts and Practices Statute examined in the 1996 Opinion, which sets forth specific acts or representations that would violate the statute. See discussion, supra at 5, n. 29 and 11, n. 60.

FN69 [***] (unpublished opinion) (UCA claims based on **fraud** and misrepresentation **preempted** by 12 C.F.R. § 563.27).

FN70 OTS Mem. Chief Counsel (Sept. 2, 1997) at 6-8.

FN71 12 C.F.R. § 560.1(b) (1998).

FN72 See Interagency Statement on Real Estate Lending, Appendix to 12 C.F.R. § 560.101 (1998).

FN73 12 C.F.R. § 571.4 (1996).

FN74 61 Fed.Reg. 60173, 60175-76 (November 27, 1996).

FN75 Indeed, the OTS has already found that a state law that impedes a federal savings association's ability to protect the collateral securing its loans has more than an incidental effect on lending operations. OTS Mem. Chief Counsel (Sept. 2, 1997) at 7.

FN76 See discussion, supra at 9, n. 46.

FN77 12 C.F.R. § 560.2(a).

FN78 We do not here address the merits of the challenge to Association A's advertising in [***] (see n. 42, supra) and do not suggest that the advertising is immune from challenge; we merely find that such a claim cannot be pursued under the UCA.

FN79 As with the claims based on Association A's advertising, we do not here address the merits of the plaintiffs claims regarding force-placed insurance and loan-related fees (see discussion, supra at 8-9). We merely find that such claims cannot be pursued under the UCA. For example, in instances where the placement of insurance and charging of fees are addressed in the loan agreement (as they were in the UCA claims against Association A discussed herein), plaintiffs could bring claims based on those practices as traditional breach of contract claims.

FN80 See A Guide to Consumer Assistance (December 1996), available from the OTS Consumer Programs Office, 1700 G St., N.W., Washington, D.C. 20552 and on the OTS's website; www.ots.treas.gov/consass.html.

FN81 See discussion, supra at 8-9.

P-99-3

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.