Jack R. Nelson (SBN 111863)
David S. Reidy (SBN 225904)
Keith D. Yandell (SBN 233146)
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922

**Mailing Address:**
P.O. Box 7936
San Francisco, CA 94120-7936

Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Attorneys for Defendants World Savings Inc.,
World Savings Bank, FSB (now renamed
"Wachovia Mortgage FSB") and Wachovia
Mortgage Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DOLORES MANDRIGUES, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1 through 10, inclusive,<br><br>　　　　　Defendants. | Case No. C07 04497<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE PORTIONS OF PLAINTIFFS' CORRECTED SECOND AMENDED COMPLAINT**<br><br>Date:　　　　February 29, 2008<br>Time:　　　　9:00 a.m.<br>Place:　　　　Courtroom 3, 5th Floor<br>Orig. Complaint: August 30, 2007<br><br>The Honorable Jeremy Fogel |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................1

II. LEGAL ARGUMENT ..........................................................................................................2

    A.  Plaintiffs Misinterpret the Requirements of TILA, Reg. Z and the Commentary ..................................................................................................................2

        1.  TILA and Reg. Z Require That Lenders Give Borrowers a Loan Payment Schedule Based On Their <u>Actual</u> Contractual Obligations <u>at the Time They Execute Their Note</u>, and Plaintiffs' TILDs All Complied With That Rule ................................................................2

        2.  TILA Does Not Require a Correlation Between An Individual Monthly Payment Amount And The Contract Rate Of Interest ........................4

        3.  TILA Does Not Require Lenders To Disclose The Likelihood That, Much Less the Timing and Amount By Which, Negative Amortization Will Occur ................................................................................6

        4.  World's Disclosures Reflect The "Effect" Of The Note's Payment Cap ...............................................................................................................6

    B.  HOLA Preempts Plaintiffs' Second, Third, Fourth and Fifth Claims for Relief Because They Would Apply State Law To Challenge The Adequacy Of Loan Disclosures ......................................................................................7

        1.  HOLA Preempts State Laws Used to Attack The Adequacy of A Federal Savings Bank's Mortgage Disclosures ..................................................9

        2.  Plaintiffs Seek To Use State Laws To Regulate World's Mortgage Disclosures ...................................................................................................10

            a.  Plaintiffs' "Fraudulent Omission" Claim Seeks Specifically To Regulate World's Mortgage Disclosures ..................12

            b.  HOLA Preempts Plaintiffs' UCL Claim for Relief Because It Too Is Based Entirely On World's Alleged TILA Violations .................................................................................................13

            c.  HOLA Preempts Plaintiffs' Breach Of The Implied Covenant Claim Because It Is Based On The Preempted Claim of "Fraudulent Omission" ...........................................................14

            d.  HOLA Preempts Plaintiffs' Breach of Contract Claim for Relief Because It Is Merely An Attack On World's Disclosures .................................................................................................14

    C.  Plaintiffs Have Not Alleged, And Cannot Allege, Valid Claims Against WSI Or WMC ...........................................................................................................14

III. CONCLUSION ...................................................................................................................15

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- i -

# TABLE OF AUTHORITIES

## CASES

America Bankers Association v. Lockyer,
  239 F. Supp. 2d 1000 (2002) ................................................................................................10

Andrews v. Chevy Chase Bank, FSB,
  240 F.R.D. 612 (D. Wisc. 2007) ..............................................................................................6

Gibson v. World Savings & Loan Association,
  103 Cal. App. 4th 1291 (2002) ..........................................................................................9, 10

Griffin Industrial v. Irvin,
  2007 U.S. App. LEXIS 19828 (11th Cir. August 21, 2007)...................................................11

Johnson v. Banc One Acceptance Corp.,
  278 F. Supp. 2d 450 (E.D. Pa. 2003)....................................................................................2, 5

Lopez v. World Savings & Loan Association,
  105 Cal. App. 4th 729 (2003) .....................................................................................9, 10, 11

Ocwen Loan Servicing,
  491 F.3d 638 (7th Cir. 2007) .................................................................................................10

Rose v. Chase Bank USA, N.A.,
  2008 U.S. App. LEXIS 1240 (January 23, 2008, 9th Cir.).......................................................8

Rosenberg v. Washington Mutual Bank,
  396 N.J. Super. 456 (2004)...............................................................................9, 10, 12, 13, 14

Silvas v. ETrade Mortg. Corp.,
  2008 U.S. App. LEXIS 1944 (9th Cir. January 30, 2008)...........................7, 8, 10, 11, 12, 13

Silvas v. ETrade Mortgage Corporation,
  421 F. Supp. 2d 1315 (S.D. Cal. 2006)...............................................................................9, 12

Wisconsin League of Financial Institutions, Ltd. v. Galecki,
  707 F. Supp 401 (1989) .........................................................................................................10

Wuxi Multimedia, Ltd. v. Koninklijke Phillips Electrics, N.V.,
  2006 U.S. Dist. LEXIS 9160 (D. Cal. 2006) .........................................................................11

## STATUTES

**California Business and Professions Code**
§ 17200................................................................................................................................ Passim

