1  David M. Arbogast - State Bar No. 167571
   darbogast@law111.com
2  Jeffrey K. Berns - State Bar No. 131351
   jberns@law111.com
3  **ARBOGAST & BERNS LLP**
   19510 Ventura Boulevard, Suite 200
4  Tarzana, California 91356
   Phone: (818) 961-2000; Fax: (818) 867-4820
5
   Paul R. Kiesel, Esq. (SBN 119854)
6  kiesel@kbla.com
   Patrick DeBlase, Esq. (SBN 167138)
7  deblase@kbla.com
   Michael C. Eyerly, Esq. (SBN 178693)
8  eyerly@kbla.com
   **KIESEL BOUCHER LARSON LLP**
9  8648 Wilshire Boulevard
   Beverly Hills, California 90211
10 Phone:  (310) 854-4444; Fax:  (310) 854-0812

11 [*Additional counsel listed on signature page*]
   Attorneys for Plaintiff and all others Similarly Situated
12

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R. MINYEN, MARK CLAUSON and CHRISTINA CLAUSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1 through 10 inclusive,<br><br>Defendants. | **CASE NO. C-07-04497 - JF (RSx)**<br><br>[*Assigned to the Hon. Jeremy Fogel*]<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF DAVID M. ARBOGAST IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**<br><br>Hearing Date: June 18, 2008<br>Time:           9:30 a.m.<br>Place:          Courtroom 4<br>Judge:         Hon. Richard Seeborg<br><br>Complaint Filed: August 30, 2007<br>Trial Date: Not set yet. |

Declaration of David M. Arbogast I.S.O Reply- C-O7-04497- JF (RSx)

1  I, David M. Arbogast, declare as follows:

2  1.  I am the attorney of record for Plaintiffs DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R. MINYEN, MARK CLAUSON and CHRISTINA CLAUSON in the above-entitled action.

2.  Exhibit 1, attached hereto is a true and correct copy of the Order Re: Discovery, Jordan v. Paul Financial, LLC, et al., U.S.D.C. (N.D. Cal. June 6, 2008) Case No. C 07-04496 SI;

3.  Exhibit 2, attached hereto is a true and correct copy of excerpts of the deposition of Jon Finley, Reyes v. Downey Savings and Loan Assn, F.A., et al. U.S.D.C. (C.D. Cal. April 30, 2008) Case No. SACV07-0615 AG (CTx);

4.  Exhibit 3, attached hereto is a true and correct copy of the Further Order Re Plaintiffs' Motion to Compel Discovery Responses, In re HP Inkjet Printer Litigation, U.S.D.C. (N.D. Cal. April 30, 2008) Case No. C 05-3580 JF (PVTx).

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on June 4, 2008.

                      */s/ David M. Arbogast*
                       David M. Arbogast

**Exhibit No. 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREGORY M. JORDAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PAUL FINANCIAL, LLC, et al.,

Defendants.

No. C 07-04496 SI

**ORDER RE: DISCOVERY**

Plaintiff Gregory Jordan has filed a letter brief asking the Court to compel defendant Paul Financial LLC to produce information and documents requested by plaintiff. Having considered the arguments of the parties and the papers submitted, the Court rules as follows.

Plaintiff's fifth interrogatory seeks the name and contact information of each putative class member to whom defendant sold an adjustable rate mortgage ("ARM") loan during the liability period. Defendant objects to the production of this information because the identities of the putative class members, as well as the information possessed by the class members, is not relevant to the question of class certification. Defendant also objects on the ground that the release of this information would violate the privacy rights of the putative class members. Without reaching the question of class members' privacy rights, the Court agrees with defendant that this discovery request will not assist plaintiff in meeting his burden of establishing that class certification is proper. Class certification raises structural questions about the nature of plaintiff's claim and the number of potential parties affected; information about individual class members will not help in this regard. To the extent plaintiff requires

information about the number of borrowers potentially affected by the practices about which plaintiff complains, the number of borrowers who received loan documents similar to the loan documents received by plaintiff, and the like, that information must be disclosed. But at this stage of the litigation, it simply is not necessary for defendant to produce the names and contact information of every putative class member. The Court therefore DENIES plaintiff's discovery request with regard to Interrogatory No. 5.