**Code of Federal Regulations**:

12 C.F.R. §226.17 ........................................................................................................................7

12 C.F.R. §226.17(c)........................................................................................................2, 3, 5, 6, 7

12 C.F.R. §226.17-18....................................................................................................................8

12 C.F.R. §226.19 ...............................................................................................................7

12 C.F.R. §226.19(b) ....................................................................................................5, 6, 7

12 C.F.R. §226.23 n48 ...................................................................................................8, 13

12 C.F.R. §560.2 ...............................................................................................................11

12 C.F.R. §560.2(b) ..........................................................................................................12

12 C.F.R. §560.2(b)(9)........................................................................................9, 10, 11, 12

12 C.F.R. §560.2(c)............................................................................................................13

12 U.S.C. Section 1461, et seq..........................................................................................2

**MISCELLANEOUS**

Home Owners' Loan Act of 1933, 48 Stat. 129 ................................................................2

Regulation Z, 12 C.F.R. Section 226 ("Reg. Z") .........................................................2, 15

Truth in Lending Act, 15 U.S.C. Section 1601 et seq .......................................................2

# I. INTRODUCTION

The Opposition by Plaintiffs Dolores Mandrigues ("Mandrigues"), Juanita Jones ("Jones"), Al F. Minyen and Wilma R. Minyen ("the Minyens") and Mark and Christina Clauson ("the Clausons") (collectively, "Plaintiffs") to the Motion to Dismiss of Defendants World Savings Bank FSB ("World"), World Savings, Inc. ("WSI"), Wachovia Mortgage Corporation ("WMC") demonstrates that Plaintiffs' Corrected Second Amended Complaint ("CSAC") is based entirely on erroneous interpretations of the Truth in Lending Act, 15 U.S.C. Section 1601 *et seq.* ("TILA"), its implementing Regulation Z, 12 C.F.R. Section 226 ("Reg. Z") and the Federal Reserve Board of Governors' Official Staff Commentary (the "Commentary") as well as impermissible and fatally flawed efforts to invoke various state law theories to attack loan disclosures that comply with TILA.

Specifically, Plaintiffs' CSAC and Opposition are based on the following *incorrect* assertions of the law under TILA:

- TILA requires that any payment schedule provided to a borrower must show individual monthly payments calculated at a level that would fully amortize principal and interest - even when such payments are not what the borrower is legally obligated to pay [Opp. 6:10-19];

- TILA requires lenders to identify the likelihood, and specific point(s) in time, that borrowers will actually experience "negative amortization," rather than inform them of how it can occur and what it means [Opp. 9:14-18]; and

- TILA defines the amount of a borrower's "legal obligation" to make a monthly payment as being based upon the amount of interest that accrues on a loan in a given month rather than upon the specific dollar amount that the borrower's promissory note states must be paid each month [Opp. 10:16-24].

Plaintiffs also assert – again erroneously – that the Home Owners' Loan Act of 1933, 48 Stat. 129, as amended, 12 U.S.C. Section 1461, *et seq.* ("HOLA") does not preempt state laws and tort claims when they are *specifically being used* to challenge the adequacy of a federally chartered bank's disclosures concerning the terms of a loan that it makes – even when the disclosures challenged comply fully with TILA. See Opp. 21:22-22:19.

Each of these assertions is unfounded. The promissory notes and Truth-In-Lending Disclosures ("TILDs") that are attached to the CSAC establish, as a matter of law, that Plaintiffs' loans complied with TILA. The CSAC should be dismissed – with prejudice.

## II.   LEGAL ARGUMENT

**A.   Plaintiffs Misinterpret the Requirements of TILA, Reg. Z and the Commentary**

Plaintiffs' Opposition underscores the fact that Plaintiffs' CSAC relies on gross misunderstandings and/or misinterpretations of TILA's requirements. These legal defects are displayed on the face of the CSAC.

**1.   TILA and Reg. Z Require That Lenders Give Borrowers a Loan Payment Schedule Based On Their <u>Actual</u> Contractual Obligations <u>at the Time They Execute Their Note</u>, and Plaintiffs' TILDs All Complied With That Rule**

Plaintiffs concede that the payment schedules that World provided to each of them[1] in their final TILDs were "*true* (e.g., they *are* the payment obligations Plaintiffs were required to make) …." Opp. 14:4-7 (emphasis added). This concession is fatal to Plaintiffs' claims because the overarching requirement of TILA is that "[t]he disclosures *shall reflect* the credit terms to which the parties are legally bound *as of the outset of the transaction*." 12 C.F.R. §226.17(c) (emphasis added). Plaintiffs' agree that World's TILDs did precisely that. Their candid admission should end the Court's analysis.