Next, plaintiff seeks the identity of all subsequent purchasers and assignees of ARM loans entered into between defendant and all putative class members. Plaintiff argues that this information is necessary because these third parties are potential defendants and because it may be necessary to contact them in order to preserve documents relevant to this litigation. Defendant objects, contending that this information is not relevant to class certification and is not necessary for the preservation of documents. Although the Court understands that the subsequent purchasers and assignees of the loans of every putative class member may well be liable under federal law if the class is certified, the Court does not find it necessary, at this time, for defendant to produce this information. The Court does not see how it would be relevant to the question of class certification. In addition, defendant has stated that all the relevant loan documents are in its possession and that it is preserving the information plaintiff needs. The Court therefore DENIES plaintiff's request without prejudice to reconsideration if it appears that (1) defendant does not have all the relevant loan documents in its possession or (2) that defendant will rely on the circumstances of the subsequent purchases or assignments of defendant's loans in its opposition to class certification.

Lastly, plaintiff seeks the following documents from defendant: five randomly-selected loan files for each subsequent purchaser or assignee of the loans at issue; a complete copy of each version of the loan documents defendant used during the liability period; and a copy of each of the loans defendant sold during the liability period. Defendant has agreed to provide a complete copy of each version of its loan documents during the relevant time period, as well as five redacted loan files for borrowers whose loans were assigned to Luminent Mortgage Capital, the entity that purchased plaintiff's own loan. The Court finds that this information is sufficient for purposes of class certification, because all plaintiff will need is a copy of each iteration of defendant's ARM loan documents. The Court does not see how

knowledge of which specific type of document was attached to loans that were later acquired by particular purchasers or assignees will be relevant to class certification. Accordingly, the Court DENIES this discovery request.

**IT IS SO ORDERED.**

Dated: June 2, 2008

_____
SUSAN ILLSTON
United States District Judge

**Exhibit No. 2**

```
              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
ALFREDO REYES, ANGELICA
REYES, CLARENCE SELLERS,
CHRISTINA SELLERS, on
behalf of themselves and
others similarly situated,
         Plaintiffs,
         vs.         Case No. SACV07-0615AG(CTx)
DOWNEY SAVINGS AND LOAN
ASSOCIATION, F.A.; DOWNEY
FINANCIAL CORPORATION; and
DOES 1 through 100,
inclusive,
         Defendants.


              DEPOSITION OF JON FINLEY
                  San Diego, California
                Wednesday, April 30, 2008


Reported By:
PATRICIA Y. SCHULER
RPR, CSR No. 11949
Job No. 87021
```

Page 1

```
1         UNITED STATES DISTRICT COURT
2         CENTRAL DISTRICT OF CALIFORNIA
3  ALFREDO REYES, ANGELICA
   REYES, CLARENCE SELLERS,
4  CHRISTINA SELLERS, on
   behalf of themselves and
5  others similarly situated,
6       Plaintiffs,
7       vs.   Case No. SACV07-0615AG(CTx)
8  DOWNEY SAVINGS AND LOAN
   ASSOCIATION, F.A.; DOWNEY
9  FINANCIAL CORPORATION; and
   DOES 1 through 100,
10 inclusive,
11      Defendants.
12 _____
13
14
15    Deposition of JON FINLEY, taken on behalf of the
16 Defendants at 402 West Broadway, Suite 500, San Diego,
17 California, beginning at 10:01 a.m. and ending at
18 12:03 p.m., on April 30, 2008, before PATRICIA Y.
19 SCHULER, Certified Shorthand Reporter No. 11949.
20
21
22
23
24
25
```

Page 2

```
1  APPEARANCES:
2  FOR PLAINTIFFS:
3     KIESEL BOUCHER LARSON
4     BY: MICHAEL C. EYERLY
5     8648 Wilshire Boulevard
6     Beverly Hills, California 90211
7     (310) 854-4444
8     - and -
9     ARBOGAST & BERNS LLP
10    BY: DAVID ARBOGAST
11    19510 Ventura Boulevard, Suite 200
12    Tarzana, California 91356
13    (818) 961-2000
14 FOR DEFENDANTS:
15    HODEL BRIGGS WINTER
16    BY: MICHAEL S. LEBOFF
17    8105 Irvine Center Drive, Suite 1400
18    Irvine, California 92618
19    (949) 450-4435
20 FOR THE WITNESS:
21    ALLEN MATKINS LECK GAMBLE & MALLORY LLP
22    By: MATTHEW J. MARINO
23    501 West Broadway, 15th Floor
24    San Diego, California 92101-3541
25    (619) 233-1155
```