The case law conclusively holds that a lender is required to provide a TILD with a payment schedule that shows the borrower their actual legal obligation – without assuming anything more. See <u>Johnson v. Banc One Acceptance Corp.</u>, 278 F. Supp. 2d 450, 456 (E.D. Pa. 2003). In examining the adequacy of a payment schedule, the key inquiry is thus whether it outlines the number and amount of payments necessary to retire the loan over its term based on the obligations set forth in the promissory note. <u>Id</u>. In light of these rules, it is hard to understand why, much less how, Plaintiffs maintain that World's payment schedules, which they admit accomplished what TILA requires, nonetheless violated TILA. Plaintiffs ignore this fundamental problem with their

---

[1] As the loan documents attached to the CSAC establish, and as Plaintiffs concede by failing to address the subject in their Opposition, that there is simply no relationship or connection of any kind – derivative or otherwise – between any of the Plaintiffs and either WSI, a sister entity of World that does not make loans, control World or interact with borrowers, or WMC, another, even more distant, affiliate of World – which again does not interact with World and does not even make "Option ARM" loans. Thus, WSI and WMC have no business being kept as defendants in the instant lawsuit.

position, however, and simply bull forward to posit that there is yet another requirement that they (and they alone) divine from TILA, which they contend consists of obligation(s) to: (1) describe for a borrower something other than their legal obligation - including a precise amount of payment that will avoid "negative amortization;" and (2) place in a TILD a specific description of the change in the principal balance of their loan after each payment that the borrower makes.   Plaintiffs try to support these non-existent rules in several ways, but there is simply no authority for them.  In fact, as World pointed out in its moving papers, the "rules" that Plaintiffs propose conflict squarely with the requirement in 12 C.F.R. §226.17(c) that a TILD "shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction [,] [which] normally is presumed to be contained in the note," and would generate confusion, not explanation, over those terms.

One way in which Plaintiffs attempt to harmonize the existing limited requirements of TILA with Plaintiffs' argument for including in a TILD the significant amount of additional financial calculations that would be necessary to comply with their "rule" is by arguing that a "legal obligation" is different than a "payment obligation," apparently believing that the difference lies in the monthly accrual of interest on a loan's principal balance.  See Opp. at 10:27-28.  Plaintiffs theorize that a TILD therefore must describe how much interest accrues each month on a loan balance and how much a borrower would have to pay in order to both retire that month's accrual and a pro rata portion of the principal balance.

This is simply wrong.  First, "the credit terms to which the parties [were] legally bound as of the outset of the transactions" here were that Plaintiffs would make the dollar amount of the payments stated in their Notes.  Those dollar amounts are reflected in their TILDs.  Second, the entirety of the TILDs payment schedules describe, in dollar terms, Plaintiffs' "legal obligations" to repay principal sums, *over the terms of the loans,* at the contract rates of interest and using as the starting point the dollar amount of payments stated in their Notes.

Plaintiffs argue that World "did not disclose payment amounts sufficient to pay both 'Principal and interest,' every month." Opp. at 7:11-12. Using Mandrigues as an example, Plaintiffs contend that World's payment schedule for Mandrigues' loan *should* have evidenced a required initial monthly payment of $1,099.29. Opp. 6:10-15; SAC ¶32.  But Plaintiffs necessarily concede

that Mandrigues' Note only required her to make monthly payments of $628.36. Id. *I.e.*, "the credit terms to which the parties were legally bound as of the outset of the transaction [as] contained in the [Mandrigues] note" set Mandrigues' "legal obligation" as making monthly payments of $628.36. Thus, using the payment schedule that Plaintiffs insist Mandrigues should have received in her TILD would have violated TILA and would have misled her into believing that the Note required her to pay substantially more than what she was "legally bound" to pay.[2]

In sum, Plaintiffs argue for what a TILDs schedule *should* reflect, which is different than what TILA says it *must* reflect. But that point is a legislative matter, not one for the judiciary.

### 2. TILA Does Not Require a Correlation Between An Individual Monthly Payment Amount And The Contract Rate Of Interest

Plaintiffs also assert that the Notes at issue violated TILA because World based the initial payments in the TILDs schedules on "an undisclosed interest rate of approximately 2%." Opp. 6:15-17.

First, the plain language of the Notes states that Plaintiffs' initial payment was an amount chosen by Plaintiffs themselves. See SAC, Ex. 1, 00002 at 3(B); Ex. 2, 00003 at 3(B); Ex. 3, 00002 at 3(B), Ex. 4, 00002 at 3(B). Thus, Plaintiffs' payment schedules were based on the initial payment amount for which Plaintiffs negotiated, not some undisclosed interest rate. Second, nothing in TILA (or any other law governing a federal savings bank) precludes a borrower and bank from agreeing on a loan payment amount that is derived from some source other than the contract rate of interest (which, of course, accrues on unpaid principal over time). World and Plaintiffs could have agreed, for example, that Plaintiffs would pay just $1 each month for the first five years of their loans. World would then be obligated to disclose a payment schedule showing a payment of $1 per month for the first five years and adjusted thereafter per the terms of the Notes.

World fully disclosed that Plaintiffs would incur interest at their "Note Rates" even though Plaintiffs contracted for the right to make payments that, at the outset of their loans, were

---

[2] Mandrigues was of course free to *voluntarily* pay a fully amortized amount (and that option of course was within the design of the "Pick-A-Pay" loan program), but in no way was she "legally obligated" to pay it.