Page 3

```
1                INDEX
2  WITNESS:              EXAMINATION
3  JON FINLEY
4     BY MR. LEBOFF           5
5     BY MR. EYERLY          26
6
7
8     PRIOR EXHIBITS REFERENCED
9         NO.   PAGE
10        2     5
11        15    15
12        10    32
```

Page 4

1 (Pages 1 to 4)

**Page 5**

1  San Diego, California, April 30, 2008
2     10:01 a.m. - 12:03 p.m.
3
4         JON FINLEY,
5  having been administered an oath, was examined and
6         testified as follows:
7
8         EXAMINATION
9  BY MR. LEBOFF:
10    Q.  Would you please state your full name and
11 spell it for the record, please.
12    A.  It's Jon Finley; J-o-n, F-i-n-l-e-y.
13    Q.  You understand the oath you just took is the
14 same oath you would take in a court of law.  You have
15 an obligation to answer my questions truthfully today?
16    A.  Yes.
17    Q.  Did you work at a company called Homefield
18 Financial in 2004?
19    A.  Yes.
20    Q.  I would like to just show you what was
21 marked previously as Exhibit 2.
22         MR. MARINO:  Mr. LeBoff, may I ask Exhibit 2
23 to what, this deposition or another deposition?
24         MR. LEBOFF:  It is Exhibit 2 to the
25 plaintiff's deposition, Christina Sellers, in this

**Page 6**

1  case.
2         MR. MARINO:  Thank you.
3  BY MR. LEBOFF:
4     Q.  Just before I ask you questions about that,
5  I just want to confirm you are represented by counsel,
6  Mr. Marino?
7     A.  Yes.
8     Q.  Have you ever seen document Exhibit 2
9  before?
10    A.  Yes.
11    Q.  At the bottom where it says, "Jon Finley" --
12
13    A.  Yes.
14    Q.  -- that is you?
15    A.  Yes.
16    Q.  See the name on top, "Christina Sellers"?
17    A.  I see it, yes.
18    Q.  Do you remember, did you do a loan for
19 Ms. Sellers?
20    A.  I did.
21    Q.  Do you remember that loan or those
22 borrowers?
23    A.  You know, we closed a lot of loans.  I don't
24 remember any of -- like, as far as like a detailed
25 recollection.  I do remember the name.  But I don't

**Page 7**

1  remember all the -- every conversation I had with her.
2  It was an incoming call center.  We talked all day on
3  the phone.
4     Q.  Fair enough.  Well, let me ask you this.  Do
5  you remember anything specifically about the Sellers'
6  loan?
7     A.  I remember her only that she -- we had many
8  conversations, because she called me quite a bit,
9  just -- and I answered all of her questions.
10        But, I mean, I don't know exactly what -- I
11 could not quote what we said, but it was just she had
12 a lot of questions.  I answered them.  That was that.
13    Q.  Do you remember what her questions were
14 about?
15    A.  Just, you know, your standard questions when
16 you are doing a loan; what are my fees, you know,
17 things like that.  But I don't remember a specific
18 question that she asked.
19    Q.  Do you remember if she ever asked any --
20 well, let me back up.  Do you recall whether the loan
21 that is referred to in Exhibit 2, whether it was an
22 option ARM loan?
23    A.  It was an option ARM loan.
24    Q.  Do you remember whether Ms. Sellers asked
25 you any questions about how option ARM loans work?