1  insufficient to repay all interest accrued during a monthly cycle. World also disclosed that the

2  payment amount selected by the borrowers might result in a payment level insufficient to pay all

3  interest accrued in a given month, which would cause negative amortization.3 World's TILDs then

4  described how, over the life of the loans, each Plaintiff's payments would develop in order to pay off

5  the *total* principal and interest over the life of the loan. That satisfied TILA. See Johnson, 278 F.

6  Supp. 2d at 456.

7  World would have violated TILA by employing the type of payment schedule that

8  Plaintiffs advocate because such a schedule would not have been based on the Note Rate or the legal

9  obligations of the parties. A lender cannot describe a payment schedule that does not match the

10  borrower's Note. Thus, the "seller buydown" example from the Commentary to 226.17(c)(1) that

11  Plaintiffs discuss at page 7 of the Opposition is a red herring. Plaintiffs attempt to rely on it to

12  support an argument that a payment schedule must reflect fully amortized payments rather than

13  contractually established payment amounts, but ignore the actual text of the statute the Commentary

14  was drafted to clarify. It states, "The disclosures shall reflect the terms of the legal obligation

15  **between the parties**." 12 C.F.R. 226.17(c)(1) (emphasis added). The Board drafted the example of

16  a seller buydown to confirm that agreements with *third parties,* even if they will have an actual

17  effect on the amount a borrower pays each month, must not be reflected in a TILD payment

18  schedule. This rule is logical because in the event the third party (in this example, the seller) fails to

19  perform on its promise to buy down the rate each month for the borrower, the borrower is still

20  *legally obligated* to satisfy the full payment obligation. Indeed, the cited Commentary and example

21  supports World's position, not Plaintiffs' argument, because the Commentary makes clear that the

22  effect of forces external to the contract or future events – even if they are known and certain to

23  impact the payments a borrower will have to make – may *never* be reflected in a TILD.

24

25  [3] This is all that TILA requires when a borrower has "an option to cap monthly payments" such as by way of selecting a minimum monthly payment that is less than a fully amortized amount. *See* FRB Official Staff Commentary to 12 C.F.R.
26  226.19(b) (April 3, 1995), pp. 10, 21. (NOTE: Plaintiffs mis-cite this same Commentary, which is specifically directed only to payment "caps" that can be invoked *at the borrower's option*, in trying - erroneously - to support an argument
27  they make relative to negative amortization as an "effect" of *contractually set limitations*, or "caps," on payment changes.)

28

**3. TILA Does Not Require Lenders To Disclose The Likelihood That, Much Less the Timing and Amount By Which, Negative Amortization Will Occur**

Plaintiffs also misinterpret TILA when they argue that lenders must disclose the likelihood (or certainty) that a borrower will experience negative amortization. Opp. 8:15-21.[4] Plaintiffs rely entirely on the Commentary to 12 C.F.R. 226.19(b) to support their position. Ironically, the language in the Commentary confirms that lenders need only disclose the "**rules** relating to the payment cap option" and the "**effects** of exercising it (such as negative amortization occurs and the principal balance will increase)…" Opp. 8:17-21, citing, Commentary to 12 C.F.R. 226.19(b) (emph. added). Thus, the Commentary confirms that a lender need only disclose the *rules* and *effects* of negative amortization. It need not set forth an assertion that it will occur.[5]

As Plaintiffs necessarily concede, World provided these precise disclosures. Specifically, World's Note stated, "From time to time my monthly payments may be insufficient to pay the total amount of the monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called deferred interest, **will be added** to my principal and **will incur interest** at the same rate as the principal." Opp. 9:1-5, citing, SAC ¶ 84, Ex 1-4, ¶ 3(D) (emph. added). The foregoing language thus describes the rules regarding when negative amortization will occur as well as its effect. Therefore, World fully disclosed all information that TILA requires regarding negative amortization, and Plaintiffs' claims to the contrary fail.

**4. World's Disclosures Reflect The "Effect" Of The Note's Payment Cap**

As noted above, Plaintiffs' misunderstanding of TILA continues in their argument that World "failed" to disclose the "effect the payment cap would have on the loan." Opp. 11:8-9; SAC ¶ 97. In support of this theory, Plaintiffs rely on the Commentary to 12 C.F.R. 226.17(c)(1):

---

[4] Predictably, Plaintiffs cite no caselaw to support their position. Andrews v. Chevy Chase Bank, FSB, 240 F.R.D. 612 (D. Wisc. 2007), is dispositive on this issue. There, as is alleged here, plaintiffs were certain to experience negative amortization if they elected to make only the minimum payments required at the outset of their loans. The lender disclosed the rules and effects of negative amortization, but did not state that it was certain to occur. The District Court found that the lender's disclosures regarding negative amortization satisfied TILA requirements as a matter of law. Id. at 620.

[5] Option ARMs are in any event not *certain* to experience negative amortization. In a declining rate environment, as is present today, even minimum scheduled payments could become sufficient to pay monthly accrued interest.

"[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment at the time of the first adjustment from changing *to the rate determined by the index or formula at consummation*, the effect of that rate or payment cap should be **reflected** in the disclosures."[6] (italics and emphasis added). As the bolded language makes clear, TILA requires that the lender provide disclosures that *reflect* the effect of a payment cap, but does not require that lenders *describe in detail the ramifications of* that effect. World satisfied TILA's requirements by employing a payment schedule that increased Plaintiffs' minimum required payment no more than 7.5%[7] at each Payment Change Date for the first ten years of Plaintiffs' loans.