**Page 8**

1     A.  I don't remember her specifically.  I know
2  that everyone -- I mean, everyone asks when we are
3  doing a loan, like, well, you know, what do you have
4  and just -- I don't know anyone that doesn't ask that,
5  what they are getting into.  But we answer all the
6  questions truthfully and honestly and explain the loan
7  the same way every time.
8     Q.  Well, let me ask you specifically.  Did you
9  ever lie to Ms. Sellers about her loan terms?
10    A.  No.
11    Q.  Do you recall if you discussed with
12 Ms. Sellers the possibility of negative amortization
13 on her loan?
14    A.  Specifically her, no.  But we explained
15 deferred interest to everyone we put in the loan.
16    Q.  You explain it the same way to every
17 borrower?
18    A.  Correct.
19    Q.  What do you tell them about the possibility
20 of negative amortization on an option ARM loan?
21    A.  Well, we tell them that "We have you
22 approved" -- well, first we take their application.
23 Then we see what makes most sense for them depending
24 on what they are trying to accomplish.
25        Then when we call them back, you know,

**Page 57**

1  A. Yes.
2  Q. Did that criteria have a specific title?
3  A. No. I think we just go to "product
4  guidelines." I don't think it was -- it was pretty
5  straightforward.
6  Q. What about for the other lenders? You
7  mentioned Indymac, Countrywide, First Franklin, and
8  then Homefield itself.
9     They also had criteria lending guidelines
10 for their option ARM loans?
11 A. Yes.
12 Q. Generally, did those lenders' loan
13 application guidelines or criteria, did they change
14 very much while you were there?
15 A. Guidelines do change. Yeah -- and I don't
16 know what the definition of "very much" is. Minimum
17 credit scores would change. Things like sometimes
18 they would allow 30-day lates for a certain period of
19 time. I don't know if those are major changes, but,
20 yeah, they would change the requirements to get the
21 approvals.
22 Q. Who had the loosest guidelines, generally
23 speaking, while you were there?
24 A. Generally speaking, World Savings had the
25 loosest guidelines.

**Page 58**

1  Q. I'm sorry, one more time.
2  A. It would have been World Savings.
3  Q. Did World Savings have an option ARM loan
4  while you were working there at Homefield?
5  A. They did.
6  Q. Where did Downey rank as far as criteria?
7  A. In my recollection, they would have been the
8  next level as far as -- I don't know if the word is
9  "loosest guidelines," but guidelines that they fit
10 someone with different issues. It depended. I
11 believe they required you to have -- I mean, it
12 depended on the equity and things like that. But I
13 believe they went to a lower credit score. I think
14 they went to lower credit score than the other banks.
15 Q. When I said "loosest," I mean, you know,
16 they had the more relaxed were or easier for folks to
17 get loans --
18 A. Correct.
19 Q. -- under their guidelines than the other
20 lenders?
21 A. Correct. They had looser guidelines than
22 most of them.
23 Q. Back on your training -- and by "your
24 training," yours and the other sales folks that were
25 at Homefield.

**Page 59**

1     You mentioned earlier that you received not
2  only training when you started, but you received
3  training during your entire stay there as a
4  salesperson, right?
5  A. Yes.
6  Q. Every day was there at least some training
7  aspect?
8  A. Yes. It was a daily -- especially when we
9  had the application. I would work them up with the
10 manager, and we would go over the way to present it
11 and the way to explain it and the way to handle the
12 questions we were probably going to be asked. Really,
13 just to gear us up.
14    We were a sales force. So you are expected
15 to sell it and present it in a way to where we
16 emphasized the positives of it, and we can answer the
17 questions that I am sure that the customer was going
18 to have.
19 Q. Was it kind of a morning briefing kind of
20 sales training session?
21 A. I would say yes. But it was on an
22 individual basis. There was a team of 10 on my
23 particular team. He would pull us in throughout
24 the -- mine was in the morning. And sometimes he
25 would get busy with some other agents. It wouldn't be