In sum, Plaintiffs contend that TILA obligated World to provide a separate *description* of the effect of the Payment Change limitations in the Notes rather than provide disclosures that *reflected* those limitations. To do what Plaintiffs' demand, however, would again go beyond TILA's requirements by creating either a fictitious payment schedule that would show payment adjustments that were not called for in the Note or some sort of separate supplemental schedule showing the accumulation of negative amortization under certain assumptions about the borrowers' future choices over what payments to make. Neither of these is required by TILA. Again, Plaintiffs' claims are directed at what they *want* TILA to require, not what it *actually does* require.

**B.  HOLA Preempts Plaintiffs' Second, Third, Fourth and Fifth Claims for Relief Because They Would Apply State Law To Challenge The Adequacy Of Loan Disclosures**

In <u>Silvas v. E*Trade Mortg. Corp.</u>, 2008 U.S. App. LEXIS 1944 (9th Cir. January 30, 2008), the Ninth Circuit found that HOLA preempted claims for relief under California Business and Professions Code § 17200 ("UCL") because plaintiffs sought to employ the UCL to challenge the

---

[6] The type of "payment cap" addressed in 12 C.F.R. 226.17(c)(1) is distinct from the cap referenced in 12 C.F.R. 226.19(b). Section 226.19 addresses programs that give the *borrower* an option to cap monthly payments by agreement at the outset of the loan. <u>See</u> Commentary to 12 C.F.R. 226.19(b) ("For the program gives the borrower an option to cap monthly payments…"). Section 226.17, on the other hand, involves payment caps contractually limiting the amount a lender may increase the borrower's payments on any given payment change date. While use of the common term "cap" is misleading, the comments address entirely different issues. Plaintiffs erroneously attempt to lump them together.

[7] The Payment Change maximum set forth in the Plaintiffs' Notes, which was applicable at all Payment Change Dates other than the 10th Payment Change Date (all of which is reflected in Plaintiffs' TILDs).

adequacy of a federal savings bank's loan disclosures.  See also Rose v. Chase Bank USA, N.A., 2008 U.S. App. LEXIS 1240 (January 23, 2008, 9th Cir.) (National Bank Act preempts UCL as applied because plaintiffs sought to employ the "unfair" and "fraudulent" prong of UCL to supplement the National Bank Act's necessarily exclusive regulations).

In Silvas, like the present case, plaintiffs alleged defendants' "practice of misrepresenting consumers' legal rights in advertisement and other documents [was] contrary to the policy of California and thus violate[d] UCL § 17200." Silvas, 2008 U.S. App. LEXIS 1944 at *11. After noting that no presumption against preemption exists in the HOLA context and that the Office of Thrift Supervision Regulation occupies the entire field of lending regulation for federal savings associations, the Court found that HOLA preempted the UCL as plaintiffs sought to apply it.  Id. at *11-12.  Specifically, the Court held that plaintiffs' Section 17200 claim "fits within § 560.2(b)(9) because **the alleged misrepresentation is contained in advertising and disclosure documents**." Id. at *11 (emph. added).  "Therefore, the preemption analysis ends." Id.

In the present case, Plaintiffs' state law claims for relief are based on World's alleged failure to disclose "material facts" in its TILA disclosures.  See, e.g., Opp. 22:16-19; SAC ¶ 91. TILA outlines what information a lender must disclose and what constitutes a material fact for the purposes of mortgage disclosures.  See, e.g., 12 C.F.R. 226.23 n48; 12 C.F.R. 226.17-18.  As Silvas makes clear, Plaintiffs may not use a state law to supplement TILA's definition of what constitutes a "material fact." Silvas, 2008 U.S. App. LEXIS 1944 at *11.  Nor may Plaintiffs employ a state law (even one of general application) to expand TILA's prescription of what information a lender must disclose when extending credit secured by real property.  Id.  Here, Plaintiffs are attempting to use state law claims to attack World's loan disclosures.  Those claims should be dismissed.

Plaintiffs seek to avoid Silvas' mandate of preemption in two ways.  First, they contend that Silvas is inapplicable because that case, unlike the case at bar, involved advertising and "marketing disclosures." Opp. 22:5.  Second, Plaintiffs rely on their boilerplate statement that their "claims are based on the 'generally applicable duty of any contracting party to disclose important material facts, and on the duty to refrain from unfair and deceptive business practices.'" Opp. 22:17-19.  As outlined below, Plaintiffs' contentions are meritless and cannot save their state law claims

for relief from preemption.

### 1. HOLA Preempts State Laws Used to Attack The Adequacy of A Federal Savings Bank's Mortgage Disclosures

Plaintiffs appear to argue that 12 C.F.R. 560.2(b)(9) only preempts state laws that, as applied, attempt to regulate advertising *and* disclosures. Opp. 1:24-25, 22:5-7. This interpretation ignores the plain language of the statute and volumes of case-law dictating that HOLA preempts any state law that, as applied, attempts to regulate a federally chartered bank's disclosures.