**Page 60**

1  until the afternoon.
2  Q. Was the sales force over at Homefield, was
3  it divided up into teams?
4  A. Yes.
5  Q. How many folks were on a team?
6  A. On average 10. But it did vary depending on
7  how many the manager had hired.
8  Q. Who was ultimately in charge of the training
9  of the sales staff?
10 A. There was the corporate trainer. But,
11 again, it was a very intimate relationship. It was a
12 hands-on relationship with the manager and the sales
13 force. It was looking at deals. He knew what was
14 going on with every file.
15    He could listen in to our calls and hear us
16 after we had just talked. They recorded calls. We
17 were well aware of what we needed to do and how to
18 answer questions. You had to do it right, or you got
19 fired there.
20 Q. Did teams receive training together?
21 A. On the corporate training side, it would
22 have been together. It would have been the whole team
23 in there for roughly an hour once a week.
24 Q. Let's talk about that. You mentioned the
25 corporate trainer now a couple of times.

```
 1  criteria, and we talked a little bit about Downey
 2  being next up.
 3       What was the difference? What made World --
 4  the criteria for an option ARM loan through World,
 5  what made that looser or easier for borrowers?
 6    A. World Savings did not have the credit score
 7  requirement. They were a portfolio lender. So if it
 8  made sense, they would still do it. Even though they
 9  may not meet a credit score requirement, if there was,
10  you know, a lot of equity in the property, person has
11  been on their job for a long time, they would look at
12  that and still grant the loan versus many other
13  lenders that had a rigid box of guidelines for that
14  day. If it didn't fit, they probably could not go
15  there.
16    Q. Did you receive training specifically to
17  World option ARM loans as opposed to Downey option ARM
18  loans?
19    A. There was a World account representative
20  that came by once a week and she would, you know, help
21  us, you know, with the things. But we would go to
22  them if we couldn't get it approved anywhere else. It
23  was usually a call, "This is what I have, do you think
24  you can do this loan," and they would tell us.
25    Q. And World actually had an account
                                                 Page 85
```

```
 1  representative come to your guys' office on a weekly
 2  basis?
 3    A. Correct.
 4    Q. Do you know what her name was?
 5    A. Her name -- I don't remember.
 6    Q. Downey didn't have that same arrangement,
 7  though. They didn't send around a customer
 8  representative to your office?
 9    A. They very well may have. I did not usually
10  engage with the account reps coming in. Most things
11  could be handled over the phone or faxed. It was a
12  much quicker way to get answers.
13    Q. All the other lenders that you sold option
14  loan products for, they all had credit score criteria
15  except for World?
16    A. Correct.
17    Q. Do you sell World option ARM loans
18  currently?
19    A. I can. I have not done one for a while.
20    Q. What about the Downey option ARM loan, do
21  you currently sell those?
22    A. I do not. Because I am not approved with
23  Downey.
24    Q. The World Savings option ARM loans while you
25  worked at Homefield back in 2004, because their
                                                 Page 86
```

```
 1  criteria was loose, did you sell more of their
 2  products than the other products?
 3    A. No, very few. Because it took a long time
 4  to close with them. Again, I am marketing -- the
 5  people that called us usually did qualify based on how
 6  they, I guess, would buy the information.
 7       But most people just didn't -- we didn't
 8  have to go there. So we didn't. But I closed a few
 9  there as well.
10    Q. If World didn't have a credit score
11  criteria, did they have other -- did this
12  representative or somebody give you other written
13  criteria or considerations that World looked at
14  whether or not -- in determining whether or not they
15  would approve an option ARM loan?
16    A. With World Savings they were worried about
17  the equity in the property. They would send out their
18  own appraiser as well as our appraiser, and usually
19  their appraisals were very, very low. They were very
20  conservative because of two reasons; you had to pay --
21  somebody had to pay for that appraisal, and also it
22  was time consuming for the process.
23    Q. Okay. I think you may have answered this,
24  and I apologize if I have asked you. You worked for
25  several other companies; Ditech, Advantix, after
                                                 Page 87
```

```
 1  Homefield. You did not sell Downey option ARM loan
 2  products when you were at Ditech or Advantix; is that
 3  right?
 4    A. Ditech was just GMAC. Advantix, I don't
 5  believe we were approved with them.
 6    Q. When you were at Advantix, did you sell
 7  World Savings option ARM loans?
 8    A. I did.
 9    Q. You did?
10    A. Yes.
11    Q. Did you sell a lot of those?
12    A. Not a lot, a couple.
13    Q. Did they have the same lending criteria when
14  you worked for Advantix as they did up in Homefield?
15    A. No. They now have credit score
16  requirements, and it was tough to go there versus when
17  I was at Homefield.
18    Q. So it would have been in 2006 when you
19  worked for Advantix, World had initiated a policy of
20  setting credit scores and made it tougher to get a
21  loan through them?
22    A. Correct. Again, I only would look at it on
23  an individual basis. I have my specific situation. I
24  would see where I could go with it. So since the
25  guidelines do change, there is no reason to memorize
                                                 Page 88
```