Section 560.2(b)(9), states that HOLA preempts state-laws which attempt to regulate:

> Disclosures and advertising, including laws requiring specific statements, information or other content be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants

The examples Section 560.2(b)(9) lists demonstrate Plaintiffs' interpretation of the scope of that provision is incorrect. Laws which, as applied, attempt to regulate credit application forms, credit contracts and billing statements are wholly unrelated to a bank's advertisements, but are specifically preempted.

Case-law confirms that any attempt to use a state law to regulate the disclosures of a federally chartered bank must fail. In <u>Rosenberg v. Washington Mutual Bank</u>, 396 N.J. Super. 456, 458 (2004), the Court found that HOLA preempted plaintiffs' common law claims for breach of contract and consumer fraud because the "focus of plaintiffs' claims, *i.e.*, [defendant's] billing disclosures, has been expressly preempted." Rejecting plaintiffs' attempt to analogize to <u>Gibson v. World Savings & Loan Assn.</u>, 103 Cal. App. 4th 1291 (2002)[8], the Court went on to state that "plaintiffs' state law claims clearly fall within 12 C.F.R. § 560.2(b)(9) as they assert that [defendant's] billing statements fail to convey, *i.e.*, disclose, to the debtor that the 'total amount due'

---

[8] Plaintiffs' attempt here to analogize to <u>Gibson</u> similarly fails. Since Gibson was decided in 2002, numerous courts have distinguished it and limited it to the facts present there. See <u>Rosenberg</u>, 396 N.J. Super. at 458; <u>Silvas v. E*Trade Mortgage Corporation</u>, 421 F. Supp. 2d 1315 (S.D. Cal. 2006), <u>Lopez v. World Savings & Loan Assn.</u>, 105 Cal. App. 4th 729, 742 (2003). <u>Gibson</u> dealt with alleged improper servicing of a loan and the plaintiffs there did not seek to challenge the adequacy of the bank's disclosures. Thus, the Court found that 12 C.F.R. 560.2(b)(9) did not apply. Here, Plaintiffs exclusively challenge World's TILA disclosures. Therefore, the court's reasoning in <u>Gibson</u> is not on point.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

figure is something other than what one normally would think of as a 'total amount due.' By way of either injunctive relief or monetary damages, plaintiffs seek to insert a form of state regulation by compelling a different type of billing statement disclosure." Rosenberg, 396 N.J. Super. at 464.[9]

The present case is analogous to Silvas and Rosenberg. Here, as in those cases, Plaintiffs attack World's disclosures and seek to impose liability on World for "failing" to disclose "adequately" certain components of World's loan agreements. Specifically, Plaintiffs contend that World's TILDs and Notes fail to convey sufficient information regarding negative amortization and the cost of credit. See, e.g., SAC ¶ 91. As the Court in Rosenberg noted, courts are to examine the gravamen of a claim for relief to see whether the state law, *as applied*, seeks to regulate conduct outlined in 12 C.F.R. 560.2(b)(9). Here, as in Rosenberg and Silvas, Plaintiffs attempt to use the UCL and state common laws to regulate a federally chartered bank's disclosures. Thus, no further analysis is necessary; Plaintiffs' state law claims are preempted. Silvas, 2008 U.S. App. Lexis 1944 at *11-12.

### 2.     Plaintiffs Seek To Use State Laws To Regulate World's Mortgage Disclosures

Recognizing that their state law claims for relief attack the adequacy of World's Note and TILDs, Plaintiffs seek to side-step preemption with a self-serving legal conclusion, stating, "Plaintiffs' claims are based on the 'generally applicable duty of any contracting party to disclose important material facts, and on the duty to refrain from unfair and deceptive business practices.'" Opp. 22:17-19; SAC ¶ 108. As a preliminary matter, such boilerplate allegations and legal conclusions, especially when contradicted by Plaintiffs factual allegations, are insufficient to survive

---

[9] Numerous other decisions confirm that attempts to use state laws of "general applicability" to challenge the adequacy of a federally chartered bank's disclosures must fail. See Ocwen Loan Servicing, 491 F.3d 638, 643 (7th Cir. 2007), ("The Office of Thrift Supervision has exclusive authority to regulate the savings and loan industry in the sense of…establishing requirements for disclosure of credit information to customers"); Am. Bankers Ass'n v. Lockyer, 239 F. Supp. 2d 1000, 1011 (2002) (holding that HOLA preempted state law attempting to govern disclosures of a federally chartered bank); Lopez, 105 Cal. App. 4th at 742 (distinguishing Gibson and holding that HOLA preempted plaintiff's Cal. Bus. & Prof. §17200 claim and stating a court performing preemption analysis "need not determine the full breadth of the term 'operations of a federal Association' because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures") citing, Wisconsin League of Financial Institutions, Ltd. v. Galecki, 707 F. Supp 401 (1989).

a motion to dismiss. <u>Wuxi Multimedia, Ltd. v. Koninklijke Phillips Elecs., N.V.</u>, 2006 U.S. Dist. Lexis 9160, 26-27 (D. Cal. 2006); <u>Griffin Indus. v. Irvin</u>, 2007 U.S. App. LEXIS 19828 (11th Cir. August 21, 2007). As outlined above, Plaintiffs' statement is contradicted by every factual allegation used to support their state law claims for relief. <u>See, e.g.</u>, SAC ¶ 91.