**Page 93**

1  retain the original and make it available upon
2  reasonable request.
3      If for any reason we do not provide a signed
4  copy to counsel, a certified copy of the transcript
5  can be used for all purposes. We will further
6  stipulate to relieve the court reporter of her duties.
7  Anything further.
8      MR. LEBOFF: So stipulated.
9      MR. EYERLY: Thank you very much.
10     (The deposition of JON FINLEY concluded at
11  12:03 p.m.)

**Page 94**

9   I, JON FINLEY, do hereby declare under the penalty of
10  perjury that I have read the foregoing transcript;
11  that I have made any corrections as appear noted, in
12  ink, initialed by me, or attached hereto; that my
13  testimony as contained herein, as corrected, is true
14  and correct.
15      EXECUTED this _____ day of _____,
16  20____, at _____, _____.
17          (City)          (State)

20          _____
21              JON FINLEY

**Page 95**

3       I, the undersigned, a Certified Shorthand
4   Reporter of the State of California, do hereby
5   certify:
6       That the foregoing proceedings were taken
7   before me at the time and place herein set forth; that
8   any witnesses in the foregoing proceedings, prior to
9   testifying, were duly sworn; that a verbatim record of
10  the proceedings was made by me using machine shorthand
11  which was thereafter transcribed under my direction;
12  that the foregoing transcript is a true record of the
13  testimony given.
14      Further, that if the foregoing pertains to
15  the original transcript of a deposition in a Federal
16  Case, before completion of the proceedings, review of
17  the transcript [ ] was [ ] was not requested.
18      I further certify I am neither financially
19  interested in the action nor a relative or employee of
20  any attorney of party to this action.
21      IN WITNESS WHEREOF, I have this date
22  subscribed my name.
23  Dated:_____

25          PATRICIA Y. SCHULER, RPR
            CSR NO. 11949

# Exhibit No. 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re: HP INKJET PRINTER LILTIGATION,<br><br>This Document Relates to:<br><br>All Actions | Case No.: C 05-3580 JF (PVT)<br><br>**FURTHER ORDER RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES** |

On April 29, 2008 the parties appeared before Magistrate Judge Patricia V. Trumbull for further hearing on Plaintiffs' motion to compel discovery responses.[1] Based on all of the briefs, arguments and other materials submitted by the parties, and the file herein,

IT IS HEREBY ORDERED that Plaintiffs' motion is GRANTED IN PART and DEFERRED IN PART. Plaintiffs' motion is granted with regard to the contact information for the customers who made the complaints reflected in the 169[2] identified customer complaint entries (the "Complaining

---

[1] The parties first appeared for hearing on this motion on February 19, 2008. After that hearing, the court continued the hearing to April 15, 2008, to allow for further meet and confer, and for the parties to take certain actions agreed upon at the hearing. The court also set a deadline for the parties to file a joint statement regarding the status of the discovery dispute. The parties filed their joint statement on April 4, 2008. Based on the parties' joint statement, the court further continued the hearing to April 29, 2008 and ordered Plaintiffs to file copies of the 179 complaint entries for which they are requesting contact information, along with a copy of their draft privacy notice. Plaintiffs submitted the complaint entries and their draft privacy notice along with copies of various California cases on which they based the wording of their draft privacy notice. In response, Defendant filed a request to submit its proposed form of privacy notice. A couple of days later it filed copies of various California cases that deal with privacy issues in discovery.

[2] Plaintiffs had identified 179 complaint entries in Exhibit A to the April 18, 2008 letter from their counsel to the court (Docket No. 158). At the hearing Plaintiffs agreed to omit Entry Nos. 54, 60, 82, 90, 97, 99, 107, 136, 138 and 157 from the list, leaving 169 entries at issue at this time.

ORDER, *page 1*

Customers"). Before providing the contact information, Defendant shall send to the Complaining Customers a privacy notice in the form of privacy notice proposed by Plaintiff as modified by the parties on the record at the hearing.[3] Defendant shall send out those notices no later than May 13, 2008. No later than June 3, 2008, Defendant shall produce to Plaintiffs the contact information for each of the Complaining Customers, except those who have returned the Refusal of Consent to be Contacted.