Moreover, Plaintiffs self-invented "affirmative action" rule is devoid of any legal support. Plaintiffs contend that "when plaintiffs rely on laws of general application, their claims are preempted if the state laws, as applied to the federal savings and loans, require *affirmative action* by the federal savings and loan association or other behavior *specific* to savings and loans activity." Opp. 21:7-9. The proper inquiry when analyzing HOLA preemption of a state law cause of action is first to ask whether the law, as applied, seeks to *regulate* the bank's lending activities in any of the categories outlined in 12 C.F.R. 560.2(b). <u>Silvas</u>, 2008 U.S. App. Lexis 1944 at *11; <u>see also</u> <u>Lopez</u>, 105 Cal. App. 4th at 742. If the answer is "yes," the inquiry ends there- the law is preempted. Whether the state law, as applied, would require affirmative action, forbearance or any other behavior by the federally chartered bank is irrelevant. Here, Plaintiffs' state law claims for relief challenge the adequacy of World's mortgage disclosures. Therefore, HOLA preempts them.[10]

Even under Plaintiffs' flawed reading of Section 560.2, their state law claims for relief would still be preempted. In their state law claims for relief, Plaintiffs contend that World is required to: 1) disclose that negative amortization is a certainty; 2) describe the effect of the payment cap preventing Plaintiffs' required monthly payment from rising greater than 7.5%; 3) specifically disclose that by "pay[ing] Principal and Interest by making payments every month" a borrower may not necessarily have each individual monthly payment credited to both principal and interest; and; 4) provide Plaintiffs a payment schedule showing an amount necessary to pay all interest accrued on the Note during each payment period rather than the amount Plaintiffs are legally obligated to pay. All of these allegations seek to require World to alter the disclosures that World provides borrowers.

---

[10] Arguing that they do not seek "affirmative action" is disingenuous when Plaintiffs demand damages and injunctive relief for a "failure" to make affirmative disclosures that they contend were required in order to comply with state laws.

Therefore, Plaintiffs' state law claims for relief would not survive the "incidental affect" analysis under 12 C.F.R. § 560.2(c). Like the court in <u>Silvas</u> rejected plaintiffs' argument that their claims for relief were grounded in "California contract, commercial and tort law" because plaintiffs' causes of action had more than an incidental effect on lending, this Court should recognize Plaintiffs' state law claims for what they are – an improper attempt to regulate disclosures of a federally chartered bank. <u>Id.</u> Indeed, if Plaintiffs prevailed on their state law claims for relief, World would be forced to change the content and format of its lending disclosures. Plaintiffs may not employ monetary damages claims or injunctive relief in order to bring about such changes, especially when they seek to impose requirements inconsistent with those outlined in TILA. <u>Rosenberg</u>, 396 N.J. Super. at 464. Therefore, Plaintiffs' state law claims for relief are preempted under both Section 560.2(b) and (c) analysis.

### a. Plaintiffs' "Fraudulent Omission" Claim Seeks Specifically To Regulate World's Mortgage Disclosures

Plaintiffs base their fraudulent omission claim for relief on World's alleged failure to disclose the following three "facts": "(i) the actual interest rate on which the payment amounts listed in the TILDs are based (12 C.F.R. § 226.17(c)); (ii) that making the payments according to the payment schedule listed in the TILDs will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the payment amounts listed on the TILDs are insufficient to pay both principle and interest." SAC ¶91. Plaintiffs argue that "TILA imposed a duty on Defendants to make certain disclosures to Plaintiffs and Class members." Opp: 14:22-26. Despite thus grounding any duty to disclose in TILA, Plaintiffs seek to use state common law remedies (including punitive damages) for "failing" to make certain loan disclosures far beyond than those authorized under TILA.[11] Given these facts, <u>Silvas</u> is dispositive. As <u>Silvas</u> held, a plaintiff may not use a state law cause of action to supplement the necessarily exclusive remedies authorized by TILA. <u>Silvas</u>, 2008 U.S. App. Lexis 1944 at *12, n. 3. Nor may a state law supplement TILA's

---

[11] It is no surprise that Plaintiffs seek to rely on state law because, as outlined in World's Motion To Dismiss, most of Plaintiffs' TILA claims are barred by TILA's one-year statue of limitations. Plaintiffs may not side-step TILA's statute of limitations, however, by using a state law cause of action to resurrect a barred claim. <u>Silvas</u>, 421 F. Supp. 2d at 1319.

requirements regarding mortgage loan disclosures. Rosenberg, 396 N.J. Super. at 464.