The information sought is relevant to Plaintiffs' claims. Defendant has not specified any of the 169 identified customer complaints that do not relate to HP printer ink levels and/or ink level messages. Instead, it argues that it is not clear from some of the customer complaints whether the complaint is relevant to Plaintiffs' claims, implying that to be relevant the customer must have claims similar to Plaintiffs' claims. However, a customer complaint need not include all of the elements of Plaintiffs' legal claims in order to be relevant to those claims. From the court's review of a significant sample of the 169 identified customer complaint entries, it appears the Complaining Customers may well have knowledge that is relevant to Plaintiffs' claims.

The privacy rights of Defendant's customers do not preclude this discovery. Where federal jurisdiction is founded on the diversity of the parties pursuant to the Class Action Fairness Act, state privilege law applies to discovery dispute. *See Martin v. Lafon Nursing Facility of the Holy Family, Inc.*, 244 F.R.D. 352, 355-56 (E.D. La. 2007). Under California law, the right to privacy is set forth in Article I, Section I of the California Constitution. It is not an absolute right, but a right subject to invasion depending on the circumstances. *See Hill v. National Collegiate Athletic Ass'n*, 7 Cal.4th 1, 37 (1994).

In a case directly on point, the California Supreme Court last year held that an opt-out notice for pre-certification discovery of potential class members' identity and contact information was appropriate in a putative class action suit involving allegedly defective DVD players. *See Pioneer Electronics (USA), Inc. v. Superior Court*, 40 Cal.4th 360 (2007). Defendant's attempt to distinguish

---

[3] At the hearing the parties agreed that the form of privacy notice proposed by Plaintiffs would be modified to include the following portions of Defendant's proposed form of privacy notice: 1) the second sentence of the first paragraph; and 2) all of the third paragraph. The parties also agreed that the response deadline stated in the notice will be May 31, 2008.

ORDER, *page 2*

1  *Pioneer* on the grounds that many of the Complaining Customers here are not likely to be potential
2  class members is unpersuasive. The *Pioneer* court did not base its decision on the fact the
3  individuals to be contacted were potential class members, but rather on its determination that:
4  1) individuals who contact a company to complain about a product have a reduced expectation of
5  privacy in the contact information they supply to the company; and 2) disclosure of those
6  individuals' identities and contact information to the named plaintiff in a putative class action, after
7  notice to those individuals and opportunity to object, was not a serious invasion of their privacy.
8  The court noted that these factors alone could end the inquiry. However, the court went on to
9  evaluate the trial court's balancing of the competing interests. In doing so, the court expressly noted
10 that "'the identity and location of persons having (discoverable) knowledge' are proper subjects of
11 civil discovery. [citations omitted.] In a real sense, many of Pioneer's complaining customers would
12 be *percipient witnesses* to relevant defects in the DVD players." *Ibid*. at 374. In light of this recent
13 controlling California Supreme Court case authority, the older appellate and district court cases cited
14 by Defendant are inapposite.

15  IT IS FURTHER ORDERED that the remainder of Plaintiff's motion is DEFERRED until
16 after Judge Fogel rules on Plaintiff's motion for class certification. Within 5 court days after Judge
17 Fogel enters his ruling on that motion, the parties shall meet and confer regarding the scope of their
18 remaining dispute regarding the subject discovery. If the parties cannot resolve their remaining
19 disputes over the subject discovery, Plaintiffs may file a renewed motion to compel on two weeks'
20 notice, setting forth their position regarding the parties' remaining disputes. Defendant shall file its
21 opposition no later than one week before the hearing. No reply shall be filed absent further order of
22 the court.

23  IT IS FURTHER ORDERED that, in the event District Judge Fogel issues an order denying
24 Plaintiffs' motion for class certification, the portion of this order granting in part Plaintiffs' motion
25 to compel shall be deemed stayed.

26 Dated: *4/30/08*

27 *Patricia V. Trumbull*
PATRICIA V. TRUMBULL
United States Magistrate Judge

ORDER, *page 3*