The closest Plaintiffs come to applying the preemption analysis mandated by the Office of Thrift Supervision ("OTS") and related case-law is in the self-serving statement, "Here Plaintiffs claims are based on the 'generally applicable duty of any contracting party to disclose important material facts, and on the duty to refrain from unfair and deceptive business practices.'" Opp. 22:16-19. However, even this statement belies Plaintiffs' position. Plaintiffs concede that each of their state law claims, including that for fraudulent omissions, are based on the duty to disclose "material facts." Pursuant to HOLA, however, the OTS has the exclusive authority to determine what constitute "material facts" for the purposes of mortgage disclosures provided by federally chartered banks. See 12 C.F.R. 226.23 n48; see also 226.17, *et seq*. As outlined above, the "facts" World allegedly concealed are not considered material by the OTS. Plaintiffs may not use state law to supplement the OTS' unambiguous definition of what constitute material terms that a lender must disclose or to prescribe additional remedies for failing to disclose such facts. Therefore, HOLA preempts Plaintiffs' claim for relief for fraudulent omissions.

### b.  HOLA Preempts Plaintiffs' UCL Claim for Relief Because It Too Is Based Entirely On World's Alleged TILA Violations

All of Plaintiffs' UCL allegations (including all three purported "prongs" of the UCL), are directly related to World's allegedly inadequate disclosures and loan-related fees. CSAC ¶¶ 109-117. As outlined above, use of a state law to challenge the adequacy of a federal savings bank's disclosures must fail as a matter of law. Silvas, 2008 U.S. App. Lexis 1944 at *11, Rosenberg, 396 N.J. Super. at 464. Plaintiffs are unable to point to a single factual allegation to support of their UCL claim that is not governed by TILA. Indeed, Plaintiffs offer no rebuttal to World's detailed analysis demonstrating how each of Plaintiffs' UCL allegations is merely a restatement of Plaintiffs' TILA claims. See MPA In Support Of Motion To Dismiss 19:6-15. No further analysis is necessary; Plaintiffs' UCL claim is preempted. Id. Moreover, as outlined above, even applying Section 560.2(c)'s" incidental effect" analysis, Plaintiffs' UCL claim is preempted because it would require World to completely change the content and format of their disclosures.

      **c.    HOLA Preempts Plaintiffs' Breach Of The Implied Covenant Claim Because It Is Based On The Preempted Claim of "Fraudulent Omission"**

Plaintiffs argue that they have alleged that World violated "the legal duty owed to Plaintiffs to disclose important material facts relating to the ARM loans, e.g., fraudulent omissions discussed above in § III (D)." Opp. 19:17-18. Plaintiffs thus concede that their claim for breach of the implied covenant rises or falls with their claim of fraudulent omission. Accordingly, this claim should be dismissed for the reasons set forth above regarding Plaintiffs' fraudulent omission claim.

      **d.    HOLA Preempts Plaintiffs' Breach of Contract Claim for Relief Because It Is Merely An Attack On World's Disclosures**

Plaintiffs' Opposition fails to identify how their breach of contract claim for relief is anything more than an assertion that World did not provide sufficient disclosures about negative amortization in its Notes. The CSAC alleges that World breached the Note because it charged "more interest than was included in the payments listed in the TILDS." CSAC ¶ 137. Nonsensical as the allegation is (because the TILD states the correct total amount of interest to be paid over the life of the loan and because Plaintiffs' also complain that World did not collect *enough* interest each month from Plaintiffs, causing them to incur negative amortization), the gravamen of Plaintiffs' breach of contract claim is the same as their TILA claim - that World" failed" to adequately disclose the loans potential to negatively amortize and the Note's rate. See Rosenberg, 396 N.J. Super. at 464 (finding that plaintiffs' breach of contract cause of action was preempted because it was a thinly veiled attempt to attack a federally chartered bank's disclosures). All loan disclosure matters are governed exclusively by the OTS. Id. Plaintiffs should therefore not be permitted to pursue a breach of contract claim when it is a thinly veiled attempt to obtain relief for conduct exclusively governed by the OTS.

**C.    Plaintiffs Have Not Alleged, And Cannot Allege, Valid Claims Against WSI Or WMC**

Plaintiffs cannot and do not offer any allegation that they had any interaction with WSI or WMC, let alone that WSI or WMC committed any malfeasance. The documents Plaintiffs attach to their CSAC confirm that Plaintiffs' relationships were with World, not WSI or WMC.

Because WSI and WMC were not "creditors" they cannot be liable to Plaintiffs under TILA. See 12 C.F.R. §226. Because WSI and WMC did not enter into any contract with Plaintiffs, they cannot be liable for breach of contract or breach of the implied contractual covenant of good faith and fair dealing. Finally, because neither WSI nor WMC made any statements to Plaintiffs, and because Plaintiffs' claims for fraudulent omission and UCL violations are based on World's loan disclosures and documentation, Plaintiffs cannot maintain those claims against WSI or WMC.

Plaintiffs' CSAC should be dismissed with prejudice as to WSI and WMC.

### III.   CONCLUSION

Plaintiffs' CSAC should be dismissed, with prejudice.

DATED: February 15, 2008

REED SMITH LLP

By   /s/ Keith D. Yandell
    Jack R. Nelson (SBN 111863)
    David S. Reidy (SBN 225904)
    Keith D. Yandell (SBN 233146)
    Attorneys for Defendants